**Sedley ALLEY, Petitioner,**

v.

**Ricky BELL, Respondent.**

**No. 97–3159–D/V.**

United States District Court,
W.D. Tennessee,
Western Division.

Jan. 18, 2000.

Robert L. Hutton, Glankler Brown, PLLC, Memphis, TN, Sedley Alley, pro se, Paul R. Bottei, Henry Alan Martin, Esq., Office of the Federal Public Defender, Nashville, TN, for Sedley Alley, petitioner.

Glenn R. Pruden, Office of Attorney General, *Criminal Justice Division*, Nashville, TN, for Ricky Bell, Warden, respondent.

## ORDER OF DISMISSAL ORDER DENYING CERTIFICATE OF APPEALABILITY ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH AND ORDER VACATING STAY OF EXECUTION

DONALD, District Judge.

## TABLE OF CONTENTS

A. INTRODUCTION ................................................... 601

B. STATE COURT PROCEDURAL HISTORY ................................. 602

C. PETITIONER'S FEDERAL HABEAS CLAIMS ............................. 607

D. ANALYSIS OF THE MERITS ......................................... 612

 I. Claims Not Cognizable In Federal Habeas ............................... 612

 II. Analysis Of Procedurally Defaulted Claims ............................... 612
 A. Legal Standard for Procedural Default ............................... 612
 B. Specific Procedurally Defaulted Claims ............................... 614
 1. Judicial Bias ..................................................... 614
 2. Procedurally Defaulted Claims of Withholding of Evidence ......... 618
 3. Improper Jury Instructions ...................................... 620
 4. Caldwell Error ................................................. 622
 5. Unconstitutionality of Death Penalty Statute ..................... 628
 6. Electrocution Violates the Eighth Amendment .................... 630
 7. Prosecutorial Misconduct During Voir Dire ...................... 630
 8. Denial of the Right to Sit at Counsel Table ...................... 631
 9. Denial of the Right to Not be Viewed in Jail Garb ................ 632
 10. Unconstitutional Victim–Impact Evidence or Argument ........... 632
 11. Ineffective Assistance of Counsel ............................... 632

 III. Analysis of Claims Considered on the Merits ........................... 633

 A. Legal Standard for Merits Review ................................... 633
 B. Specific Claims for Substantive Review ............................. 634
 1. Judicial Bias ..................................................... 634
 2. Evidentiary Rulings Deprived Petitioner of a Defense ............. 638
 3. Unconstitutional Aggravating Circumstance ...................... 640
 4. Unconstitutional Jury Instruction on Reasonable Doubt ........... 644
 5. Unconstitutional Jury Instruction on Malice ..................... 646
 6. Unconstitutional Use of Victim–Impact Evidence ................. 648
 7. Unconstitutional Exclusion of Jurors Jarred and Todd ............ 649

 8. Prosecutorial Misconduct During Cross–Examination . . . . . . . . . . . . . .653
 9. Prosecutor's Improper Use of Victim–Impact Evidence . . . . . . . . . . . .654
 10. Insufficient Evidence of Deliberation . . . . . . . . . . . . . . . . . . . . . . . . . . .654
 11. Insufficient Evidence of Premeditation . . . . . . . . . . . . . . . . . . . . . . . . . .656
 12. Improper Instructions on Deliberation and Premeditation . . . . . . . . . .657
 13. Burden–Shifting Instructions on Mitigation . . . . . . . . . . . . . . . . . . . . . .658
 14. Prosecutor's Misconduct During Voir Dire . . . . . . . . . . . . . . . . . . . . . . .659
 15. Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .659

C. Legal Standard for Sixth Amendment Claims . . . . . . . . . . . . . . . . . . . . . . . . . .659

D. Analysis of Specific Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .660
 1. Inadequate Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .660
 2. Failures to Make Objections to Victim–Impact Evidence . . . . . . . . . . .662
 3. Failure to Object to Prosecution Arguments and Jury Instruc-
 tions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .662
 4. Failure to Seek Trial Judge's Recusal for Bias . . . . . . . . . . . . . . . . . . .662
 5. Inadequate Cross–Examination of Expert Witnesses . . . . . . . . . . . . . . .663
 6. Inadequate Presentation of Mitigating Evidence . . . . . . . . . . . . . . . . . .663
 7. Inadequate Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .664
 8. Failure to Raise Insufficient Evidence . . . . . . . . . . . . . . . . . . . . . . . . . .664
 9. Failure to Challenge Constitutionality of Tennessee Death Pen-
 alty Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .664
 10. Failure to File a Petition for Rehearing on Direct Appeal . . . . . . . . . .665

E. APPEAL ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .666

 I. Certificate of Appealability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .666

 II. In Forma Pauperis Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .667

 III. Vacation of Stay of Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .667

## TABLE OF AUTHORITIES

### FEDERAL CASES

Adams v. Jago, 703 F.2d 978, 981 (6th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .125
Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) . . . . . . . . . . . . . . .103
Amos v. Scott, 61 F.3d 333, 340–41 (5th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . .53–55, 59
Anderson v. Harless, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) . . . . . . . . . . . . . . . . .25
Austin v. Bell, 126 F.3d 843, 847 (6th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .94–96
Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090
 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .141
Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69
 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54
Berger v. United States, 255 U.S. 22, 31, 41 S.Ct. 230, 65 L.Ed. 481
 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 74
Blanton v. Elo, 186 F.3d 712 (6th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 81
Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) . . . . . . . . . . . . . . .101
Boyde v. California, 494 U.S. 370, 376, 110 S.Ct. 1190, 108 L.Ed.2d 316
 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .124
Boysiewick v. Schriro, 179 F.3d 616, 621 (8th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . .76
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) . . . . . . . . . . . . 38, 39
Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d
 353 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 111, 112
Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1991) . . . . . . . . . . . . . . .93
Caldwell v. Mississippi, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86
 L.Ed.2d 231 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
Caldwell v. State, 1994 WL 716266 (Tenn.Crim.App. Dec.28, 1994) . . . . . . . . . . . . . . . . . . .51
Campbell v. State, 1993 WL 122057 (Tenn.Crim.App. Apr.21, 1993) . . . . . . . . . . . . . . . . . . .51

Cardwell v. Greene, 152 F.3d 331, 339 (4th Cir.1998) ................................69
Carpenter v. Mohr, 163 F.3d 938, 944–45 (6th Cir.1998) ........................ 48, 60, 74
Cartwright v. Maynard, 822 F.2d 1477, 1485 (10th Cir.1987) ...................... 86, 88
Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705
 (1967) ..........................................................111–113
Coe v. Bell, 161 F.3d 320, 330 (6th Cir.1998) ........................... 48, 50, 56, 96, 99
Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d
 640 (1991) ...........................................23, 25, 26, 37, 53, 59,
 61, 65, 67, 103, 138
Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636
 (1986) ..........................................................80
Crane v. Sparkman, No. 97–5321, 1998 WL 598725 at * 6 (6th Cir.
 Aug.27, 1998) ..................................................76
Dorman v. Wainwright, 798 F.2d 1358, 1363 (11th Cir.1986) ......................64
Dugger v. Adams, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989)................52
Duncan v. Henry, 513 U.S. 364, 366, 115 S.Ct. 887, 130 L.Ed.2d 865
 (1995) ..........................................................25
Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854
 (1992) ..........................................................92
Estelle v. McGuire, 502 U.S. 62, 72–73, 112 S.Ct. 475, 116 L.Ed.2d 385
 (1991) ..........................................................99
Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)................66
Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935
 (1991) ..........................................................49
Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592
 (1976) ..........................................................66
Glenn v. Tate, 71 F.3d 1204, 1210 (6th Cir.1995).................................126
Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)................86
Granberry v. Greer, 481 U.S. 129, 133–34, 107 S.Ct. 1671, 95 L.Ed.2d
 119 (1987) ......................................................24
Gray v. Netherland, 518 U.S. 152, 162–63, 116 S.Ct. 2074, 135 L.Ed.2d
 457 (1996) .......................................... 24, 25, 29, 59
Hall v. Iowa, 705 F.2d 283, 287 (8th Cir.1983)...................................22
Hannah v. Conley, 49 F.3d 1193, 1194–95 (6th Cir.1995)........................ 28, 49
Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir.1998) .............................71
Houston v. Dutton, 50 F.3d 381 (6th Cir.1995) ..................................86
In Re Murchison, 349 U.S. 133, 134, 75 S.Ct. 623, 99 L.Ed. 942 (1955)............31, 72
In Re Winship, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368
 (1970) ..........................................................95
Isabel v. United States, 980 F.2d 60, 64 (1st Cir.1992) ...........................125
Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560
 (1979) ..........................................................114
Johnson v. State, 1991 WL 111130 (Tenn.Crim.App. June 26, 1991) ......................51
Johnson v. State, 1994 WL 90483 (Tenn.Crim.App. Mar.23, 1994) ......................51
Jones v. Toombs, 125 F.3d 945, 947 (6th Cir.1997)........................... 48, 60, 74
Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir.1997)................................142
Kirby v. Dutton, 794 F.2d 245, 247 (6th Cir.1986) ..............................22
Knapp v. Kinsey, 232 F.2d 458, 461–62 (6th Cir.1956) ........................... 32, 36
Koteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed.
 1557 (1946) .....................................................102
Lambrix v. Singletary, 520 U.S. 518, 537–38, 117 S.Ct. 1517, 137
 L.Ed.2d 771 (1997) ........................................... 91, 92
Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir.1993) ........................125, 127
Liteky v. United States, 510 U.S. 540, 550–51, 555–56, 114 S.Ct. 1147,
 127 L.Ed.2d 474 (1994) ...............................29, 73, 74, 75, 76, 77,
 79
Lockhart v. Fretwell, 506 U.S. 364, 368, 113 S.Ct. 838, 122 L.Ed.2d 180
 (1993) ..........................................................126
Lyons v. Ohio Adult Parole Authority, 105 F.3d 1063, 1073 (6th
 Cir.1997) .......................................................141

Lyons v. Stovall, — F.3d ——, 1999 WL 639577 at *12 (6th Cir. Aug.24, 1999) ................................................ 42, 43, 92

Mackall v. Angelone, 131 F.3d 442, 449 (4th Cir.1997) ................................. 68

Mackall v. Murray, 109 F.3d 957 (4th Cir.1997) ............................... 68

Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) ............................................ 31, 72, 87, 88

Martin v. Ohio, 480 U.S. 228, 234, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) ................... 122

Martin v. Solem, 801 F.2d 324, 331 (8th Cir.1986) ............................. 22

Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) ........................................ 85, 87–89, 93

McBee v. Abramajtys, 929 F.2d 264, 267 (6th Cir.1991) ........................... 49

McGore v. Wrigglesworth, 114 F.3d 601 (6th Cir.1997) ........................... 142

McQueen v. Patton, 118 F.3d 460, 464 (6th Cir.1997) ........................... 63

Montana v. Egelhoff, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) ........................................ 80, 81

Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ................ 107

Murray v. Carrier, 477 U.S. 478, 488 (1986) ............................. 26

Nelson v. Nagle, 995 F.2d 1549 (11th Cir.1993) ............................. 47

Nelson v. Solem, 714 F.2d 57, 60 n. 2 (8th Cir.1983) ........................... 22

Nevers v. Killinger, 169 F.3d 352, 361 (6th Cir.1999) ...................... 69–72, 112

Norton v. Parke, 892 F.2d 476, 479 n. 7 (6th Cir.1989) ......................... 76

O'Brien v. Dubois, 145 F.3d 16, 20 (1st Cir.1998) ............................. 69–71

O'Guinn v. Dutton, 88 F.3d 1409, 1411 (6th Cir.1996) ......................... 71

O'Guinn v. State, 1997 WL 210890 *1 (Tenn.Crim.App. Apr.29, 1997) ................... 62

O'Sullivan v. Boerckel, 526 U.S. 838, 119 S.Ct. 1728, 1732–33, 144 L.Ed.2d 1 (1999) ................................................ 25

Prtiz v. Stewart, 149 F.3d 923, 939 (9th Cir.1998) ............................. 23, 76

Parker v. Rose, 728 F.2d 392, 394 (6th Cir.1984) ............................. 52

Patterson v. New York, 432 U.S. 197, 206–07, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) ........................................ 122

Payne v. Tennessee, 501 U.S. 808, 824, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ........................................ 101

Pendleton v. State, 510 U.S. 1084, 114 S.Ct. 916, 127 L.Ed.2d 205, 1994 WL 14231 (Tenn.Crim.App. Apr. 21, 1994) ............................. 51

Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ........................................ 138

Perry v. Leeke, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989) ................... 66

Picard v. Connor, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) ........................................ 24

Pillette v. Foltz, 824 F.2d 494, 497–98 (6th Cir.1987) ......................... 25, 29, 59

Poland v. Stewart, 117 F.3d 1094, 1103–04 (9th Cir.1997) ......................... 76

Porter v. Singletary, 49 F.3d 1483 (11th Cir.1995) ............................. 29

Richmond v. Lewis, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992) .............. 85, 126

Rickman v. Dutton, 854 F.Supp. 1305 (M.D.Tenn.1994) ........................... 86

Robison v. Johnson, 151 F.3d 256, 267 (5th Cir.1998) ........................... 43

Rose v. Lundy, 455 U.S. 509, 519, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) ................... 24

Ross v. Moffitt, 417 U.S. 600, 609, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) ................. 138

Rust v. Zent, 17 F.3d 155, 160 (6th Cir.1994) ............................. 24, 26

Sandstrom v. Montana, 442 U.S. 510, 513, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) ........................................ 98

Sawyer v. Smith, 497 U.S. 227, 234, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) ........................................ 42

Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) .............. 26, 27

Shannon v. United States, 512 U.S. 573, 579–81, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) ........................................ 41, 42

Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) ................... 85

South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) ........................................ 103

Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ........................................ 57, 125–127

Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182
(1993) ................................................................93
Teague v. Lane, 489 U.S. 288, 297–99, 109 S.Ct. 1060, 103 L.Ed.2d 334
(1989) ...................................................... 26, 42, 55, 92
Tillett v. Freeman, 868 F.2d 106, 108 (3d Cir.1989) ........................22
Tumey v. Ohio, 273 U.S. 510, 520, 47 S.Ct. 437, 71 L.Ed. 749 (1927)............. 32, 72
United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 16
L.Ed.2d 778 (1966) ........................................... 73, 74
Uited States v. Levine, 80 F.3d 129, 135 (5th Cir.1996) .....................43
Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)..................93
Wainwright v. Sykes, 433 U.S. 72, 87–88, 97 S.Ct. 2497, 53 L.Ed.2d 594
(1977) ................................................................26
Wainwright v. Witt, 469 U.S. 412, 424–26, 105 S.Ct. 844, 83 L.Ed.2d
841 (1985) ........................................................103, 105
Walton v. Arizona, 497 U.S. 639, 651–52, 110 S.Ct. 3047, 111 L.Ed.2d
511 (1990) ............................................................61
West v. Johnson, 92 F.3d 1385, 1411 n. 47 (5th Cir.1996) ................ 30, 76
Witherspoon v. Illinois, 391 U.S. 510, 521, 88 S.Ct. 1770, 20 L.Ed.2d
776 (1968) ...........................................................103
Wong v. Money, 42 F.3d 313, 324–26 (6th Cir.1998) ...................... 82, 83
Wooden v. State, 1998 WL 511133 at *7 (Tenn.Crim.App. Aug.20, 1998)..................58
Workman v. Bell, 178 F.3d 759, 776–77 (6th Cir.1998)............................. 96, 136
Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir.1992) ........................127
Wright v. State, 1994 WL 115955 (Tenn.Crim.App. Apr.7, 1994).........................51
Yates v. Evatt, 500 U.S. 391, 401–02, 111 S.Ct. 1884, 114 L.Ed.2d 432
(1991) ........................................................... 97, 99

## STATE CASES

Adkins v. State, 911 S.W.2d 334 (Tenn.Crim.App.1994)................................51
Alley v. State, 882 S.W.2d 810 (Tenn.Crim.App.1994) ................................12
Alley v. State, 958 S.W.2d 138 (Tenn.Crim.App.1997) .................. 12, 59, 60, 122, 125,
127–130, 137
Buchanan v. State, 488 S.W.2d 724 (Tenn.1973) ...............................52
Burford v. State, 845 S.W.2d 204 (Tenn.1992).....................................62
Carroll v. State, 532 S.W.2d 934, 937 (Tenn.Crim.App.1975) ......................52
Carter v. State, 952 S.W.2d 417, 420 (Tenn.1997)..................................27
Cone v. State, 927 S.W.2d 579, 581–82 (Tenn.Crim.App.1995) ....................... 58, 59
Delbridge v. State, 742 S.W.2d 266, 267 (Tenn.1987) ..............................51
Freeman v. Jeffcoat, No. 01A01–9103–CV–00086, 1991 WL 165802
(Tenn.App. Aug.30, 1991) ............................................50
House v. State, 911 S.W.2d 705, 713–14 (Tenn.1995) ....................... 49, 50, 58
Kinsey v. State, 545 So.2d 200, 203 (1989) ...................................138
Pryor v. State, 632 S.W.2d 570 (Tenn.Crim.App.1982)..............................52
Roberts v. State, 335 So.2d 285 (Fla.1976)..........................................44
Sands v. State, 903 S.W.2d 297 (Tenn.1995) .......................................62
Shell v. State, 554 So.2d 887, 903 (Miss.1989) ...................................86
State v. Alley, 776 S.W.2d 506 (Tenn.1989) .........................3, 6, 7, 12, 80–82, 114,
124, 138, 139
State v. Banks, 564 S.W.2d 947, 949 (Tenn.1978) .................................81
State v. Bland, 958 S.W.2d 651, 660 (Tenn.1997) .............................115, 117
State v. Brown, 836 S.W.2d 530, 543 (1992) ............................ 115, 119, 120
State v. Gentry, 881 S.W.2d 1, 4–5 (Tenn.Crim.App.1993) .........................115
State v. Hines, 919 S.W.2d 573, 581 (Tenn.1995)....................................91
State v. Lee, 634 S.W.2d 645, 647 (Tenn.Crim.App.1982) ...........................52
State v. Williams, 690 S.W.2d 517, 526–27 (1985) ................................86
State v. Wilson, 530 S.W.2d 766, 768–69 (Tenn.1975)................................51
Stewart v. State, 534 S.W.2d 875 (Tenn.Crim.App.1976)..............................52
Strouth v. State, 755 S.W.2d 819, 822 (Tenn.Crim.App.1986) ........................51
Swanson v. State, 749 S.W.2d 731, 734 (Tenn.1988) ................................55
Wooden v. State, 898 S.W.2d 752, 754 (Tenn.Crim.App.1994)............................50

Workman v. State, 868 S.W.2d 705 (Tenn.Crim.App.1993) ............................51

**FEDERAL STATUTES**

18 U.S.C. § 1361 ......... 74, 75
21 U.S.C. § 848(q) ......... .2
28 U.S.C. § 144 ......... .73
28 U.S.C. § 455 ......... .75
28 U.S.C. § 1913 ......... 142
28 U.S.C. § 1915 ......... .2
28 U.S.C. § 1917 ......... 142
28 U.S.C. § 2251 ......... 2, 143
28 U.S.C. § 2254 ......... 2, 12, 18, 22
28 U.S.C. § 2254(a) ......... .21
28 U.S.C. § 2254(b) ......... 23, 24
28 U.S.C. § 2254(d) ......... 68, 105
28 U.S.C. § 2254(e)(1) ......... 106
28 U.S.C. § 2253(c) ......... 140
Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–
 132, Title I, § 102, 110 Stat. 1220 (Apr. 24, 1996) ......... 2, 141
F.R.A.P. 24(a) ......... 142, 143
Insanity Defense Reform Act, 18 U.S.C. §§ 17, 4241–4247 ......... .41
Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(b) ......... 142
Rule 4, Rules Governing Section 2254 ......... .24
Rule 8(a), Rules Governing Section 2254 ......... 140

**STATE STATUTES**

Tenn.Code Ann. § 33–7–303 ......... .40
Tenn.Code Ann. § 39–2–20 ......... 122
Tenn.Code Ann. § 39–2–203(i) ......... .85
Tenn.Code Ann. § 40–30–102 ......... .27
Tenn.Code Ann. § 40–30–102 (1990) ......... .50
Tenn.Code Ann. § 40–30–112 ......... 27, 49
Tenn.Code Ann. § 40–30–201 ......... 27, 62
Tenn.Code Ann. § 40–30–202(a) ......... .44
Tenn.Code Ann. § 40–30–217(a)(1) ......... 40, 62
Tenn.Code Ann. §§ 40–30–101 to 124 ......... .27

**OTHER AUTHORITIES**

16 Whittier Law Review 645, 666–69 (1995) ......... .44
68 U.S.L.W. 3008 (June 22, 1999) ......... .48
81 A.L.R.4th 659 ......... .44
Ala. Rules of App. Proc. 39 ......... 138

## A. INTRODUCTION

Petitioner, Sedley Alley, is confined as an inmate on death row at the Riverbend Maximum Security Facility in Nashville, Tennessee. Alley filed a series of motions related to his capital murder conviction and death sentence in the United States District Court for the Middle District of Tennessee. In preparation for filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254, Alley filed a motion for stay of execution under 28 U.S.C. § 2251, a motion under 28 U.S.C. § 1915 to proceed *in forma pauperis* in filing the habeas petition, an affidavit in support of the § 1915 motion, and an application under 21 U.S.C. § 848(q) for appointment of counsel to prepare and file a § 2254 habeas petition.

The Middle District Court granted a stay of execution, granted leave to proceed *in forma pauperis,* and transferred the petition to this District. This Court appointed counsel for Alley, and counsel has

filed a habeas petition and two subsequent amendments. The State has filed answers to the petition and both amendments and has filed the complete state court record with the Court. The Court has previously entered a number of orders, the most significant of which for purposes of this final order are the orders holding inapplicable to this petition Chapter 154 of Title 28 of the United States Code, enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, Title I, § 102, 110 Stat. 1220 (Apr. 24, 1996), and holding applicable to this petition Chapter 153 of Title 28, as amended by the AEDPA.

## B. *STATE COURT PROCEDURAL HISTORY*

In March of 1987, a Shelby County, Tennessee, Criminal Court jury convicted petitioner of kidnapping, raping, and murdering United States Marine Corps Lance Corporal Suzanne Marie Collins and sentenced him to death by electrocution. The Tennessee Supreme Court affirmed the conviction and sentence. *State v. Alley*, 776 S.W.2d 506 (Tenn.1989). A proper consideration of this federal habeas petition requires a detailed recitation of the procedural history in state court, beginning with the facts of the murder itself. The following recitation is taken from the Tennessee Supreme Court's opinion.

At approximately 10:00 p.m. on 11 July 1985 [Collins] left her barracks dressed in physical training gear, a red Marine T-shirt, red Marine shorts, white socks and tennis shoes and went jogging on the Base, north of Navy Road. Her roommate indicated that the victim had been too busy that day to work out at the gym, which was closed at that time of night. Her body was found the next morning in Orgill Park, which adjoins the Naval Base, north of Navy Road.

Defendant was not in the military service but was married to a military person and they lived on the Naval Base. He was employed by a Millington heating and air conditioning company. He was almost 30 years old, had two children, born of an earlier marriage, living in Kentucky, and had a history of alcohol and substance abuse. After appropriate Miranda warnings defendant waived the presence of an attorney and gave a lengthy statement of his activities that resulted in the death of Suzanne Collins to officers of the Naval Investigating Service on the morning of 12 July 1985. The statement was tape recorded with defendant's permission. A narrative account of the relevant events of that evening as he related them to the Naval officers follows.

About 7:00 p.m. on 11 July 1985, his wife left with two women to go to a Tupperware party. Defendant had been drinking beer before they left and by approximately 9:00 p.m. he had consumed an additional six-pack and a fifth of wine. At that time he drove his 1972 Mercury station wagon, with a Kentucky license tag to the Mini Mart and purchased another six-pack. He was depressed, lonely and unhappy. He had no friends "of his own" here. He missed his two children, his mother and father, all Kentucky residents. He was torn between going to Kentucky, staying where he was, or driving the car into a wall to kill himself. He drove to the north side of the Base, parked on a lot near the golf course and started running toward Navy Lake. He ran past a girl jogging and before he got to the lake he stopped, she caught up with him and they had a brief conversation. He did not know her name and had never seen her before. They turned around and jogged back to his car. He stopped there out of breath, and she continued on toward the gate at Navy Road. He started driving down the road toward that gate in spite of his apparent recognition that he was drunk and weaving from side to side on the roadway. Parenthetically, the asphalt road in that vicinity has narrow lanes, no curb, the grass covered shoulders and nearby ter-

rain are approximately level with the roadway. He heard a thump and realized he had struck the girl jogger. Quoting from his statement, "she rolled around and screamed a couple of times and I ran over and grabbed her and told her I was going to take her to the hospital. I helped her into the car and we started towards...."

On the way to the hospital defendant said that she called him names such as a drunken bastard and threatened to get him in trouble and he tried to calm her down, without success. When he reached the traffic light on Navy Road near the 7/11 store he turned left and again went to the north part of the Base in the vicinity of the lake. He described in considerable detail the subsequent events, that included hitting her a few times, holding her down on the ground, and sticking a screwdriver in the side of her head, [FN1] under circumstances apparently calculated by defendant to appear to be accidental. All of these actions were because she would not listen to his pleas not to turn him in.

FN1. The forensic pathologist testified that she did not have an injury to her head inflicted in the manner or means described by defendant, nor did she have any injuries that could have been caused by being struck by an automobile.

He insisted that he did not have sex with her at any time, nor did he even try at any time. He insisted that he was scared of the trouble she was threatening him with and was drunk and could not think clearly. After sticking the screwdriver in her head and her collapse, he decided to make it appear that she had been raped. He took off her clothes, and dragged her by the feet over near a tree. There he broke off a tree limb, inserted it in her vagina and "pushed it in." He then ran to the car and drove away.

The State called numerous witnesses who observed some of the movements of defendant and victim that night.

A Naval officer driving north toward the lake on the Base passed two male Marines jogging north, and later saw a female Marine in red T-shirt and red shorts also jogging north. After passing the lone Marine he saw a white male near an old station wagon with wood paneling that was parked on an empty lot near the buffalo pens. The two Marines testified that as they jogged north a female Marine was jogging south and shortly thereafter they encountered a station wagon with wood grain paneling also going south that swerved over into the north lane towards them. The car continued on southward and when they were several hundred yards further north they heard a female voice screaming in distress, "Don't touch me", "Leave me alone." They immediately turned around and ran south in the direction of the scream. It was too dark to see any activity very far ahead and before they reached the scene they saw the station wagon drive off toward the main gate. At that time they were about 100 yards away and were able to observe that the station wagon was off the road in the grass, near the fence, on the left or wrong side for a vehicle going south. Suspecting a kidnapping they continued on to the gate and gave a full report of what they had witnessed. They accompanied military security personnel on a tour of the residential areas of the Base looking for the station wagon, without success. However, after they returned to their barracks, they were summoned to the security offices where they identified the station wagon. Defendant had been stopped and brought in for questioning as had his wife. Their responses had allayed any suspicion that defendant had been connected with a kidnapping and they were allowed to go home. All of these events occurred before approximately 1:00 a.m., 12 July 1985. The victim's body was found shortly before

6:00 a.m. on that date and defendant was promptly arrested by the military police.

After completing the statement, defendant voluntarily accompanied officers over the route he had taken the night before and to the location of the murder and accurately identified various things, including the tree where he had left the body and where it was found by others and from which the limb he used had been broken.

The pathologist, Dr. James Bell, testified that the cause of death was multiple injuries. He also identified several specific injuries, each of which could have been fatal. The victim had bruises and abrasions over her entire body, front and back. He testified that the injuries to the skull could have been inflicted by the rounded end of defendant's screwdriver that was found near the scene, but not by the pointed end. He identified the tree branch that was inserted into the victim's body. It measured 31 inches in length and had been inserted into the body more than once, to a depth of twenty inches, causing severe internal injuries and hemorrhaging. The pathologist was of the opinion that the victim was alive when the tree limb was inserted into her body. There were also bruises on the victim's neck consistent with strangulation.

*Id.* at 508–10.

On October 25, 1985, the Shelby County Grand Jury returned indictments against petitioner on charges of First Degree Murder, Murder During the Perpetration of a Kidnapping, and Murder During the Perpetration of Rape (case number 85–05085), Aggravated Kidnapping (case number 85–05086), and Aggravated Rape (case number 85–05087). State Trial Court Record, Addendum 1 (hereinafter Addendum 1) at 2–11. On October 31, 1985, Shelby County Criminal Court Judge W. Fred Axley arraigned petitioner, found him indigent, appointed the Shelby County Public Defender to represent him, and set a report date for December 5, 1985. *Id.* at 14. On December 5 the defendant, through Edward G. Thompson and Robert Jones of the Public Defender's Capital Defense Team moved to continue the case for motions and report until January 6, 1986, and requested an extension of time to file pre-trial motions. Judge Axley granted this motion. *Id.* at 15. On December 9, 1985, the defendant filed a variety of pre-trial motions. *Id.* at Table of Contents pp. 1–2.[1] On January 6, 1986, Judge Axley granted the defendant's motion to continue the case for motions and report until January 31, 1986. *Id.* at 15. On January 29, 1986, the defendant's counsel appeared in open court and made an oral motion to transfer defendant to a hospital for a complete neurological examination to determine if he suffered from brain damage. *Id.* at 19. Judge Axley granted this motion. *Id.* On January 31, 1986, Judge Axley ruled on most of the above pre-trial motions, continued the case for consideration of other motions until February 28,

1. Defendant filed motions seeking: discovery; pre-trial hearings on motions; disclosure of the State's intent to seek the death penalty; disclosure of the State's intention to use various evidence; disclosure of witness statements; dismissal of the indictment (asserting, inter alia, that the Tennessee Death Penalty Statute is unconstitutional because it requires a jury to return a sentence of death if it finds some aggravating and no mitigating circumstances and because the aggravating circumstance "heinous, atrocious or cruel in that it involved torture or depravity of mind" is unconstitutionally vague); a hearing on what prior crimes or bad acts the State could use to impeach the defendant if he testified; disclosure of the identity of sentencing phase witnesses; disclosure of the aggravating circumstances on which the State intended to rely at sentencing; a written response from the prosecution to all defense pre-trial motions; an instruction that the jury should presume that any sentence would be carried out as required by state law; disclosure of information that could be used to impeach prosecution witnesses; disclosure of the arrest history of prosecution witnesses; empaneling of separate juries to consider guilt and punishment; disclosure of the list of prospective jurors; and disclosure of exculpatory evidence.

1986, and scheduled the trial for March 17, 1986. *Id.* at 80–81.

On February 28, 1986, the prosecution filed a Tenn. R.Crim. P. 12.2(a), (b) motion seeking notice of the defendant's intent to rely on a defense of insanity. *Id.* at 96. That same day, Judge Axley ruled on some of the remaining motions, continued the case until March 5, 1986, for consideration of those motions not then decided, and set a new trial date of April 14, 1986. *Id.* at 97.

On Friday, April 4, 1986, however, the defendant filed a motion seeking a transfer to a hospital for a mental examination. *Id.* at 104; Transcript of Hearing on Transfer Motion, Addendum 2 (hereinafter Addendum 2) at 8. At the request of defense counsel, Judge Axley conducted an *in camera* examination of clinical psychologist Dr. Allen Overton Battle to determine whether to order the defendant's hospitalization. Addendum 2. On April 2 and 3, 1986, Dr. Battle examined the defendant in the jail, at the request of his attorneys. *Id.* at 20. Dr. Battle testified at the April 4 hearing that he had concerns over whether Alley suffered from multiple personalities and that a temporary commitment at the City of Memphis Hospital was needed to ascertain whether a thirty-day psychiatric evaluation was necessary. *Id.* at 21, 64. Although the prosecution at that hearing requested that Judge Axley deny any continuance of either the trial date or the suppression motions set for that day, Judge Axley expressly found that he could not rule on a motion to suppress the defendant's confession without resolving whether he was competent at the time he confessed, and that he could not rule on the defendant's competence without adequate testimony from expert witnesses. *Id.* at 68–69. Judge Axley continued the motion to hospitalize the defendant until the following Monday, April 7, 1986. *Id.* at 69.

On Monday, April 7, Judge Axley entered an order directing a mental evaluation of the defendant to determine his competence to stand trial. Addendum 1 at 105. That afternoon, Judge Axley conducted a hearing on the defendant's competency. Transcript of Hearing, Addendum 3. The prosecution presented testimony by Dr. Lynne Zager, Ph.D., a clinical psychologist and director of forensic services at the Midtown Mental Health Center. *Id.* at 2–3. Dr. Zager recommended a thirty-day psychiatric evaluation to determine whether the defendant was competent at the time he committed the murder, and Judge Axley ordered the evaluation. *Id.* at 8; Order Directing Transfer for Mental Evaluation, Addendum 1 at 106. Judge Axley continued the case until May 27, 1986, for a hearing to consider the results of the evaluation. Addendum 2 at 10. Judge Axley thereafter twice continued that hearing, first to June 23, 1986, Addendum 1 at 111, and then to September 22, 1986. *Id.* at 112. At the September 22 report date, Judge Axley set the competency hearing for October 3. Transcript of September 22 Pretrial Motions Hearing, Addendum 4 at 20. In the interim, on July 23, 1986, the mental evaluation team from the Tennessee Department of Mental Health and Mental Retardation had filed its report, indicating that the defendant was not then competent to stand trial and that the Department and its experts needed further time to assess whether the defendant was competent at the time he committed the crime. Addendum 1 at 113–16. Dr. Willis Marshall filed a report expressing his opinion that the defendant suffered from multiple personality disorder. *Id.* at 115.

On October 3 and 7, 1986 (a Friday and a Tuesday), Judge Axley presided at a competency hearing. *Id.* at 128, 129, 132; Transcript of Competency Hearing, Addenda 5 & 6. At the conclusion of that hearing, Judge Axley took the issue under advisement until October 24, 1986. While the hearing was recessed, on Monday, October 6, 1986, Judge Axley ordered the Department of Mental Health and Mental

Retardation to provide the Court with a copy of a videotape of a hypnosis session of the defendant conducted by Dr. Battle and of a videotape of each of the sodium amytal induced sessions conducted by Dr. Marshall. Addendum 1 at 130. On October 24, 1986, Judge Axley found that the defendant was not then presently competent to stand trial and directed his commitment to the Department for an additional sixty days for further evaluation, setting the next competency hearing for January 9, 1987. *Id.* at 135. Judge Axley thereafter continued that hearing twice more, until Monday, February 9, 1987. Transcript of Compentency Hearing, Addendum 7 (hereinafter Addendum 7). Consideration of the prosecution's motion to review the tape of the hypnosis session consumed that day, and Judge Axley reset the competency hearing itself for the following day, February 10. The hearing eventually consumed all of February 10.and part of February 11. Addendum 7. At the conclusion of the hearing, Judge Axley ruled that the defendant was competent to stand trial. *Id.* at 273–74. He then set the trial for March 2, 1986. *Id.* at 274. At that time, defense counsel raised a possible need for a continuance beyond March 2, but the Court insisted that the case would go to trial on that date. *Id.* at 277–79.

Despite this explicit ruling, and three weeks notice that the trial would definitely proceed, on February 27 defendant's counsel sought a continuance of the trial. Judge Axley granted a continuance of three working days. Transcript of Hearing on Motion for Continuance. Addendum 8 at 8. On March 2, the defendants made an oral motion in open court for a further continuance. At that hearing Judge Axley specifically noted that most of the expected medical testimony at trial would duplicate testimony at the three previous competency hearings, and denied the motion. Transcript of Hearing on Mo-

tion for Continuance, Addendum 9 at 12–13. On Wednesday, March 4, the Office of the Public Defender filed a motion to withdraw because of an inadequate chance to prepare. Transcript of Hearing on Motion to Withdraw, Addendum 10. Judge Axley then announced that the jury would not be selected until Monday, March 9, and that various pre-trial motions would be heard until Thursday, March 5. *Id.* at 3–4. Defense counsel then expressed appreciation for not beginning jury selection until the following Monday.

Judge Axley proceeded to conduct motion hearings on Thursday and Friday, and began jury selection on Monday, March 9. The trial itself did not begin until Tuesday, March 10. Judge Axley sequestered the jury. Addendum 1 at 201. The trial lasted through Wednesday, March 18, 1987. *Id.* at 204–09; Trial Transcript, Addendum 12 (hereinafter Addendum 12) at 1755. The jury began deliberating at 2:15 p.m., Addendum 12 at 1764, and returned a guilty verdict on all three crimes at 4:46 p.m. *Id.* at 1766. Judge Axley presided at the sentencing phase of the trial, at which the prosecution presented no evidence but relied on the evidence presented at the guilt phase. *Id.* at 1777. The jury retired at 8:46 p.m. *Id.* at 1839. At 10:50 p.m. the jury returned with a verdict of death. *Id.* at 1841–43. The defendant thereafter filed a new trial motion. On May 11, 1987, Judge Axley denied that motion and sentenced the defendant to two consecutive forty-year sentences on the rape and kidnapping convictions. Alley took an appeal directly to the Tennessee Supreme Court, which affirmed the conviction and sentence. *State v. Alley,* 776 S.W.2d 506 (1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990).[2]

Alley thereafter pursued post-conviction remedies through the state court system. *See Alley v. State,* 882 S.W.2d 810 (Tenn.Crim.App.1994)(vacating denial of post-conviction petition and remanding for

---

**2.** Accordingly, petitioner's conviction was final on the denial of certiorari on January 8, 1990.

further proceedings); *Alley v. State,* 958 S.W.2d 138 (Tenn.Crim.App.1997), *perm. app. denied,* (Tenn. Sept. 29, 1997). The state courts denied all relief and Alley, through counsel, now brings this petition seeking a writ of habeas corpus under 28 U.S.C. § 2254.

## C. *PETITIONER'S FEDERAL HABEAS CLAIMS*

Petitioner brings the following claims:

### I. *CLAIMS OF JUDICIAL BIAS*

Petitioner claims Judge Axley deprived him of due process by failing to conduct the trial fairly and impartially, as evinced by the following actions that demonstrated bias:

1. Judge Axley deprived petitioner of due process by engaging in an undisclosed ex parte conversation with two law students during the trial and expressing an opinion about the likelihood that petitioner would ever actually be put to death. Petition, ¶ 26(a)(1) at 8.

2. Judge Axley deprived petitioner of due process by engaging in an undisclosed ex parte conversation with jurors during trial while they were at a weekend picnic. Petition, ¶ 26(a)(2) at 8; First Amended Petition, ¶ 3 at 2.

3. Judge Axley deprived petitioner of due process by providing legal instructions to the jury during deliberations without the presence of petitioner or his counsel. First Amended Petition, ¶ 4 at 2.

4. Judge Axley deprived petitioner of due process by engaging in undisclosed ex parte contact with members of the victim's family, who sent him

 a) a letter, and

 b) a Christmas card. Petition, ¶ 26(a)(3) at 8.

5. Judge Axley deprived petitioner of due process by engaging in ex parte contact through his wife's sitting in the courtroom with the victim's family during the trial. Petition, ¶ 26(a)(4) at 9.

6. Judge Axley deprived petitioner of due process by permitting members of the victim's family to enter a hallway through which access could be had to the judge's chambers and the jury room. Petition, ¶ 26(a)(5) at 9.

7. Judge Axley deprived petitioner of due process by pressuring mental health professionals to speed up the mental examination of petitioner. Petition, ¶ 26(a)(6) at 9.

8. Judge Axley deprived petitioner of due process by excluding videotapes of the petitioner under hypnosis based on his personal belief in petitioner's lack of credibility. Petition, ¶ 26(a)(7) at 9.

9. Judge Axley deprived petitioner of due process by demonstrating hostility towards petitioner's counsel and using profanity. Petition, ¶ 26(a)(8) at 9.

10. Judge Axley deprived petitioner of due process by including false statements in the Rule 12 trial report. Petition, ¶ 26(a)(9) at 9.

11. Judge Axley deprived petitioner of due process by displaying relief at imposing the death penalty. Petition, ¶ 26(b)(1) at 10.

12. Judge Axley deprived petitioner of due process by making comments during the post-conviction proceedings that ultimately resulted in his recusal. Petition, ¶ 26(b)(2) at 10.

13. Judge Axley deprived petitioner of due process by expressing dissatisfaction with the litigation of post-conviction proceedings in other capital cases. Petition, ¶ 26(b)(3) at 10.

### II. *CLAIMS OF A DUE PROCESS VIOLATION BASED ON EVIDENTIARY RULINGS THAT DEPRIVED PETITIONER OF THE RIGHT TO PRESENT A COMPLETE DEFENSE DURING THE GUILT AND PENALTY PHASES OF THE TRIAL*

Petitioner claims that Judge Axley deprived him of a fair trial by ruling in-

admissible the videotapes of hypnosis sessions conducted by Dr. Battle and sodium amytal interrogation sessions conducted by Dr. Marshal.

1. The exclusion of the tapes undermined petitioner's fundamental right to present a complete defense of insanity during the guilt phase of the trial. Petition, ¶ 27(a) at 11.

2. The exclusion of the tapes significantly undermined fundamental elements of petitioner's insanity defense during the guilt phase, depriving him of a fair trial. Petition, ¶ 27(b) at 12.

3. The exclusion of the tapes eliminated the cornerstone of petitioner's insanity defense during the guilt phase, depriving him of a fair trial. Petition, ¶ 27(c)(6) at 13.

4. Judge Axley excluded the tapes based on his personal viewpoint of the petitioner's credibility, thereby interfering with the jury's role as the judge of the evidence. Petition, ¶ 27(i) at 18.

5. The exclusion of the videotapes during the penalty phase deprived petitioner of evidence of his character and mental state, both of which were admissible as a critical mitigation factor. Petition, ¶ 28(a)(1), (2) at 19–20.

## III. UNCONSTITUTIONALLY VAGUE AGGRAVATING CIRCUMSTANCE

Tennessee's murder statute permits imposition of the death penalty based on an unconstitutionally vague aggravating circumstance: that the murder is "heinous, atrocious or cruel in that it involved torture or depravity of mind."

1. The definition of the circumstance is facially vague. Petition, ¶ 29(a) at 23.

2. The state trial court used an unconstitutionally vague jury instruction in defining the terms heinous, atrocious, and cruel. Petition, ¶ 29(b) at 23.

## IV. UNCONSTITUTIONAL JURY INSTRUCTIONS ON REASONABLE DOUBT

The trial court gave an unconstitutional jury instruction defining reasonable doubt during the guilt and penalty phases of the trial. Petition, ¶¶ 30, 30(n) at 27, 32.

## V. UNCONSTITUTIONAL JURY INSTRUCTIONS ON MALICE

The trial court gave an unconstitutional jury instruction defining malice during the guilt phase of the trial. Petition, ¶ 31 at 33–34.

## VI. UNCONSTITUTIONAL USE OF VICTIM–IMPACT EVIDENCE

The prosecution deprived petitioner of a fair trial by seeking to persuade the jury to convict and sentence him based on sympathy for the victim and her family instead of on evidence of his guilt, as demonstrated by the following evidence and arguments at trial and sentencing.

1. The trial court permitted the display of an enlarged graduation photograph of the victim during the first two days of trial. Petition, ¶ 32(a)(1) at 35.

2. The prosecutor made opening remarks regarding the victim's character. Petition, ¶ 32(a)(2) at 35.

3. The victim's father offered irrelevant testimony regarding her character and background. Petition, ¶ 32(a)(3) at 35.

4. The prosecutor stated during guilt phase closing arguments that the victim and her family deserved justice. Petition, ¶ 32(a)(4), (5) at 35.

5. The prosecutor stated during closing arguments that the jury should put themselves in the shoes of the victim's family. Petition, ¶ 32(a)(6), (8) at 35–36.

6. The prosecutor stated during closing arguments that the victim's family had been wronged and the jury should

feel sympathy for them. Petition, ¶ 32(a)(7), (9), (10) at 36.

7. The prosecutor stated during the penalty phase arguments that "I feel like I know" the victim. Petition, ¶ 32(a)(11) at 36.

## VII. *IMPROPER EXCLUSION OF JURORS JARRED AND TODD*

Petitioner claims that the trial court erred by excluding jurors Jarred and Todd for cause. Petition, ¶ 34 at 42.

## VIII. *WITHHOLDING OF EVIDENCE*

The trial court and prosecutor deprived petitioner of due process by withholding evidence of bias and mitigation.

1. Judge Axley deprived petitioner of a fair trial by withholding evidence of his bias. Petition, ¶ 35 at 43.

2. The prosecution withheld mitigating evidence by withholding Dr. Zager's opinion on mitigation. Petition, ¶ 35 at 43.

## IX. *UNCONSTITUTIONAL JURY INSTRUCTION ON EFFECT OF VERDICT OF NOT GUILTY BY REASON OF INSANITY*

The trial court deprived petitioner of due process by instructing the jury that a not guilty by reason of insanity verdict would result in the petitioner's automatic detention in a mental facility. Petition, ¶ 36 at 43.

## X. *PROSECUTORIAL MISCONDUCT*

The prosecution employed improper cross-examination and jury arguments, and presented irrelevant evidence, in violation of the Sixth, Eighth, and Fourteenth Amendments.

1. On cross-examination of petitioner's brother during the petitioner's proof at the penalty phase, the prosecution asked whether he knew if petitioner had ever been charged with any crimes in another state, despite a complete lack of evidence that any such charges existed. Petition, ¶¶ 37, 38 at 44.

2. The prosecution's summation during the penalty phase denigrated mercy and tended to diminish the jury's responsibility for the death sentence. Petition, ¶ 37 at 44.

3. The prosecutor displayed the victim's high school graduation photograph, inviting the jury to decide the case on the basis of sympathy for her instead of the evidence of petitioner's guilt. Petition, ¶ 38 at 44.

## XI. *INSUFFICIENT EVIDENCE OF DELIBERATION*

There was insufficient evidence of the essential element of deliberation required to convict petitioner of first degree murder. Petition, ¶ 39 at 44.

## XII. *INSUFFICIENT EVIDENCE OF PREMEDITATION*

There was insufficient evidence of the essential element of premeditation required to convict petitioner of first degree murder. Petition, ¶ 39 at 44.

## XIII. *IMPROPER JURY INSTRUCTIONS ON DELIBERATION*

The trial court deprived petitioner of a fair trial by delivering jury instructions that misstated the prosecution's burden of proof on the essential element of deliberation required to convict petitioner of first degree murder. Petition, ¶ 39 at 44.

## XIV. *IMPROPER JURY INSTRUCTIONS ON PREMEDITATION*

The trial court deprived petitioner of a fair trial by delivering jury instructions that misstated the prosecution's burden of proof on the essential element of premeditation required to convict petitioner of first degree murder. Petition, ¶ 39 at 44.

### XV. UNCONSTITUTIONAL APPLICATION OF TENNESSEE DEATH PENALTY STATUTE

The Tennessee Death Penalty Statute is unconstitutional as applied to petitioner.

1. The statute requires jury unanimity on mitigating factors. Petition, ¶ 40 at 45.

2. The trial court failed to inform the jury of the effect of a non-unanimous verdict. *Id.*

3. The jury instructions shifted the burden of proof to the petitioner to show mitigating circumstances. *Id.*

4. The statute requires imposition of a death sentence in the absence of mitigating factors. *Id.*

### XVI. ELECTROCUTION IS INHERENTLY CRUEL AND UNUSUAL PUNISHMENT

Petitioner claims that any electrocution automatically violates the Eighth Amendment's ban on cruel and unusual punishment. Petition, ¶ 41 at 45.

### XVII. PROSECUTORIAL MISCONDUCT DURING VOIR DIRE

Petitioner claims that various remarks by the prosecutor during voir dire diminished the jury's responsibility for imposing the death penalty, invited jurors to feel sympathy for the victim and her family, referred to unconstitutional aggravating factors, and referred to unconstitutional instructions regarding unanimity in finding mitigating factors. Second Amended Petition, ¶ 44.

### XVIII. DENIAL OF RIGHT TO SIT AT COUNSEL TABLE

Petitioner claims that the requirement that he sit behind counsel, rather than at the counsel table, interfered with his counsel's ability to represent him. Second Amended Petition, ¶ 45.

### XIX. JURORS' VIEW OF PETITIONER IN JAIL CLOTHING

Petitioner claims that the jury viewed him in jail clothing, in violation of his right to a fair trial. Second Amended Petition, ¶ 46.

### XX. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner presents numerous claims that his trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment.

1. Counsel failed to prepare effectively for trial, in part due to the Judge's failure to grant a continuance. Petition, ¶ 33(a) at 38.

2. Counsel failed to properly interview and prepare Dr. Battle for presentation of his opinions, causing his testimony to not directly support petitioner's insanity defense. Petition, ¶ 33(b) at 38.

3. Counsel failed to object to the presentation of victim impact evidence, including the victim's graduation photograph and questions about the victim. Petition, ¶ 33(c) at 38–39.

4. Counsel on direct appeal of the conviction failed to raise a claim that references to the victim and her family in the prosecutor's closing arguments deprived petitioner of a fair trial. Petition, ¶ 33(c) at 38–39.

5. Counsel failed to seek recusal of the trial judge despite evidence of bias. Petition, ¶ 33(d) at 39.

6. Counsel failed by not properly cross-examining the prosecution's expert medical witnesses so as to demonstrate that:

a) petitioner was insane;

b) mitigating evidence existed; and

c) each expert's opinion failed to consider relevant medical evidence, including records of petitioner's medical history. Petition, ¶ 33(e) at 39.

7. Counsel failed to have Dr. Wyatt Nichols evaluate petitioner for purposes of eliciting mitigating evidence. Petition, ¶ 33(f) at 39.

8. Counsel failed to investigate and present medical evidence that petitioner's mental health problems supported both his defense and that mitigating circumstances existed. Petition, ¶ 33(g) at 39–40.

9. Counsel failed to investigate and present medical evidence to establish that petitioner's genetic disorders supported both his defense and the existence of mitigating circumstances. Petition, ¶ 33(h) at 40.

10. Counsel failed to investigate and present medical evidence to establish that petitioner has suffered brain damage, thus supporting both his defense and the existence of mitigating circumstances. Petition, ¶ 33(i) at 40.

11. Counsel failed to investigate and present evidence of the urethral dilation medical procedure performed on petitioner as a child, which would have supported both his defense and the existence of mitigating circumstances. Petition, ¶ 33(j) at 41.

12. Counsel failed to investigate and present during the penalty phase testimony from Dr. Lynn Zager as to the existence of mitigating circumstances. Petition, ¶ 33(k) at 41.

13. Counsel failed to present all available mitigating evidence during the penalty phase. Petition, ¶ 33(*l*) at 41.

14. Counsel failed to make a forceful closing argument at the close of the penalty phase. Petition, ¶ 33(*l*) at 41.

15. Counsel failed to object to cross-examination of the defendant's brother regarding non-existent prior criminal charges. Petition, ¶ 33(m) at 41.

16. Counsel failed to object to the Court's instructions on reasonable doubt during either the guilt or penal-

ty phases of the trial. Petition, ¶ 33(n) at 41.

17. Counsel failed to object to the Court's instructions on malice. Petition, ¶ 33(*o*) at 41.

18. Counsel failed to raise a defense that the State did not adduce sufficient evidence to establish the essential elements of premeditation and deliberation. Petition, ¶ 33(p) at 41.

19. Counsel failed to object to the exclusion for cause of juror Jarred. Petition, ¶ 33(q) at 41.

20. Counsel failed to raise on direct appeal the unconstitutionality of the prosecution's closing arguments. Petition, ¶ 33(r) at 42.

21. Counsel failed to object to the prosecutor's closing arguments that denigrated mercy and diminished the jury's responsibility for imposing the death sentence. Petition, ¶ 33(s) at 42.

22. Counsel failed to object to the unconstitutionality of penalty phase instructions. Petition, ¶ 33(t) at 42.

23. Counsel failed to obtain all appropriate experts for the presentation of a defense at the guilt phase. Petition, ¶ 33(u) at 42.

24. Counsel failed to obtain all appropriate experts for the presentation of mitigating circumstances at the penalty phase. Petition, ¶ 33(u) at 42.

25. Counsel failed to challenge the constitutionality of the Tennessee Death Penalty Statute as applied to petitioner. Petition, ¶ 33(v) at 42.

26. Counsel failed to object to the Tennessee Supreme Court's improper characterization of Dr. Marshall's testimony on direct appeal. Petition, ¶ 33(w) at 42.

27. Counsel failed to raise any and all issues presented in this petition on direct appeal or in post-conviction proceedings. Petition, ¶ 33(x) at 42.

28. Counsel failed to object to the petitioner's being dressed in jail

clothes in the presence of the jury. Second Amended Petition, ¶ 46.

## D. ANALYSIS OF THE MERITS

### I. Claims Not Cognizable In Federal Habeas

■■■ Under 28 U.S.C. § 2254(a), a district court may entertain "an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254 (emphasis added). The threshold question in any federal habeas petition, therefore, is whether the petition even raises such claims. *See, e.g., Tillett v. Freeman,* 868 F.2d 106, 108 (3d Cir.1989); *Martin v. Solem,* 801 F.2d 324, 331 (8th Cir.1986); *Nelson v. Solem,* 714 F.2d 57, 60 n. 2 (8th Cir.1983); *Hall v. Iowa,* 705 F.2d 283, 287 (8th Cir.1983). Claims I.12 (Petition, ¶ 26(b)(2)) and I.13 (¶ 26(b)(3)) relate only to the trial judge's conduct related to the first post-conviction proceeding. Error committed during the state post-conviction proceedings cannot provide a basis for federal habeas relief.

> [T]he writ [of habeas corpus] is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings such as [petitioner] claims here because the claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration.

*Kirby v. Dutton,* 794 F.2d 245, 247 (6th Cir.1986). To the extent that petitioner is now attempting to contend that the judge's comments during the post-conviction proceedings somehow support a claim of bias during the original trial, his contention is utterly frivolous and without foundation. Petitioner points to nothing in the five-thousand-plus page state court record to connect Judge Axley's isolated comments during state post-conviction proceedings with the manner in which he conducted the original trial. Furthermore, expressions of impatience with the necessity of conducting post-conviction proceedings, after a presumptively valid state court trial and a presumptively valid conviction that has been upheld on direct appeal including a denial of certiorari by the United Supreme Court, provide no support for a contention that the trial judge's conduct of that original criminal proceeding was not above board and completely impartial. *See Ortiz v. Stewart,* 149 F.3d 923, 939 (9th Cir. 1998). This contention is a frivolous attempt to create an issue where none exists, and is utterly devoid of even arguable merit as a claim for federal habeas relief. Accordingly, claims I.12 (Petition, ¶ 26(b)(2)) and I.13 (Petition, ¶ 26(b)(3)) are not cognizable claims for relief under § 2254(a).

■■ Similarly, to the extent that claim XX.27 (Petition, ¶ 33(x)) should be construed as contending that petitioner's state post-conviction counsel provided ineffective assistance, he has no claim because there is no right to effective assistance of counsel during state collateral proceedings. *Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

### II. Analysis Of Procedurally Defaulted Claims

#### A. Legal Standard for Procedural Default

■■■ Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that-
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B) (i) there is an absence of available State corrective process; or
> >
> > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. *See, e.g., Granberry v. Greer,* 481 U.S. 129, 133–34, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987); *Rose v. Lundy,* 455 U.S. 509, 519, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. *Preiser v. Rodriguez,* 411 U.S. 475, 477, 489–90, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

▇ To exhaust these state remedies, the applicant must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." *Gray v. Netherland,* 518 U.S. 152, 162–63, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (citing *Picard,* 404 U.S. at 271, 92 S.Ct. 509). " '[T]he substance of a federal habeas corpus claim must first be presented to the state courts.' " *Gray,* 518 U.S. at 163, 116 S.Ct. 2074 (quoting *Picard,* 404 U.S. at 278, 92 S.Ct. 509). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." *Gray,* 518 U.S. at 163, 116 S.Ct. 2074.

▇ Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." *Id.* When a petitioner raises different factual issues under the same legal theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 1732–33, 144 L.Ed.2d 1 (1999) (holding that exhaustion requirement mandates presentation of all claims to state court through discretionary review process). *See also Pillette v. Foltz,* 824 F.2d 494, 497–98 (6th Cir.1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts, without presenting each factual claim. *Pillette,* 824 F.2d at 497–98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Duncan v. Henry,* 513 U.S. 364, 366, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). *Cf. Gray,* 518 U.S. at 163, 116 S.Ct. 2074.

▇ Moreover, the state court must address the merits of those claims. *Coleman,* 501 U.S. at 734–35, 111 S.Ct. 2546. If the state court decides those claims on an adequate and independent state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner is barred by this procedural default from seeking federal habeas review, unless he can show cause and prejudice for that default. *See Wainwright v. Sykes,* 433 U.S. 72, 87–88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

▇ When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further con-

sideration to them, the claims are deemed exhausted, but procedurally barred. *Coleman*, 501 U.S. at 752–53, 111 S.Ct. 2546; *Teague v. Lane*, 489 U.S. 288, 297–99, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Wainwright v. Sykes*, 433 U.S. at 87–88, 97 S.Ct. 2497; *Rust*, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause and prejudice for the default in order to obtain federal court review of his claim. *Teague*, 489 U.S. at 297–99, 109 S.Ct. 1060; *Wainwright v. Sykes*, 433 U.S. at 87–88, 97 S.Ct. 2497. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. *Coleman*, 501 U.S. at 752–53, 111 S.Ct. 2546; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. The petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting *Murray*, 477 U.S. at 496, 106 S.Ct. 2639). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327, 115 S.Ct. 851.

Tennessee's post-conviction statute specifies types of procedural default that may bar the state court from reviewing the merits of a constitutional claim. The con-

duct of petitioner's post-conviction proceedings were governed by Tennessee's original post-conviction statute, since replaced. *See* Tenn.Code Ann. §§ 40–30–101 to 124. A three year statute-of-limitations governed the filing of petitions under that statute. *Id.* at § 40–30–102. It also enunciated a standard by which state courts were to determine whether to consider the merits of post-conviction claims. *Id.* at 40–30–112.[3]

On May 10, 1995, however, Tennessee replaced the three-year statute in Tenn. Code Ann. § 40–30–102 with the one-year statute in Tenn.Code Ann. § 40–30–201. In *Carter v. State*, 952 S.W.2d 417, 420 (Tenn.1997), the Tennessee Supreme Court interpreted the statute of limitations as not reviving previously barred claims. The Sixth Circuit has previously upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on post-conviction relief. *Hannah v. Conley*, 49 F.3d 1193, 1194–95 (6th Cir.1995) (construing first statute and stating "the language of Tenn.Code Ann. § 40–30–102 is mandatory."). In this case, petitioner's right to file any further state post-conviction petition is barred by the new one-year statute of limitations.

### B. *Specific Procedurally Defaulted Claims*

#### 1. *Judicial Bias*

The Court examines each of petitioner's claims in turn for procedural default. Regarding his claims of judicial bias, petitioner has never presented claims I.1 (¶ 26(a)(1)), I.2 (¶ 26(a)(2)), I.3 (First Amended Petition, ¶ 4), I.4(b) (¶ 26(a)(3)),

---

**3.** Tenn.Code Ann. § 40–30–112 states:
 (a) A ground for relief is "previously determined" if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.
 (b)(1) A ground for relief is "waived" if the petitioner knowingly and understandingly

failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.
 (2) There is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived.

I.8 (¶ 26(a)(7)), I.9 (¶ 26(a)(8)), or I.11 (¶ 26(b)(1)) to the Tennessee courts.

Petitioner attempts to avoid this procedural default by the strident assertion that a habeas petitioner need not demonstrate cause because

1) many related specific allegations of bias have already been presented to the state courts,

2) "a claim of judicial bias by its very nature cannot be barred by judicial review",

3) defendants are not required to police the judiciary,

4) Judge Axley was affirmatively obliged to recuse himself, and

5) petitioner could not reasonably have discovered the supporting facts any sooner.

Petitioner's Reply to Respondent's Answer at 37–39 (hereinafter Petitioner's Reply). None of these contentions has any merit.

 Insofar as petitioner contends that related allegations have previously been raised in state court, his position is patently without merit in light of *Gray*, 518 U.S. at 163, 116 S.Ct. 2074, and *Pillette*, 824 F.2d at 497–98. Petitioner is obliged to present each of his factual and legal claims to the state courts. His failure bars federal review absent a showing of cause and prejudice.

Petitioner's second contention is grammatically incomprehensible. The issue here is not whether a claim is "barred by judicial review" but whether it will not be reviewed at all because of a prior proce-

dural default. Insofar as he is attempting to argue that the cause and prejudice framework of § 2254(b) and *Wainwright v. Sykes* and its progeny can never be applicable to a claim of judicial bias, his own citation of *Porter v. Singletary*, 49 F.3d 1483 (11th Cir.1995), belies this contention.[4] The United States Court of Appeals for the Eleventh Circuit not only engaged in a cause and prejudice analysis in *Porter*, it specifically remanded to provide an opportunity for the petitioner to demonstrate cause. *See also West v. Johnson*, 92 F.3d 1385, 1411 n. 47 (5th Cir.1996), *cert. denied*, 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997)(applying cause and prejudice analysis to judicial bias claim and holding claim procedurally barred). Petitioner's factual presentation here, however, does not begin to approach the facts alleged in *Porter*.

This contention is closely related to petitioner's next two arguments—that the presumption of judicial impartiality precludes availability of evidence before federal habeas review and that a judge is obliged to recuse himself. Each of these contentions is sheer and disingenuous sophistry.

 Virtually from the moment petitioner was convicted, through the direct appeal and throughout the state post-conviction process, petitioner has sought to shift the focus of this case from his own culpability to the conduct of the trial judge. This campaign, which borders on the unethical in its use of distorted legal arguments and slanted factual presenta-

---

**4.** *Porter* involved a claim of newly discovered evidence that a judge had told a clerk of court, *before* trial, that he had changed the venue of the capital murder trial to one in which a conviction was more likely so that he would be able to sentence the defendant to death. Under then-prevailing Florida law, the judge, not a jury, imposed the sentence in capital cases. The only similarity between this case and *Porter* was that the judge there ALSO used the expression "son-of-a-bitch" in describing the defendant. Petitioner's reliance on this case is sheer puffery.

Furthermore, despite petitioner's indignation at the judge's choice of invective, this claim is flatly contradicted by *Liteky v. United States*, 510 U.S. 540, 550–51, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994):

The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings.

tions, has attempted to divert this court's focus from the issue at hand: the validity of the state court's resolution of petitioner's constitutional claims. Despite these efforts, petitioner has not developed any support for this baseless claim. The issue is not, however, whether a judge is required *vel non* to recuse himself. The issue is whether petitioner can raise a claim of judicial bias for the first time on federal habeas review, without ever bothering to develop the facts in state court. Petitioner's contention that the allegations in this case are so serious as to excuse a procedural default do not withstand reasoned analysis.

Petitioner's contention that a presumption of judicial impartiality prevented him from developing facts to support this claim in state court is baseless. In essence, this argument would carve out a judicial bias exception to both the exhaustion requirement and procedural default jurisprudence. Nothing in the jurisprudence of either concept, however, supports such an exception.

Petitioner's argument that a judge has an inherent obligation to recuse himself if biased does not support his claim here, because he has not demonstrated either bias or cause for his procedural default. Thus, petitioner's citation of *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980);[5] *In re Murchison*, 349 U.S. 133, 134, 75 S.Ct. 623, 99 L.Ed. 942 (1955);[6] *Tumey v. Ohio*, 273 U.S. 510, 520, 47 S.Ct. 437, 71 L.Ed. 749 (1927),[7] and *Knapp v. Kinsey*, 232 F.2d 458, 461–62 (6th Cir.1956),[8] are all completely inapposite.

Given petitioner's view that he need not demonstrate cause and prejudice, it is not surprising that his factual presentation completely neglects the requirement of cause. More damaging to his claim, however, is his failure to provide any support for it apart from pejorative mischaracterizations of the record, thus dooming any argument that "prejudice" exists for his procedural default. Thus, the contention that he could not have reasonably developed the facts sooner cannot legally constitute "cause" because the "facts" he has developed do not amount to a claim of bias in any event.

Thus, the very description of the judge's conversation with two law school students

---

5. *Marshall* involved an attempt to invalidate a provision of the Fair Labor Standards Act's requiring administrative hearings on child labor violations before a Department of Labor Administrative Law Judge on the grounds that the Department's retention of fines and civil penalties generated by the proceedings constituted a significant pecuniary interest in finding an employer guilty, thus rendering the judge inherently biased and the trial violative of due process. The Supreme Court held that the statute did not create an intrinsically biased tribunal because no governmental official stood to profit from the proceedings, and there was no realistic possibility that the administrative law judge's impartiality would be distorted because the agency might gain from fines and penalties. 446 U.S. at 252, 100 S.Ct. 1610.

6. *Murchison* overturned the criminal contempt conviction of a witness who testified before a "one-man-judge grand jury." The sole judge acting as a grand jury adjudged him in contempt and then conducted the criminal trial.

7. *Tumey* invalidated as violative of due process a conviction under the Ohio Prohibition Act because the defendant was tried in a mayoral court so structured that there was "no way by which the mayor may be paid for his service as judge, if he does not convict those who are brought before him." Alley has completely failed to even allege facts supporting a claim that Judge Axley enjoyed some possible pecuniary interest in his conviction and death sentence.

8. In *Knapp*, a federal district judge repeatedly interjected himself into a civil stockholder's lawsuit by threatening defense witnesses with prosecution, suggesting that the local federal prosecutor had neglected his duty to bring criminal charges, by repeatedly interrogating and intimidating witnesses, and by signaling in every conceivable fashion that he had prejudged the issues. Alley's allegations of purported judicial bias implicate *NO* trial rulings and bear not even the most remote similarity to the patently improper actions of the judge in *Knapp*.

as an "ex parte" contact is duplicitous and misleading. "Ex parte" by definition is a contact with *another party*, not a private student observer. *Black's Law Dictionary 5th Ed.* at 517. Accordingly, this allegation has never provided any support for a constitutional claim of judicial bias based on *ex parte* contact. Nor does it support a view that the judge was in fact biased and therefore should have recused himself. Accordingly, this allegation does not support a claim of prejudice.

■ The allegation that Judge Axley made an intemperate reference to petitioner and the improbability that he would ever actually be executed can hardly be considered evidence of bias. Notably, although petitioner's counsel has chosen to downplay this critical fact, Judge Axley allegedly made the comment *AFTER* the jury returned its verdict of guilt, when a presumption of innocence no longer attaches. Thus, counsel's reliance on *Porter v. Singletary* is clearly misplaced. Petitioner's equating the express announcement of a predisposition by the judge in *Porter* with Judge Axley's statement by describing the *Porter* analysis as "the precise situation here," Petitioner's Reply at 38, simply misconstrues both *Porter* and the facts in this case.

Furthermore, when one considers that at the time of Judge Axley's comment NO ONE in the State of Tennessee had been executed since 1961, and that no execution has been carried out since petitioner's trial, his remark reduces merely to a prescient commentary on Tennessee's criminal justice system. There is no constitutional prohibition on a criminal court judge holding or propounding a jurisprudential view in favor of capital punishment or the enforcement of laws providing for capital

punishment. This claim has no foundation whatsoever in law.

■ The attempt to transmogrify Judge Axley's casual conversations with two law students into a scheme of illicit cooperation with the prosecutor's office because one of the students was also serving as an intern in that office is simply reprehensible. The affidavit provided by the former student, Craig Morton, who is now an attorney, merely indicates that he was invited to watch the trial, that he spoke with Judge Axley in his chambers during the trial, and that he did "not recall specifically what was discussed ...." Exh. 4 to Petitioner's Memorandum in Support of Motion for an Evidentiary Hearing. This is not evidence that Judge Axley took any action during the trial at the instigation of this *observer*. Furthermore, a law student acting as an *intern* is not the equivalent of a prosecutor or other employee with some interest in the prosecution's obtaining a guilty verdict or a death sentence. Notably, neither student performed any work for Judge Axley during the trial. Nor is there any allegation that Mr. Morton performed any work for the prosecutor's office on *this* case.[9] This claim does not support a claim that petitioner's trial was unfair because of judicial bias. Accordingly, the contention that these claims can be considered despite a clear procedural default is devoid of even arguable merit.

Accordingly, petitioner's contention that he has demonstrated judicial bias of such a degree that he need not demonstrate cause and prejudice is devoid of arguable merit.

■ Similarly, claim I.4(b), that the Judge received a Christmas card from the victim's family, is not, contrary to petitioner's hyperbole, evidence of bias. First, judicial bias must consist of actions by the

9. Petitioner's attempt to spin this particular pile of straw into gold is particularly inappropriate, given that at the start of this case the order appointing counsel had to be drawn with some care to ensure that the former state district attorney (an assistant at the time of the Alley criminal trial), now a partner in Mr. Hutton's firm, had no contact with the case. Just as this should not result in counsel's disqualification on this case, there is no basis for believing that Judge Axley should have recused himself based on one comment to a law student observer.

judge, not third parties. More importantly, petitioner does not even allege *when* the card was received, whether during or after the trial, or, if after, then how long after. The contention that Judge Axley was absolutely obliged to reveal if he received the Christmas card is also devoid of merit. Again, this is yet another example of counsel's attempt to fabricate a claim where none exists. Petitioner's claim that he should be able to raise this claim initially on federal habeas review is frivolous.

Claim I.3 (First Amended Petition, ¶ 3), that Judge Axley gave private instructions to the jurors, is completely unsupported by any affidavit, citation to the record, or other proof of any sort. Petitioner does not allege the content of the instruction, Accordingly, the contention that this claim can be presented despite an obvious procedural default is without merit.

■ Claim I.2 (¶ 26(a)(2)), that Judge Axley met with the jurors at a picnic, is another attempt to twist an innocent event into judicial misconduct. The hearsay related in the affidavit of petitioner's counsel's investigator does not even allege with any certainty where the contact occurred. Exh. 1 to Petitioner's Reply to Respondent's Response to Petitioner's Motion for Discovery. It does clearly allege that it occurred over a weekend, and thus not during the jury's deliberations. *Id.* The only allegation is that the judge was checking on whether the Court's deputies had properly provided for the welfare of the sequestered jury over the weekend. There is no allegation that the judge said

anything about the case, and no allegation that any juror said anything to him.[10] This contact was *not* improper and was not an action of the type to cause any reasonable person to suspect that the judge was biased against petitioner.

■ Finally, petitioner attempts to demonstrate cause by contending that the facts could not be discovered prior to federal habeas review. The reason the "facts" were not discovered sooner is because petitioner's post-conviction counsel did not look. Unlike *Porter*, in which a key fact was not uncovered until a court officer revealed a theretofore undiscoverable conversation with the judge, the alleged contact between the judge and jury could easily have been discovered by post-conviction counsel's interviewing jurors during the state post-conviction process.[11] As already noted, judicial bias has been the petitioner's watchword ever since he was convicted. That he should neglect to uncover everything to support this claim can hardly be the external cause for procedural default required under *Wainwright v. Sykes. See, e.g., Coleman*, 501 U.S. at 752, 111 S.Ct. 2546. More significant is that ten years of effort since the jury's verdict have produced nothing more on this issue than the frivolous claims presented in this petition.[12]

### 2. *Procedurally Defaulted Claims of Withholding of Evidence*

Petitioner never raised in the state courts claims VIII.1 (Petition, ¶ 35) or VIII.2 (Petition, ¶ 35)—that the prosecu-

10. The state court record reflects that the Court instructed the jury on the Friday at the close of the day's work, "[d]o not discuss the case among yourselves or allow anyone to discuss it with you." Addendum 12, Vol. 7 at 904. The petitioner does not even allege that this instruction was disobeyed.

11. Counsel's contention that the lack of discovery procedures in state post-conviction proceedings is unavailing. The facts proffered in support of this claim were developed purely by investigatory work, not discovery. The Court notes as well that the contention

that discovery is not available is belied by the state court post-conviction record, which contains, among every other piece of paper generated during the original criminal prosecution, the prosecutor's original criminal file. *See* Transcript of Post–Conviction Hearing, Addendum 29 (hereinafter Addendum 29), Exh. 31.

12. Not even the amalgamation of all of claims I.1 through I.13 results in a total picture of a biased judge or of a trial that was anything other than fair and impartial.

tion withheld exculpatory material consisting of evidence of Judge Axley's bias and Dr. Zager's opinion on mitigation. These claims are, therefore, procedurally defaulted. Petitioner in essence relies on the same arguments rejected, *supra*, for failing to raise these claims in state court.

The Court reiterates that Alley has completely failed even to allege any acts of bias by Judge Axley that would have triggered a duty by the prosecution to disclose them to the defense. Furthermore, the letter from the victim's father to Judge Axley, which petitioner contends should have been disclosed during trial, was disclosed during the post-conviction process. Petitioner, therefore, clearly had an opportunity to raise a claim that the prosecution's nondisclosure of this letter constituted the withholding of exculpatory evidence as prohibited by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The contention that the prosecution withheld evidence that Dr. Zager had developed an opinion on mitigation is devoid of merit. Petitioner states in his reply to the respondent's answer that:

> As to the withholding of evidence concerning Dr. Zager's opinions about mitigation, a hearing on this matter is necessary, as Dr. Zager refused to testify at the post-conviction hearing, and has likewise refused to discuss the substance of her views with federal counsel.

Reply Brief at 126. This statement flagrantly misrepresents the record of the post-conviction hearing. First, Dr. Zager unquestionably testified at the post-conviction hearing. *See* Addendum 29, Vol. 7 at 99–143. At that hearing, petitioner's post-conviction counsel attempted to elicit expert testimony concerning possible mitigating evidence that should have been used by petitioner's original trial counsel. Dr. Zager made it clear that she had been employed to explore two issues: petitioner's mental competency to stand trial and his mental condition at the time of the offense. *Id.* at 123. Counsel then inquired:

Q: But you had, despite that, formulated certain opinions about causation which were not involved in the order that you were given?

A: Hypotheses.

Q: Okay.... But the hypotheses you formulated was not a part of your evaluation, per se?

A: I would say they were.

Q: Did you in your evaluation express your belief that the events in his youth caused him to commit the act he did?

A: I can't say exactly what caused the behavior at the time. I can't. But, yes, I did take that into serious account, what happened to him as a youth and his medical problems from a psychological perspective. I did take that into account in terms of what his mental condition at the time the offense is said to have occurred. I took that into account and I shared that with the people— other mental health professionals and with attorneys.... Meaning both the prosecution and the defense.... I generally share information with both sides.

\* \* \* \* \* \*

Q: Would you state for us, having reviewed Sedley Alley's case, what factors you would consider mitigating as you understand it today involving the crime and his youth?

A: **I can't do that. I cannot do that right now. I am not prepared to do that.**

Q: What would it-

A: It's a totally different kind of thing than what I prepared to do in this case and I really can't do that.

Q: What would it take to get you prepared to do that?

A: Probably a court order and some time to do it.

\* \* \* \* \* \*

Q: Let me ask you to assume for purposes of this question that the ramifications of the Department of Health and all of that have been worked out and you've got an order that says, Dr. Zager, look at this case with mitigation; could you do that, and then come back in here and testify as to mitigating factors?

A: Yes.

*Id.* at 125–26, 126, 128–29, 130. From this excerpt it is quite clear that Dr. Zager did not "refuse to testify." Instead, based on her expertise, she expressed an inability to render the opinion counsel sought to elicit. Clearly, this testimony does not support any claim that any exculpatory evidence even exists, much less that the prosecution has withheld it. Accordingly, petitioner's argument that his procedural default of this issue should be excused because the supporting evidence was not discoverable until the federal habeas proceeding completely lacks any foundation in fact, and is devoid of even arguable legal merit.

3. *Improper Jury Instructions*

Petitioner has never presented to the state courts claim IX (Petition, ¶ 36), that the trial court deprived petitioner of due process by instructing the jury regarding the effect of a verdict of not guilty by reason of insanity. The trial court instructed the jury as follows:

Pursuant to Tennessee Code Annotated Section 33–7–303, the Court further instructs you that a finding of not guilty by reason of insanity at the time the defendant committed the offense shall result in automatic detention of the person so acquitted in a mental hospital or treatment center pending further proceedings.

Jury Instructions, Addendum 13 (hereinafter Addendum 13) at 1870. Petitioner contends that this instruction deprived him of

due process by inviting the jury to convict him on the basis of something other than the evidence, and by encouraging them to convict rather than acquit.

Petitioner suggests that his procedural default of this claim could be cured by dismissal of this claim alone without prejudice to permit exhaustion of state court remedies. He suggests that because the claim is based on well-settled federal law but is a new rule in Tennessee, it could be raised under Tenn.Code Ann. § 40–30–217(a)(1) as a "claim based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, *if retrospective application of that right* is required." This contention grossly mischaracterizes federal law, and also misinterprets § 40–30–217(a)(1).

Petitioner contends that in light of *Shannon v. United States,* 512 U.S. 573, 579–81, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994), this instruction is unconstitutional because the jury should not be concerned with the results of a verdict. Petitioner's reliance on *Shannon* is misplaced, both because *Shannon* enunciates a rule of federal criminal practice, not a universally applicable constitutional requirement, and because petitioner completely misconstrues the holding and its significance.

*Shannon* dealt with a contention that the defendant has an absolute right to the instruction—the exact opposite of the proposition advanced by petitioner in this case. *Shannon* construed the requirements of the federal Insanity Defense Reform Act, 18 U.S.C. §§ 17, 4241–4247 (IDRA), which applies in *federal* criminal prosecutions, as not *requiring* the instruction, and then considered whether, as an exercise of supervisory power over the federal courts, to require federal courts to give such an instruction. 512 U.S. at 584–85, 114 S.Ct. 2419. Significantly, far from absolutely prohibiting the requested instruction, the Court merely rejected any *absolute* right of a federal defendant to demand such an instruction. *Id.* at 586,

114 S.Ct. 2419. While disparaging the federal defendant's characterization of the instruction as salutary, however, the Court explicitly recognized that it might be *necessary* under some circumstances. *Id.* at 587–88, 114 S.Ct. 2419.

Petitioner's method of transmogrifying *Shannon*'s holding into a ukase prohibiting the Tennessee instruction is difficult to unravel. Actually, far from being a well-settled rule grounded in clear federal law, this claim would require the Court to invent a whole new constitutional rule. That result would be barred, of course, by the non-retroactivity prohibition of *Teague*, 489 U.S. at 310, 109 S.Ct. 1060. *Teague* held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. at 310, 109 S.Ct. 1060. The court recognized two exceptions:

> First, a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. Second, a new rule should be applied retroactively if it requires the observance of those procedures that ... are implicit in the concept of ordered liberty.

489 U.S. at 307, 109 S.Ct. 1060 (citations and quotation marks omitted). In *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), the Supreme Court reaffirmed *Teague* and explained that "new rules" are those that "were not 'dictated by precedent existing at the time the defendant's conviction became final.'" 497 U.S. at 234, 110 S.Ct. 2822 (citing *Teague*, 489 U.S. at 301, 109 S.Ct. 1060). *See also Lyons v. Stovall*, 188 F.3d 327, 340 (6th Cir.1999)(applying *Teague sua sponte* and noting that "a legal ruling sought by a federal habeas petition will be deemed 'new' as long as the correctness of

the rule is susceptible to debate among reasonable minds").[13]

The proposition proposed by petitioner is certainly not settled, even as a matter of federal court interpretation of the IDRA. In *Robison v. Johnson,* 151 F.3d 256, 267 (5th Cir.1998), the death-sentenced petitioner raised a claim based on *Shannon v. United States* that Texas Code of Criminal Procedure article 46.031(e), which *prohibited* the accused from informing the jury of the consequences of a not-guilty-by-reason-of-insanity verdict, violated due process by making it more likely that the jury would convict rather than permit him to escape responsibility, the result the prosecution argued would occur if the jury failed to convict. The Fifth Circuit rejected this claim, holding that the trial court properly instructed the jury not to consider the effect of a not guilty verdict, *curing the impression created by the prosecution's argument that he would be released.* That is, the defendant sought to obtain a jury instruction making it clear that a not-guilty-by-insanity verdict *would* keep him hospitalized. The Court cited no federal case law recognizing that Robison's counsel was seeking to *reverse* an established federal constitutional right.

*United States v. Levine,* 80 F.3d 129, 135 (5th Cir.1996), also undercuts petitioner's argument that federal law is settled. Levine adopted an insanity defense to a federal robbery indictment, and the prosecutor argued that he would go free unless found guilty. Defense counsel sought and obtained an instruction that a not guilty by insanity verdict would result in the defendant's commitment for treatment under federal law. If, as petitioner argues, this instruction violates the Constitution, both *Levine* and *Shannon* make no sense.

Furthermore, states other than Tennessee affirmatively require such instructions. *See, e.g., Roberts v. State,* 335 So.2d 285 (Fla.1976)(adopting requirement that in-

---

**13.** The panel opinion's substantive application of *Teague* is announced in Judge Clay's majority opinion. Judge Gilman's concurrence announced the holding as to the *sua sponte* application of *Teague.* 188 F.3d 327, 1999 WL 639577 at *18.

struction be given in Florida). *See also* Note, "The Not Guilty By Reason of Insanity Verdict: Should Juries Be Informed Of Its Consequences?" 16 Whittier Law Review 645, 666–69 (1995)(discussing varied approach of federal appellate courts to instruction); Fleming, "Instructions in State Criminal Case in Which Defendant Pleads Insanity as to Hospital Confinement in Event of Acquittal" 81 A.L.R.4th 659 § 3 (1990)(compiling jurisdictions and cases using instruction). Accordingly, petitioner cannot prevail on his contention that this is a well-settled but new federal rule that would entitle him to reopen his Tennessee post-conviction proceeding, thus requiring dismissal of his claim without prejudice.

■ As the claim is not exhausted and could not provide a basis for reopening petitioner's state court post-conviction proceeding, further presentation of this claim is barred both by Tennessee's post-conviction statute of limitations in Tenn.Code Ann. § 40–30–202(a) and by the one-petition rule of § 40–30–202(c). Petitioner does not even attempt to demonstrate cause and prejudice for this procedural default. Furthermore, the claim is clearly barred under *Teague*. Accordingly, this claim is without merit.[14]

### 4. *Caldwell Error*

Petitioner contends in claim X.2 (Petition, ¶ 37), that the prosecution's closing argument violated the Eighth Amendment. In *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the prosecution violated the Eighth Amendment by arguing that the jurors should not view themselves as personally responsible for a defendant's execution because their verdict was subject to appellate review. The Supreme Court in *Caldwell* held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Petitioner contends that certain comments during the prosecution's rebuttal on closing argument for the sentencing hearing both denigrated mercy and diminished the jury's responsibility for imposing the death penalty, in violation of the Eighth Amendment.

Petitioner's brief on appeal from the denial of the post-conviction petition contended, without actually citing *Caldwell*, that a portion of the prosecution's closing argument diminished the jury's responsibility for imposing the death sentence. Petitioner's Post–Conviction Brief on Appeal, Addendum 30 (hereinafter Addendum 30) at 49. The petitioner's brief quoted the following argument, which is also set forth in the transcript of the State's rebuttal on closing argument at the sentencing hearing, filed as Exhibit 28 to the post-conviction hearing:

> If Suzanne Marie Collins chooses to forgive this man, if Suzanne Marie Collins chooses to have mercy, that is her right. That is not your right; that is not my right. That is not the right of the State of Tennessee.... So, no matter what your individual inclination may be to mercy, don't confuse your individual rights to forgive, to grant mercy. Don't take over Suzanne Marie Collins' right. You are here to represent the people of the State of Tennessee, civilization and the State of Tennessee and you must act on behalf of those people.

Addendum 30 at 49.[15] The State responded by citing *Caldwell* as not prohibiting

---

**14.** Finally, as to this claim, the Court observes that petitioner's whole argument is essentially a non sequitur. Rather than encouraging a guilty verdict, if anything, the Tennessee instruction makes it *more*, not less, likely that a jury would return a not-guilty-by-insanity-verdict by offering an alternative to guilt and

decreasing the risk that jurors would be afraid to return that verdict because it might result in returning a murderer to the community.

**15.** This transcript was not originally prepared as part of the petitioner's direct appeal from his conviction. The exhibit quoted here is

the argument. State's Post–Conviction Brief on Appeal, Addendum 31 at 70. The Tennessee Court of Criminal Appeals held that petitioner waived the claim by failing to present it on direct appeal. *Alley*, 958 S.W.2d 138, 153. The Court also, however, concluded that the first part of this argument "was not erroneous" without citing any authority.

Here, the petitioner alleges *Caldwell* error and denigration of mercy (citing *Nelson v. Nagle*, 995 F.2d 1549 (11th Cir. 1993)). Petitioner supports this contention only by reference to transcript pages, without actually quoting the specific statements alleged to have either denigrated mercy or diminished the jury's responsibility. The petitioner refers somewhat cryptically to "Sent. Tr. 161–62, 149." Reply Brief at 131. The Court infers that both cites refer to Addendum 29, Exh. 28.[16]

The difficulty with this claim is that in the state courts petitioner has never raised a "denigration of mercy" claim, never cited *Nelson*,[17] and has not relied on the prosecution comments repeated in note 16 as supporting the specific *Caldwell* claim asserted here. Petitioner no longer has any remedy in state court because any further claims are barred both by the Tennessee post-conviction statute of limitations and Tennessee's one-petition rule. Accordingly, these aspects of petitioner's claim are barred by his procedural default.[18]

found at Exhibit 28 to the post-conviction hearing. *See* Order Denying State's Petition to Rehear in the Court of Criminal Appeals, Post–Conviction Proceeding, Addendum 28 at 161–62. The petitioner's appellate brief contains an insignificant typographical error in quoting this passage, which should read, in pertinent part: "You are here to represent the people of the State of Tennessee, the civilization *in* the State of Tennessee, and you must act on behalf of those people." Addendum 29, Exh. 28 at 161–62. The Respondent had the arguments retranscribed for filing as an Addendum to this habeas petition. That new transcript, Opening and Closing Arguments Penalty Phase, Addendum 38 at 32, differs insignificantly from the first transcript, although agreeing that the brief contained the minor error: "You are ... *in* the State of Tennessee. And you must act ...." The differences are insignificant and clearly result only from the differing technique of the two different court reporters.

16. The first cite is quoted above. The second citation, from Addendum 29, Exh. 28 at 149, presumably refers to the following statements:

When you go back there, ask yourself, do you have cause to follow the law, which I know you have and certainly will; but ask yourselves again if anybody feels like, well, they're calling upon me to do something that is unusual, unnatural, remember that what you are doing here is following the law of the State of Tennessee.

Again, we live in a democracy. We elect our representatives. They go to Nashville, and it is all of the people of the State of Tennessee—the majority rule—who have made this decision. All that you really have to do in the case is to be able to follow that law and enforce that law.

So, it's not as though it's one or twelve people that actually do this. You-all didn't go to Nashville and pass the law, even though I certainly think you agree with it and can follow that law, but it is all the people of the State of Tennessee who have decided that under certain circumstances society cannot survive and exist with Sedley Alley. It's as simple as that.

When the state proves the aggravating circumstances to you, when there's no mitigation that outweighs it, then society and all the people of the State of Tennessee said, under these circumstances, our society cannot live with somebody who engages in conduct this atrocious.

Addendum 29, Exh. 28 at 149–50.

17. *Nelson* held violative of due process an Alabama prosecutor's quotation from an 1873 Georgia decision that decried the sentimentality of mercy, in part because it unfairly misled the jury regarding prevailing Alabama law that permitted the jury to consider mercy for the defendant as a factor in imposing the death penalty.

18. Petitioner cannot rely on his appellate attorneys' ineffective assistance as cause for failing to raise either the denigration of mercy claim or the *Caldwell* claim on direct appeal, because he has never presented *those* ineffective assistance claims to the state courts. *See Carpenter v. Mohr*, 163 F.3d 938, 944–45 (6th Cir.1998)(holding that if a federal habeas petitioner seeks to show cause for a procedural default by claiming ineffective assistance of counsel on direct appeal in state court, he must first exhaust the ineffective assistance claim by presenting it to the state's highest court), *pet. for cert. filed*, —— U.S. ——, 120

As the State specifically invoked petitioner's waiver of the remaining aspects of this claim, they are also procedurally barred. *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir.1998)(following *Harris v. Reed*, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), and holding that an alternative holding does not require a federal court to disregard a procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991)(also following *Harris* and holding that "a federal court need not reach the merits of a habeas petition where the last state-court opinion clearly and expressly rested upon procedural default *as an alternative ground.*")(emphasis in original).

Petitioner contends that no aspects of this claim can be procedurally barred because he has not personally failed to raise them in the state courts. As to any claims never raised in the Tennessee courts, this contention is patently without merit. *See, e.g., Hannah*, 49 F.3d at 1194–95 (finding claims procedurally defaulted based on Tennessee post-conviction statute of limitations).

▮▮▮ As to those claims held waived by the state courts, petitioner contends that Tennessee cannot invoke a default based on waiver because the waiver rule of Tenn. Code Ann. § 40–30–112 is not an adequate and independent state ground under *Wainwright v. Sykes.* Petitioner contends, citing *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991), that the waiver rule is not "adequate" be-

cause it was not "firmly established and regularly followed."

Petitioner contends that the waiver rule was not regularly followed or firmly established because *House v. State*, 911 S.W.2d 705, 713–14 (Tenn.1995), changed the standard for evaluating waiver in Tennessee from a subjective to an objective standard. According to petitioner, prior to *House*, Tennessee courts applied a subjective standard for waiver that required a personally knowing and voluntary decision by the prisoner to waive the claim. *House* held that the standard for waiver under § 40–30–112 is an objective one in which "a petitioner is bound by the action or inaction of his attorney." *House*, 911 S.W.2d at 714. Petitioner supports his contention that this is a change in the law by arguing that Tennessee has not consistently applied the waiver rule. He refers to numerous cases, contending that the majority of them support his theory that Tennessee courts decide constitutional claims on substantive grounds rather than invoking waiver as a procedural bar. Petitioner's analysis of the requirements for a state's invocation of its procedural default is erroneous and his reliance on state cases is misplaced.

First, to establish that the State's procedural bar is not "adequate" because it was not regularly applied, petitioner primarily relies on a series of cases decided in 1994, when the Tennessee Court of Criminal Appeals attempted unsuccessfully to reinterpret Tennessee's waiver rules.[19] Rath-

S.Ct. 444, 145 L.Ed.2d 362 (1999); *Jones v. Toombs*, 125 F.3d 945, 947 (6th Cir.1997)(holding that petitioner "failed to satisfy the cause requirement of *Coleman*" because he did not raise his ineffective assistance claim "as an independent issue in state court"), *cert. denied*, 521 U.S. 1108, 117 S.Ct. 2490, 138 L.Ed.2d 997 (1997). Petitioner did contend on appeal from his post-conviction petition that his attorneys were ineffective for failing to *object* during closing arguments to these statements, Addendum 30 at 35, and his original post-conviction petition incorporated all of his trial error claims in a generalized claim that his attorneys failed to raise the incorporated claims on appeal. Post–Convic-

tion Petition, ¶ 12, Addendum 22 (hereinafter Addendum 22) at 72. He asserted, however, neither a claim that counsel failed to object to a prosecutorial denigration of mercy in violation of the Eighth or Fourteenth Amendments, nor any independent claim that counsel's failure to raise such a claim on direct appeal violated the Sixth Amendment. *Id.* at 70–72. Accordingly he cannot demonstrate cause for this procedural default.

**19.** To support his contention that Tennessee applies a subjective standard for determining waiver, petitioner cites to *dicta* and overruled Tennessee cases. The Sixth Circuit has previ-

ously rejected a virtually identical argument in *Coe*, 161 F.3d at 331, finding the petitioner's presentation of Tennessee case law comprised irrelevant citations. The same is true here. Although *Coe*'s conclusion applies with equal force here, the glaring defects in petitioner's presentation merits a brief detailed discussion.

Petitioner relies heavily, for instance, on *Wooden v. State*, 898 S.W.2d 752, 754 (Tenn. Crim.App.1994). In 1992, Wooden, a Tennessee prisoner, filed a third post-conviction petition seeking to invalidate his 1982 rape conviction based on allegedly exculpatory evidence in police files that were unavailable to him until after the decision in *Freeman v. Jeffcoat*, No. 01A01–9103–CV–00086, 1991 WL 165802 (Tenn.App. Aug.30, 1991), *perm. app. denied*, (Tenn.1992), made the Tennessee Public Records Law applicable to certain police records. The trial court dismissed Wooden's petition as barred by the former three-year statute of limitations on Tennessee post-conviction petitions. *See* Tenn.Code Ann. § 40–30–102 (1990). The appellate court, in *dicta*, observed that "it is doubtful that the defense of waiver would apply" and then remanded the case because the State conceded that the prisoner was entitled to a hearing on whether the statute of limitations would bar claims based on allegedly exculpatory evidence released under the public records law. This case, therefore, does not stand for the proposition that Tennessee courts had adopted and uniformly applied a subjective test for waiver prior to *House*. Similarly, petitioner cites the initial intermediate appellate opinions in *Caldwell v. State*, 1994 WL 716266 (Tenn.Crim.App. Dec.28, 1994), *rev'd*, 917 S.W.2d 662 (Tenn.1996); *Pendleton v. State*, 1994 WL 142301 (Tenn.Crim.App. 1994), *remanded by Supreme Court*, 1996 WL 50986 (Tenn. Feb.5, 1996), *aff'g dismissal of petition after remand*, 1996 WL 134214 (Tenn. Crim.App. Mar.22, 1996), *perm. app. denied* (Tenn. Oct. 21, 1996); and *Johnson v. State*, 1994 WL 90483 (Tenn.Crim.App. Mar.23, 1994)(reversing dismissal of post-conviction petition), *vac'd and remanded*, 1995 WL 603159 (Tenn. Oct.9, 1995), *on remand*, 1997 WL 141887 (Tenn.Crim.App. Mar.27, 1997)(affirming dismissal of petition), *perm. app. denied* (Tenn. Sept. 8, 1997).

Moreover, his brief simply misconstrues many of the cases he cites. *See* Reply Brief at 50. There petitioner asserts that "the Tennessee courts have routinely addressed such claims on the merits" and cites a number of cases in a footnote. *Id.* at n. 37. In actuality the cases do not support the stated proposition. *Adkins v. State*, 911 S.W.2d 334 (Tenn. Crim.App.1994), is a pre-*House* decision by the same judge who decided *Wooden*, and was not appealed to the Tennessee Supreme Court. *Workman v. State*, 868 S.W.2d 705 (Tenn.Crim.App.1993), affirmed a dismissal based on waiver. The court discussed the "merits" only in relation to its refutation of the petitioner's fundamental miscarriage argument. *Strouth v. State*, 755 S.W.2d 819, 822 (Tenn.Crim.App.1986), actually did invoke the waiver rule on various claims. *Johnson v. State*, 1991 WL 111130 (Tenn. Crim.App. June 26, 1991), affirmed a trial court decision holding unspecified claims waived. *Campbell v. State*, 1993 WL 122057 (Tenn.Crim.App. Apr.21, 1993), does not discuss waiver at all, and thus certainly does not support a contention that Tennessee courts ignore procedural defaults. *Wright v. State*, 1994 WL 115955 (Tenn.Crim.App. Apr.7, 1994), rejected a perfunctory assertion of waiver in the face of the trial court's discussion of the merits and the petitioner's failure to raise Sixth Amendment claims.

The numerous cases included in a long string citation, Reply Brief at 51 n.38, are also misdescribed. For instance, a careful reading of *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn.1987), cited as authority for determining waiver on a subjective standard, actually supports *House*. It is true that the Tennessee Supreme Court in *Delbridge* reached the merits of the claim, but only after the Court of Criminal Appeals *conducted a cause and prejudice analysis* and found the waiver excusable on the basis of ineffective assistance during the first appeal as of right. *State v. Wilson*, 530 S.W.2d 766, 768–69 (Tenn.1975), permitted a defendant to take a delayed appeal because the original appeal was completely defaulted after the *state court* failed to prepare and file a timely bill of exceptions. As the defendant was indigent, the preparation of the bill was beyond his control. Although decided before *Wainwright v. Sykes*, the Tennessee Supreme Court's analysis is not founded on either a subjective waiver standard or a predilection for ignoring procedural default and reaching the merits. In effect, the Court found a classic instance of "cause" for the defaulted appeal. This obviously demonstrates Tennessee's adherence to waiver rules based on an objective standard, *NOT* the proposition cited by petitioner. In *Buchanan v. State*, 488 S.W.2d 724 (Tenn.1973), however, the petitioner's trial counsel did not object to the form of the jury's verdict and the Tennessee Supreme Court reviewed the validity of the form on post-conviction, *without discussing* waiver or procedural default at all. This case is irrelevant to the issue, but to the extent that the petitioner seeks to divine a rule from silence, the petitioner clearly had an arguable ineffective assistance claim. *State v. Lee*, 634 S.W.2d 645, 647 (Tenn.Crim. App.1982), actually applied the waiver rule as

er than establishing that the "regularly followed" rule was contrary to *House,* these citations establish conclusively that the Tennessee Supreme Court rebuffed an attempt by the intermediate appellate court to modify Tennessee's existing rule enforcing procedural defaults. If anything, the unsuccessful attempts by the Court of Criminal Appeals reflects a consistent practice by the Tennessee trial courts to require that claims be asserted at the first opportunity, whether at trial or the first post-conviction petition.

It is clear from *House* that the Supreme Court's decision followed and applied the existing Tennessee case law, merely providing a clarified enunciation of the objective waiver standard that Tennessee had always invoked. Far from changing the State's application of its waiver rule, *House* merely propounded the analysis more cogently than in previous decisions. That previous explanations were less succinct or clear, however, does not support petitioner's contention that Tennessee did not previously uphold its procedural bar.

As is clear from *Coleman v. Thompson,* the federal courts are not to "impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim." *Coleman,* 501 U.S. at 739, 111 S.Ct. 2546.

Neither are they prohibited from adopting a more clear explanation for an existing procedural rule.

■ Petitioner's attempt at a statistical analysis fails on two other grounds as well. If state courts are *required* always to invoke procedural defaults and to avoid analyzing the merits, the alternative grounds analysis in *Harris v. Reed* is rendered nonsensical. As the Fifth Circuit noted in *Amos v. Scott,* 61 F.3d 333, 340–41 (5th Cir.1995): "We decline today to impose on the [state courts] the need to pronounce some shibboleth or incant some magic words guaranteeing safe passage from a holding based on a state procedural bar to an alternative holding on the merits without infecting the opinion with 'excuse' and thus dooming it to inadequacy." 61 F.3d at 341. Since it is not a valid contention that a state court recitation of an alternative holdings voids its invocation of a procedural bar, neither is it valid to argue that the same alternative recitation causes the alternative procedural holding to be essentially invalid by reason of its "irregularity."

We acknowledge with approval the principle that an occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate; after all, "regular-

---

an alternative ground to bar a number of claims, without discussing whether the waiver is judged objectively or subjectively. *Pryor v. State,* 632 S.W.2d 570 (Tenn.Crim.App.1982), is a perfunctory discussion of the right of self-representation, and is completely off the point. Similarly, *Stewart v. State,* 534 S.W.2d 875 (Tenn.Crim.App.1975), has nothing to do with the issue before the Court. *Carroll v. State,* 532 S.W.2d 934, 937 (Tenn.Crim.App. 1975), merely notes in passing that the petitioner failed to demonstrate that "the contentions raised in the post-conviction petition were not duly considered in his original appeal." If anything, this supports an inference that the Court invoked waiver. The remainder of the cases simply do not merit further discussion. In particular, citation to older cases that pre-date *Wainwright's* procedural default analytical framework, not to mention the "regularity" requirements of *Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 103

L.Ed.2d 435 (1989) and *Ford,* do not support petitioner's contention.

Moreover, petitioner relies heavily on federal habeas cases in which judges have expressed in *dicta* their opinion as to the regularity of Tennessee's waiver rules. For instance, he cites, *inter alia, Parker v. Rose,* 728 F.2d 392, 394 (6th Cir.1984), as quoting a dubious law review article for the proposition that "petitioners 'who clearly did not raise their claims for relief at the first opportunity, are entitled to seek post-conviction relief.'" The actual holding of the case, however, is that the petitioner's claims were unexhausted, reflected in the speculative assertion that "it is by no means clear that petitioner will be deemed by the state court to have "presumptively waived" his right to proceed under the Post–Conviction Procedure Act. *Id.* at 394–95.

ly" is not synonymous with "always" and "strictly" is not synonymous with "unanimously."

*Id.* at 342. Just as a state court is simply not obliged to analyze claims in the same semantics as the federal habeas court, neither is it prohibited from ever reaching the merits of a constitutional claim if a state procedural bar could be invoked.

██ Petitioner's contention fails on another and more serious ground. The question in examining the existence of a regularly followed ground is not merely whether state courts always, or even most of the time, invoke procedural bars in the abstract. The question is: does the rule exist and do the state courts apply it consistently in similar cases? *Amos,* 61 F.3d at 340–41. In *Ford,* the relevant "rule" was the Georgia Supreme Court's invocation of a procedural rule requiring counsel to object during voir dire to a racially motivated peremptory jury strike, as prohibited by *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson,* however, was not decided until after the trial in that case, making any objection impossible. Not surprisingly, the Supreme Court found the state court's invocation of a procedural bar in these circumstances to be unfair.

Here, by contrast, *Caldwell* was decided prior to petitioner's trial, and the error could have been raised on direct appeal. Furthermore, the Tennessee rule permitting a finding of waiver of claims not raised on appeal did exist at the time of petitioner's trial. Petitioner does not present case law to support a claim that the state courts routinely ignore the waiver rule in cases similar to his.[20]

Furthermore, petitioner cites no support for the implicit and unstated premise to his syllogism: that intermediate state court decisions are relevant to a determination of regularity. *Ford* dealt with the practice of the Georgia Supreme Court. The primary case that arguably provides general

support for deciding "regularity" based on statistical analysis of prior state court holdings is *Dugger,* 489 U.S. at 410 n. 6, 109 S.Ct. 1211. *Dugger* based its regularity analysis on decisions of the Florida Supreme Court. Petitioner's statistical analysis fails because the Court of Criminal Appeals cases he cites do not demonstrate that the Tennessee Supreme Court "does not strictly or regularly apply the contemporaneous objection rule to claims identical or similar to his." *Amos,* 61 F.3d at 341. Petitioner's reliance on overruled or vacated intermediate state court decisions contrary to state law as applied in *House* does not support his claim.

Petitioner's citation of *Swanson v. State,* 749 S.W.2d 731, 734 (Tenn.1988), is also misleading. Petitioner cites *Swanson* for the proposition that Tennessee did not formerly invoke waiver of claims that could have been presented in an earlier post-conviction petition: "[t]he simple fact that a petitioner has had one bite at the post-conviction apple does not ipso facto preclude another bite when the petitioner can show that no knowing and understanding waiver of a ground or relief was made . . . ." 748 S.W.2d at 735. *Swanson,* however, did not actually deal with waiver as such, but with the trial court's procedural handling of waiver. The crux of the holding concerned the impropriety of dismissal before permitting amendment by counsel of an inartfully drafted *pro se* post-conviction petition. The Court specifically withheld judgment on whether waiver should be found after remand and appointment of counsel. *Id.* at 736. *Swanson* simply does not support petitioner's attack on the adequacy of Tennessee's independent state ground for barring review of his *Caldwell* claim.

Finally, the precise attack on *House* raised here has been flatly rejected by the Sixth Circuit in *Coe,* 161 F.3d at 331 (holding that *House* enunciates a state procedural rule that has been regularly followed and is, therefore, adequate).

**20.** As already discussed, *supra* n. 19, petitioner's citations are inapposite.

Petitioner's argument that *House* is a retroactive change in Tennessee law is unavailing. In essence, petitioner merely disagrees with the way in which the Tennessee courts have applied Tennessee's post-conviction procedures to bar review of the merits of most of his claims. This does not establish that the procedural bar does not exist.

Finally, as to this claim, petitioner cannot demonstrate cause for his procedural default based on ineffective assistance of counsel because counsel was simply not deficient for failing to appeal on the basis of the prosecution's arguments. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In actuality, the argument, far from limiting the jury's responsibility for the death penalty, actually specifically called that duty to their attention. The quote already mentioned [21] did not relate to the jury's responsibility regarding actually imposing the death penalty—it related to the source of the duty and argued that the jurors should uphold the law. To the extent that any juror might have misinterpreted that argument as diminishing his responsibility, the rebuttal's closing statements certainly reinforced it:

> They call it "jury duty", ladies and gentlemen, for a reason. You take an oath to follow the laws of the State of Tennessee for a reason. It would be very easy to go back, to deliberate and to say a life sentence. That would be very easy. It will be very difficult to sign your name, stating that, we find an aggravating circumstance. It will be very difficult to sentence Mr. Sedley Alley to death, but, ladies and gentlemen, duty is that way. Duty is difficult.

Addendum 29 at 167. That any attorney would have regarded the earlier ambiguous comments as seriously diminishing the jury's unique responsibility after these final words is simply without merit. Petitioner's claims of prosecutorial misconduct during the closing argument are completely devoid of merit.

### 5. *Unconstitutionality of Death Penalty Statute*

Petitioner claims that Tennessee's statutory provisions for imposing the death penalty are unconstitutional as applied to him in four different ways. Claim XV (Petition, ¶ 40):

1) unconstitutional requirement of jury unanimity on the existence of mitigating factors;

2) trial court failure to inform the jury of the consequence of a non-unanimous verdict violated the Eighth Amendment by diminishing the reliability of the sentencing verdict;

3) trial court violated the Eighth Amendment by instructing the jury that the defendant had the burden of proof on the existence of mitigating factors; and

4) the statute requires a death sentence in the absence of mitigating factors.

Petitioner has never specifically presented claims XV(1), XV(2), or XV(4) to the state courts. *See* Addendum 30 at 51, 53–55. Petitioner contends that his generalized challenge to the death penalty statute on post-conviction review resulted in a finding that the claim was "previously determined." He also argues, citing irrelevant case law from other circuits construing procedural defaults in other states, that a "previous determination" means his claims were all resolved on the merits. Neither contention is remotely meritorious.

By raising a ground for relief during a Tennessee post-conviction petition, the petitioner is provided a full and fair opportunity to present the constitutional claim. *House,* 911 S.W.2d at 710–11; *Cone v. State,* 927 S.W.2d 579, 581–82 (Tenn.Crim. App.1995); *Wooden v. State,* 1998 WL 511133 at *7 (Tenn.Crim.App. Aug.20, 1998), *perm. app. denied,* (Tenn. Mar. 22,

---

**21.** *See supra* n. 16.

1999). The Tennessee courts hold that subsequent consideration of factual allegations supporting that ground are barred by the prior presentation of the ground. *Cone*, 927 S.W.2d at 581–82. Alley's argument to the contrary is based on his mistakenly equating the federal habeas term of art "claim" with the Tennessee phrase "ground for relief."

 Under § 2254(b), exhaustion is required of every single factual aspect of a claim, not merely of generalized assertions of constitutional error. *Gray*, 518 U.S. at 163, 116 S.Ct. 2074; *Pillette*, 824 F.2d at 497–98. The state court refused to consider the merits of the factual allegations supporting any further attacks on the constitutionality of Tennessee's death penalty statute because petitioner had already had an opportunity on direct appeal to present his contention (whether described as a "claim" or as a "ground for relief"), that the statute was unconstitutionally applied to him. *Alley*, 958 S.W.2d at 155–56.

By refusing to consider the later factual allegations on the merits, the state courts erected a procedural bar in this federal habeas proceeding to the presentation of these specific claims based on those particular factual allegations. That the state court does not use terms that parallel federal habeas analysis in describing the "claims" asserted in state post-conviction proceedings is irrelevant.[22]

Petitioner argues that by declaring this ground "previously determined," the state courts have admitted that this claim has been decided on the merits. Petitioner reasons that since he cannot be procedurally barred from raising claims decided on the merits, the state court has decided all of his *claims* of the statute's unconstitutionality on the merits for purposes of federal habeas review.

The difficulty with petitioner's argument is that it is clear that these specific claims were not addressed on the merits by the state courts. It is clear that the state courts interpreted the "previously determined" language as a type of procedural bar—a legal determination that certain claims resting on specific factual support should have been presented at the time the petitioner raised similar claims within a broad ground implicating the same constitutional right. *Alley*, 958 S.W.2d at 155–56. Accordingly, for federal habeas purposes, the "previously determined" category is a type of procedural default as to those claims.[23]

 Plaintiff also attempts to argue that the Tennessee Supreme Court's duty to automatically review all aspects of the constitutionality of the death sentence necessarily requires that it considered this *possible* claim. This contention, however, is clearly untenable in light of *Coleman*'s rejection of the petitioner's contention that "consideration of all the filed papers" necessarily resulted in a merits review of all constitutional claims. 501 U.S. at 744, 111 S.Ct. 2546. Besides, an argument that the Court must review all conceivable claims, presented or not, directly contradicts controlling Supreme Court jurisprudence as discussed above.

22. *See* discussion, *supra* at 626–627, of *Coleman*, 501 U.S. at 739, 111 S.Ct. 2546, and *Amos*, 61 F.3d at 341, holding that federal courts are not to make a shibboleth of particular words or phrases.

23. Given that petitioner also did not present to the state courts a claim that counsel was ineffective for failing to incorporate this specific attack on the statute's constitutionality within his direct appeal, it appears natural that he has not attempted to demonstrate cause for that default on the basis of ineffective assistance of counsel. *See, e.g., Carpenter*, 163 F.3d at 944–45 (holding that if a federal habeas petitioner seeks to show cause for a procedural default by claiming ineffective assistance of counsel on direct appeal in state court, he must first exhaust the ineffective assistance claim by presenting it to the state's highest court); *Jones*, 125 F.3d at 947 (holding that petitioner "failed to satisfy the cause requirement of *Coleman*" because he did not raise his ineffective assistance claim "as an independent issue in state court"), *cert. denied*, 521 U.S. 1108, 117 S.Ct. 2490, 138 L.Ed.2d 997 (1997).

Finally, as to claim XV(4), petitioner could not, as a matter of law, demonstrate prejudice for this procedural default because the claim itself is foreclosed by *Walton v. Arizona,* 497 U.S. 639, 651–52, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

### 6. *Electrocution Violates the Eighth Amendment*

Petitioner has never presented claim XVI (Petition, ¶ 41), that electrocution is inherently cruel and unusual, to the state courts. He asserts, citing Tenn.Code Ann. § 40–30–217(a)(1), and *O'Guinn v. Dutton,* 88 F.3d 1409, 1411 (6th Cir.1996)(en banc), *cert. denied,* 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997), that this is a new rule on which he could rely to reopen the state post-conviction process, thereby precluding a finding of a procedural default, since he would still have a state court remedy. This contention is specious. *O'Guinn* is distinguishable for three reasons. First, the petitioner did not reopen a previous petition but was permitted to file a successive petition under the previous state post-conviction statute.[24] Next, the State had already granted that permission and was holding the petition in abeyance pending the disposition of the parallel federal habeas petition. *See* 88 F.3d at 1412. Lastly and most importantly, to justify filing the new state post-conviction petition, the petitioner relied not on a legal argument but on previously unavailable evidence tending to demonstrate that the State had committed a *Brady* violation.[25]

Here, by contrast, petitioner seeks to turn the state post-conviction statute on its head by arguing that *any* new legal claim must necessarily be unexhausted because the state court *might* grant leave to reopen. This contradicts both common sense and the plain text of the statute.

■■ The statute provides, in pertinent part, that the new claim must be "based upon a *final* ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required." Tenn.Code Ann. § 40–30–217(a)(1). Petitioner essentially argues that the procedural prerequisite of an actual ruling may be replaced by wishful thinking—the mere possibility that a court might eventually create the right he seeks to assert should support the possibility of reopening and, hence, the existence of a state remedy. This argument refutes itself, and requires no further analysis.

Insofar as petitioner's arguments should be construed as an attempt to demonstrate cause and prejudice for this default, he cannot demonstrate the latter because the claim is frivolous as a matter of law. *McQueen v. Patton,* 118 F.3d 460, 464 (6th Cir.1997)(holding that "[e]lectrocution has never been found to be cruel and unusual punishment by any American court.").

### 7. *Prosecutorial Misconduct During Voir Dire*

Petitioner claims that during voir dire of the jury the prosecution made statements:

1) diminishing the jury's responsibility for imposing the death penalty, Voir Dire Transcript, Addendum 39 (hereinafter Addendum 39) at 41, 54, 65, 298;

2) revealing victim impact information that was intended to elicit sympathy for the victim, *Id.* at 40, 45, 71, 100, 408;

3) referring to the terms "heinous, atrocious, or cruel", *Id.* at 52, 60, 62, 132, 140, 404; and

---

**24.** *See O'Guinn v. State,* 1997 WL 210890 *1 (Tenn.Crim.App. Apr.29, 1997) (noting that O'Guinn filed his third post-conviction petition on April 18, 1995), *perm. app. denied,* (Tenn. Sept. 15, 1997). The revised Tennessee Post–Conviction Act was effective on May 10, 1995. *See* notes following Tenn.Code Ann. § 40–30–201 (1997).

**25.** The state courts had carved out an exception to the one-petition rule and the statute of limitations procedural bars in the previous statute for certain types of new-arising factual claims. *See O'Guinn,* 1997 WL 210890 at *2, discussing *Burford v. State,* 845 S.W.2d 204 (Tenn.1992), and *Sands v. State,* 903 S.W.2d 297 (Tenn.1995).

4) referring to the requirement that mitigating circumstances be found unanimously, despite the unconstitutionality of the unanimity requirement, *Id.* at 38, 61–63, 135, 308, 500.

Claim XVII (Second Amended Petition, ¶ 44).[26]

██ Petitioner has never presented the first, third, or fourth of these claims to the state courts. He has only presented one aspect of the second claim during direct appeal, when he claimed that the prosecution improperly asked juror Janie Hearn if she could give the victim's parents a fair trial.[27] Presentation of these claims is now barred by Tennessee's post-conviction statute of limitations. This procedural default bars federal review of this claim absent a showing of cause and prejudice. Petitioner contends, citing *Dorman v. Wainwright,* 798 F.2d 1358, 1363 (11th Cir.1986), that the unavailability of the voir dire transcript constitutes "cause" excusing his procedural default. This contention is specious. Dorman defaulted his entire state appeal because of the *State*'s delay in preparing a transcript for him. The State's "misfeasance in the preparation of Dorman's trial transcript" constituted a factor external to the defense that sufficed as cause for his default. 798 F.2d at 1369–70.

Here, by contrast, petitioner obtained a timely transcript during the direct appeal, *including portions of the voir dire proceedings* related to the exclusion of jurors Todd and Jarred. His counsel simply elected not to have the remainder of the voir dire transcribed. The *State* had noth-ing to do with the decision Petitioner's representation in this habeas petition that he had had no access to these records is disingenuous and inexcusable.

██ The failure of petitioner's counsel to raise these claims on direct appeal, if that failure rises to the level of ineffective assistance in violation of the Sixth Amendment, could arguably constitute cause for his procedural default. Petitioner, however, had the opportunity to raise such a claim of ineffective assistance during the state post-conviction process, and did not. His right to bring that claim is also now barred. Accordingly, his failure to exhaust that ineffective assistance claim precludes him from showing cause for failing to raise these claims during his direct appeal. *Carpenter,* 163 F.3d at 944–45; *Jones,* 125 F.3d at 947.

Petitioner also had the opportunity to have those portions of the trial transcribed during the state post-conviction proceedings, but chose not to. He makes no argument whatsoever that the State has ever interfered with a request for this transcript. And, of course, the failure of post-conviction counsel to raise any claims is attributable to petitioner and cannot constitute cause for this default. *Coleman,* 501 U.S. at 752–53, 111 S.Ct. 2546.

Federal review of these claims is barred by petitioner's procedural default.

8. *Denial of the Right to Sit at Counsel Table*

Petitioner claims in claim XVIII (Second Amended Petition, ¶ 45), that he was de-

---

**26.** The respondent correctly notes that some of petitioner's citations are mistaken. The reference to p.45 of the voir dire transcript is to a colloquy between counsel and the Court during a bench conference, not voir dire. At pp. 135, 308, and 500, the prosecutor actually makes no reference to unanimity. Indeed, the only reference that could possibly be construed as making this argument are two oblique references to the jury's collective duty to determine if mitigating circumstances are proved, at 38 and 63. The petitioner incorrectly attributes the use of the word "gross" to the prosecution, when it was used by a juror. Addendum 39 at 404. Finally, the reference to sympathy at p.408 in actuality is part of a statement that concludes, "[i]t's very important that the decisions we make here not be based upon anything other than truthful analysis that aren't based upon things that reflect sympathy or prejudice." *Id.* at 409. The prosecutor followed this statement with the question, "[c]an each of you decide this case without any reference to—without any sympathy or prejudice?" *Id.*

**27.** For substantive analysis of this claim *see infra* at 659.

prived of his right to assist in his defense by being seated behind counsel, rather than at the same table with the attorneys.[28] Petitioner has never presented this claim to the state courts and his right to do so is now barred by both the one-petition rule and the Tennessee post-conviction statute of limitations. Petitioner does not even attempt to argue cause for this default.[29] This claim, accordingly, is barred by this procedural default.

### 9. *Denial of the Right to Not be Viewed in Jail Garb*

Petitioner claims, citing *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), that the jurors were allowed to view him in jail clothing, depriving him of due process. Claim XIX (Second Amended Petition, ¶ 46). Petitioner has never presented this claim to the state courts and his right to do so is now barred by both the one-petition rule and the Tennessee post-conviction statute of limitations. Petitioner does not even attempt to argue cause for this default.[30] This claim, accordingly, is barred by this procedural default.

### 10. *Unconstitutional Victim–Impact Evidence or Argument*

Petitioner raised claims VI.2 (Petition, ¶ 32(a)(2)) or VI.4–7 (Petition, ¶ 32(a)(4)-

(11)) during his post-conviction petition, but the Court of Criminal Appeals held them procedurally barred by finding that petitioner's victim-impact claim was "previously determined." Presentation of these claims is now barred by both the one-petition rule and the Tennessee post-conviction statute of limitations.

Petitioner does not attempt to present cause and prejudice for this default, but argues that the state court could not properly find default because the Tennessee Supreme Court was obliged to review the entire record for constitutional error on direct appeal. As previously discussed, *supra* at 628–630, Tennessee courts are invoking a species of procedural default when they use the phrase "previously determined," and petitioner's arguments that the generalized duty to review the death sentence's constitutionality cures all procedural defaults is plainly without merit.

### 11. *Ineffective Assistance of Counsel*

 Petitioner has never raised claims XX.15 (Petition, ¶ 33(m)), XX.19 (¶ 33(q)), XX.23 (¶ 33(u)),[31] XX.27 (¶ 33(x)), in the state courts. His right to raise these claims is now barred by both Tennessee's one-petition rule and the post-conviction statute of limitations. Petitioner must demonstrate cause and prejudice for this default. Petitioner's only basis for arguing

---

**28.** Petitioner relies on *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), and *Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), neither of which support his position. *Geders* reversed a federal criminal conviction because the trial judge violated defendant's Sixth Amendment rights when he prohibited counsel from consulting with the defendant during an overnight recess between his direct and cross-examination. *Perry* rejected a claim that denial of the right to consult with counsel during a fifteen minute recess between direct and cross-examination interfered with the defendant's Sixth Amendment rights. Petitioner proffers no support whatsoever that his ability to consult with counsel was adversely affected by the courtroom seating arrangements.

**29.** As with his other claims, petitioner has also not exhausted any claim that counsel on direct appeal rendered ineffective assistance by failing to raise this claim, precluding this as a basis for cause.

**30.** As with his other claims, petitioner has also not exhausted any claim that counsel on direct appeal rendered ineffective assistance by failing to raise this claim, precluding this as a basis for cause.

**31.** Petitioner did raise a claim that trial counsel failed to fully utilize one expert—Dr. Wyatt Nichols. This claim will be considered in the Court's analysis of the other exhausted ineffective assistance claims.

cause is that his post-conviction counsel did not raise these claims and that counsel's failure must constitute cause when claims could not have been raised sooner than the post-conviction proceeding. This contention is directly contrary to *Coleman v. Thompson,* and the only authority petitioner cites is a panel opinion of the Fourth Circuit that was reversed by the *en banc* court.[32] These claims are barred by petitioner's procedural default.

### III. *Analysis of Claims Considered on the Merits*

#### A. *Legal Standard for Merits Review*

The standard for reviewing petitioner's constitutional claims on the merits is enunciated in 28 U.S.C. § 2254(d). That section provides as follows.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This new provision directs the federal habeas court "to make the state court decision the cynosure of federal review." *O'Brien v. Dubois,* 145 F.3d 16, 20 (1st Cir.1998). *See also Nevers v. Killinger,* 169 F.3d 352, 361 (6th Cir. 1999) (adopting *O'Brien* interpretation of

§ 2254(d) in Sixth Circuit); *Blanton v. Elo,* 186 F.3d 712 (6th Cir.1999)(following *O'Brien* and *Nevers* ).

 Petitioner's numerous remaining claims were decided on the merits in his post-conviction proceeding. In those proceedings, his claims were "adjudicated 'on the merits,' and not disposed of on procedural grounds." *Cardwell v. Greene,* 152 F.3d 331, 339 (4th Cir.1998). This Court must decide whether the state court adjudications of those claims were either "contrary to" or an "unreasonable application" of "clearly established" federal law as determined by the United States Supreme Court. In applying § 2254(d)(1), the federal habeas court should seek to give effect to both of these clauses. *O'Brien,* 145 F.3d at 20.

A federal habeas court charged to weigh a state court decision must undertake an independent two-step analysis of that decision. First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.

*Id.* at 24; *Nevers,* 169 F.3d at 359 (quoting same language). In analyzing this first clause, the federal habeas court determines whether there is any Supreme Court decision which is dispositive of the issue and then asks whether the state court is contrary to that precedent. *Id.*

32. *Mackall v. Murray,* 109 F.3d 957 (4th Cir. 1997), *rev'g panel opinion, Mackall v. Angelone,* 131 F.3d 442, 449 (4th Cir.1997), *cert. denied,* 522 U.S. 1100, 118 S.Ct. 907, 139 L.Ed.2d 922 (1998). As the *en banc* court noted, every federal appellate court to which

the issue has been presented has rejected the contention that the absence of prior opportunities to raise a claim converts collateral-proceeding ineffective assistance to cause on federal habeas review. 131 F.3d at 449 n. 13.

The Sixth Circuit adopted *O'Brien*'s analytical framework in *Nevers*, explaining that the First Circuit had drawn on *Teague* in deciding whether a Supreme Court decision is "dispositive of the issue":

> "Drawing on Teague, we hold that an affirmative answer to the first section 2254(d)(1) inquiry—whether the Supreme Court has prescribed a rule that governs the petitioner's claim—requires something more than a recognition that the Supreme Court has articulated a general standard that covers the claim. To obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court."

*Nevers*, 169 F.3d at 359 (quoting *O'Brien*, 145 F.3d at 24–25) (citations omitted). As *Nevers* and *O'Brien* further explain, " '[a] petitioner need not point a habeas court to a factually identical precedent.' " *Nevers*, 169 F.3d at 359 (quoting *O'Brien*, 145 F.3d at 25). Many Supreme Court holdings, according to *Nevers* and *O'Brien*, "erect a framework specifically intended for application to variant factual situations." *Id.*

> [T]he key inquiry, at bottom, is whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case.

*O'Brien*, 145 F.3d at 25. *Accord, Nevers*, 169 F.3d at 359 (quoting same language).

■ If there is no dispositive Supreme Court case, the federal habeas court analyzes whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence. *O'Brien*, 145 F.3d at 25. "This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable." *Id.* Reasonableness, according to *O'Brien*, is an objective test.

> We think it is pellucid, however, that the "unreasonable application" clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result. Rather, for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

*Id.* In *Nevers*, the Sixth Circuit adopted this standard, adding that it is essentially equivalent to the standard previously adopted in *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.1998)(adopting the standard of *Drinkard v. Johnson*, 97 F.3d 751, 767 (5th Cir.1996)), that an unreasonable application occurs when "a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Nevers* reconciled these two approaches (*O'Brien* having previously rejected *Drinkard*), and noting that reasonable jurists could not find a state court's application of clearly established Supreme Court precedent debatable if it is "outside the universe of plausible, credible outcomes." 169 F.3d at 362.

### B. *Specific Claims for Substantive Review*

#### 1. *Judicial Bias*

Petitioner exhausted all of the remaining claims of judicial bias during the appeal of his post-conviction petition:[33] claims I.4(a) (Petition, ¶ 26(a)(3)), I.5 (Petition, ¶ 26(a)(4)), I.6 (Petition, ¶ 26(a)(5)), I.7 (Petition, ¶ 26(a)(6)), I.10 (Petition, ¶ 26(a)(9)). The Tennessee Court of Criminal Appeals

---

**33.** *See supra* at 606–608: Claims I.4 (Petition, ¶ 26(a)(3)), I.5 (Petition, ¶ 26(a)(4)), I.6 (Petition, ¶ 26(a)(5)), I.7 (Petition, ¶ 26(a)(6)), I.8 (Petition, ¶ 26(a)(7)), I.9 (Petition, ¶ 26(a)(8)), I.10 (Petition, ¶ 26(a)(9)).

ruled on each of these claims, holding that none of them supported a claim that petitioner's trial was unfair so as to deprive him of due process.

As discussed, *supra* at 616, petitioner relies on *Marshall,* 446 U.S. at 242, 100 S.Ct. 1610; *In re Murchison,* 349 U.S. at 134, 75 S.Ct. 623; and *Tumey,* 273 U.S. at 520, 47 S.Ct. 437, in arguing that Judge Axley displayed bias that deprived him of a fair trial. However, as already indicated with reference to the procedurally defaulted claims, petitioner's reliance on these authorities is completely misplaced. In determining whether there is a dispositive Supreme Court case contrary to the Court of Criminal Appeals' determination, these cases provide only a general background. They certainly do not provide a particular rule applicable to *this* case, however, they might be similar to other hypothetical cases.

Rather, the first step in locating controlling Supreme Court precedent is the identification of the relevant issue for decision. Here, petitioner, having no specific authority to support his claim of bias, has relied merely on generalized assertions of the right to an impartial tribunal. Examination of the *facts* he proffers to support his claim, however, reveals issues that are directly controlled by Supreme Court case law.

Thus, with regards to the letter from the victim's family, it is clear under Supreme Court precedent that neither the receipt of this letter nor its non-disclosure amounted to bias. The seminal Supreme Court case on judicial bias is *Berger v. United States,* 255 U.S. 22, 31, 41 S.Ct. 230, 65 L.Ed. 481 (1921), in which the Court directed the recusal of United States District Judge Kennesaw Mountain Landis from presiding over a World War I espionage prosecution based on pretrial statements evincing a clear racial and ethnic bias against Americans of German or Austrian ancestry. In determining that the defendants were entitled to recusal under the then-controlling version of the federal statute governing judicial disqualification[34] the Supreme Court first articulated the principle that "the bias or prejudice which can be urged against a judge must be based upon something other than rulings in the case." *Id.* In a later exposition of this fundamental principle the Court observed: "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Finally, in *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147, the Court delimited what the Court there described as "the extra-judicial source factor":

First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.,* 384 U.S. at 583, 86 S.Ct. at 1710. In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an

---

**34.** Now codified at 28 U.S.C. § 144.

extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. an example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans; because their 'hearts are reeking with disloyalty.'" *Id.* at 28, 41 S.Ct. 230 (internal quotation marks omitted). **Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, an even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.** A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555–56, 114 S.Ct. 1147 (emphasis added).

The federal criminal defendants in *Litsky* were indicted for willful destruction of property of the United States in violation of 18 U.S.C. § 1361, based on various acts of vandalism committed while protesting at the Fort Benning Military Reservation. The defendants requested the trial judge's recusal based on the manner in which the judge conducted a prior trial of one defendant on related and similar charges. The defendants claimed that the judge displayed bias by:

Stating at the outset of the trial that its purpose was to try a criminal case and not to provide a political forum; observing after Bourgeois' opening statement (which described the purpose of his protest) that the statement ought to have been directed toward the anticipated evidentiary showing; limiting defense counsel's crossexamination; questioning witnesses; periodically cautioning defense counsel to confine his questions to issues material to trial; similarly admonishing witnesses to keep answers responsive to actual questions directed to material issues; admonishing Bourgeois that closing argument was not a time for "making a speech" in a "political forum"; and giving Bourgeois what petitioners considered to be an excessive sentence. The final asserted ground for disqualification—and the one that counsel for petitioners described at oral argument as the most serious—was the judge's interruption of the closing argument of one of Bourgeois' codefendants, instructing him to cease the introduction of new facts, and to restrict himself to discussion of evidence already presented.

*Id.* at 542–43, 114 S.Ct. 1147. The Supreme Court, applying the recusal principles articulated above, affirmed the convictions:

All of these grounds are inadequate under the principles we have described above: They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of judicial proceedings, and neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.

*Id.* at 556, 114 S.Ct. 1147. Although *Liteky* articulated these principles in interpreting one of the federal recusal statutes—28 U.S.C. § 455, the federal appellate courts have assumed that the principles it enunciates apply in federal habeas cases to Fourteenth Amendment claims for deprivation of a fair trial based on judicial bias. *See, e.g., Boysiewick v. Schriro,* 179 F.3d 616, 621 (8th Cir.1999); *Crane v. Sparkman,* No. 97–5321, 1998 WL 598725 at * 6 (6th Cir. Aug.27, 1998) (holding that judge's *response* to letter from murder victim's

family after trial did not support claim that bias rendered trial unfair);[35] *Ortiz,* 149 F.3d at 940; *Poland v. Stewart,* 117 F.3d 1094, 1103–04 (9th Cir.1997) (applying *Liteky* to judicial bias claim in death penalty case); *West,* 92 F.3d at 1411 n. 47.

The Tennessee Court of Criminal Appeals' decision was neither "contrary to" nor an "unreasonable application" of these principles. The mere receipt of a letter says nothing about the judge's disposition, and the non-disclosure of it to the defense proves nothing. Furthermore, petitioner's argument that this letter resulted in Judge Axley setting a trial date is clearly contradicted by the procedural history of the case as set forth above. The Tennessee Court of Criminal Appeals' holding that the "trial judge did not respond to the family or make any special concessions on their behalf" is correct, and the conclusion that petitioner was not deprived of a fair trial complies with § 2254(d)(1). Claim I.4(a), accordingly, is without merit.

■ Similarly, the Tennessee Court of Criminal Appeals' other rulings comply with § 2254(d)(1). Petitioner has never connected the proximity of the seat occupied by Judge Axley's wife to the victim's family with any action by Judge Axley. The state court's determination that the jurors did not even know Judge Axley's wife is uncontradicted by the petitioner. Claim I.5 is without merit.

■ Likewise, access by family members to a hallway also leading to the judge's chambers and jury room is not evidence of *judicial* bias at all. The state court's holding on this claim (claim I.6) is neither contrary to nor an unreasonable application of the *Liteky* standards.

The claim that Judge Axley tried to hurry the mental examination of petitioner (claim I.7), is factually frivolous. The Court has reviewed the transcripts of the competency hearings. Far from revealing any bias against petitioner, the transcripts demonstrate the conclusive validity of the Court of Criminal Appeal's decision that Judge Axley did no such thing. Indeed, Judge Axley permitted a series of mental evaluations that exceeded by many months the thirty days normally permitted by Tennessee statute for conducting competency evaluations. Not only does the record *not support* this claim of bias, it supports an inference of more than the required patience with petitioner, his counsel, and the medical professionals who were asked to examine and evaluate petitioner.

■ The claim that Judge Axley demonstrated bias by excluding the videotapes (claim I.8), is clearly frivolous because it is a judicial ruling that does not "evidence the degree of favoritism or antagonism required." *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147. As discussed, *infra* at 638–640, petitioner's extravagant claims that the exclusion of this evidence violated due process are devoid of merit. It follows *a fortiori* that the essence of this claim is that a proper evidentiary ruling is evidence of bias. This claim is clearly without merit.

■ The Court of Criminal Appeals did not explicitly rule on petitioner's claims of Judge Axley's bias based on his use of profanity and hostility towards petitioner's counsel ·(claim I.9). Nevertheless, the general conclusion rejecting petitioner's claims that judicial bias deprived him of a fair trial are in keeping with the controlling law already discussed.[36] At most, the peti-

---

**35.** Although citation to unpublished Sixth Circuit precedents is disfavored, this case is referred to in the absence of clear published case law from this Circuit "because it establishes the law governing the present action and 'there is no [Sixth Circuit] published opinion that would serve as well.'" *Norton v.*

*Parke,* 892 F.2d 476, 479 n. 7 (6th Cir.1989). The Sixth Circuit has not issued a published opinion addressing *Liteky*'s applicability to constitutional claims of judicial bias in a § 2254 petition.

**36.** Furthermore, the Court has reviewed the record for the "examples of extreme apparent

tioner is relying on "expressions of impatience, dissatisfaction, annoyance, and even anger." *Liteky*, 510 U.S. at 555–56, 114 S.Ct. 1147. The petitioner has completely failed to demonstrate any constitutional violation, or any claim to relief.

■ Equally clearly, the claim based on the judge's completion of the Rule 12 report is devoid of merit. The report had no affect on the outcome of the appeal, and thus could not prejudice the petitioner in any way. More significantly, the claim that the report is "false" is itself without factual foundation. In claiming that it is false, petitioner relies on Judge Axley's assertion that no mitigating evidence was shown. The contrary view, of course, is the linchpin of petitioner's post-conviction and habeas claims. Judge Axley, however, quite obviously completed the report based on his perspective of the evidence: namely, that the petitioner failed in his attempts to demonstrate mitigation. Whether Judge Axley's perspective was accurate or not, however, is irrelevant to the ultimate decision by the Tennessee Supreme Court to affirm his conviction. It follows *a fortiori* that it is also irrelevant to the petitioner's claims of constitutional error affecting his conviction and sentence. More importantly, as a claim of judicial bias it fails because it is simply yet another instance of

a judicial evaluation of the evidence and law, which cannot constitute bias regardless of the accuracy of Judge Axley's analysis.

### 2. *Evidentiary Rulings Deprived Petitioner of a Defense*

Petitioner claims that his due process right to present a complete defense during both the guilt and penalty phases of his trial was violated by the exclusion of the videotapes of the hypnosis and sodium amytal interrogation sessions conducted by Doctors Battler and Marshall, respectively. Claim II (Petition, ¶ 27(a), (b), (c)(6), (i), and ¶ 28(a)(1), (2)).

The Tennessee Supreme Court ruled on direct review that Judge Axley properly excluded the tapes. *Alley*, 776 S.W.2d at 515–16. Petitioner contends that this is contrary to the teaching of *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), and related cases, that a criminal defendant must be permitted to present a complete defense. In petitioner's view, this jurisprudence prohibited the state court from excluding "vital" evidence. Petitioner argues that the tapes were "vital" because they provided the primary support for the opinions of Dr. Marshall and Dr. Battle that petitioner experienced

---

bias" as cited by petitioner in his Rely Brief at 35 n.21. Of the various colloquies between Judge Axley and defense counsel, in every single one Judge Axley was making an evidentiary ruling, exercising control over the pace of the proceedings, the timing of witnesses, the decorum and conduct of counsel in the courtroom, or over the general administration of the trial. Indeed, the record indicates that of forty-three examples from the trial, the list consists of thirty-two evidentiary rulings, two references to witness testimony during which there is no statement by the Court at all, several colloquies over trial management and delay, and, finally, a few instances in which Judge Axley admonished counsel for either one side or the other regarding the proper procedure for making and responding to objections. Every single instance is an example of a judicial action. Some are critical of counsel, but every single criticism relates directly to the conduct of the trial, *not* to the

person of the petitioner or his guilt or innocence. Moreover, every single cited instance occurred either during a bench conference or outside the presence of the jury. The petitioner has not cited, and this Court's review does not reveal, a single instance in which Judge Axley expressed any personal feeling or belief regarding the guilt or innocence of the petitioner, or indeed characterized him or commented about him in any way at all during the trial. Furthermore, although petitioner has included in his list numerous examples of mere evidentiary rulings against the defense, he has omitted the numerous rulings in the defense's favor, as well as the instances in which Judge Axley was also impatient with the prosecution. In reality, as examples of bias the citations are neither extreme nor apparent. Rather than providing actual examples of bias, the petitioner has merely catalogued the judge's numerous evidentiary rulings and mischaracterized them.

a multiple personality (claims II.1, II.2, II.3).

■ Petitioner, however, has misidentified the Supreme Court precedent that provides the controlling law. "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). As the Court noted, "[a]ny number of familiar and unquestionably constitutional evidentiary rules authorize the exclusion of relevant evidence.... [f]or instance, Federal [ ]Rule of Evidence 403." *Id.*[37] Tennessee adopted Federal Rule of Evidence 403 in *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). In petitioner's direct appeal, the Tennessee Supreme Court held the tapes were properly excluded because the risk that they would confuse and mislead the jury outweighed their probative value. *Alley*, 776 S.W.2d at 515–16.[38]

Petitioner does not argue that this decision incorrectly applied Tennessee's evidentiary rules. Rather, he relies purely on a constitutional right to present evidence he considers vital to the defense. The Constitution, however, does not dictate this result. Rather, it is "perfectly clear that [in *Crane* ] we were not setting forth an absolute entitlement to introduce crucial, relevant evidence." *Egelhoff*, 518 U.S. at 53, 116 S.Ct. 2013. Furthermore, "*Crane* does nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a 'valid' reason." *Id.* As *Egelhoff* makes clear, Supreme Court precedent, including the cases relied on by petitioner, merely announce the unremarkable rule that "erroneous evidentiary rulings can, in combination, rise to the level of a due process

violation." *Id.* Petitioner, however, has not demonstrated that the videotapes were excluded as a result of an erroneous evidentiary ruling.

■ The Tennessee Supreme Court's ruling was not an unreasonable application of the principles enunciated by *Egelhoff*. *See Blanton*, 186 F.3d at 716 (holding that under *Egelhoff* and *Crane* "it is not error to limit relevant evidence for a valid state reason, including cumulativeness."). The videotapes were plainly *not* the crucial link in petitioner's insanity defense.

Just because a criminal defendant asserts an insanity defense does not convert all testimony or evidence related to psychiatric evaluations of the defendant into critical evidence. *Wong v. Money*, 142 F.3d 313, 324–26 (6th Cir.1998). In *Wong*, the federal habeas petitioner claimed that the exclusion of psychiatric testimony regarding her capacity to form the mens rea to commit felonious assault and vandalism deprived her of due process by interfering with the presentation of her defense. The Sixth Circuit disagreed, finding that Ohio was not constitutionally required to recognize a defense of diminished capacity and that the proffered testimony was unrelated to her insanity defense.

Similarly, here the petitioner sought to introduce evidence that he experienced multiple personalities. However, neither of petitioner's expert witnesses, Dr. Marshall and Dr. Battle, gave a definitive expert opinion that a specific different personality was in control at the time of the murder. *See Alley*, 776 S.W.2d at 510. Furthermore, Dr. Battle testified that even if another personality was in control, if that personality were sane, petitioner would have been able to appreciate the wrongfulness of his conduct. Addendum

---

**37.** The Rule states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay,

waste of time, or needless presentation of cumulative evidence.

**38.** The Tennessee Supreme Court's ruling vitiates any error in Judge Axley's articulation of the basis for excluding the tapes, thus disposing of petitioner's claim II.4 (Petition, ¶ 27(i)).

12 at 1201–02. Accordingly, a multiple personality diagnosis would actually not have supported the conclusion that petitioner was insane at the time of the crime. The tapes, accordingly, were irrelevant to the petitioner's insanity defense. *Wong,* 142 F.3d at 325. It follows *a fortiori* that the evidence could not have significantly undermined a fundamental element of the accused's defense. *Id.*

Furthermore, the exclusion of this evidence did not, as would be required for a due process claim under *Crane,* "preclude Petitioner from introducing any factual evidence; i.e., 'facts' about the alleged crime at hand." *Wong,* 142 F.3d at 325. The trial court specifically found, and the Tennessee Supreme Court agreed, that the videotapes contained no information about the events of the day of the murder or petitioner's mental state on that day.

Given the Tennessee Supreme Court holding that the proffered videotapes were inadmissible, petitioner's fact-intensive attack on the crucial character of that evidence is simply irrelevant. In essence, the petitioner's argument can reasonably be summarized as follows:

> Faced with overwhelming and virtually incontrovertible proof of my guilt, including my confession, and lacking any credible defense, my attorneys grasped at a slender reed of a defense and attempted to piece together a viable claim of insanity. Faced with contradictory and inconclusive expert medical opinions to support this defense, my attorneys, as a matter of trial tactics and strategy, based my insanity defense on an inadmissible item of evidence. The trial court excluded the evidence during both the guilt and penalty phases of my trial, and the prosecutor successfully argued that the defense, including a variety of otherwise unsupported expert testimony, lacked any foundation. The jury rather logically rejected my defense. Since I had no valid defense based on admissible evidence, the Constitution requires that the judge allow me to introduce any evidence I wanted to, because I face the death penalty.

The Tennessee Supreme Court's decision is not an unreasonable application of clearly established Supreme Court law, and this claim is devoid of merit.

Petitioner's parallel contention (claim II.5), that the inadmissible videotapes should have been admitted during the sentencing hearing, is similarly devoid of merit. Contrary to petitioner's characterization, the videotapes did not constitute mitigating evidence. Petitioner's insistence that the tapes "are rife with mitigating evidence—evidence of [his] mental disturbance before and at the time of the offense," Reply Brief at 70, is completely unsupported by the record. Furthermore, this entire argument is founded on the erroneous assumption that a state court cannot exclude inadmissible or irrelevant evidence from a death penalty hearing. Petitioner cites no authority that supports this proposition. The Tennessee Supreme Court's conclusion that the tapes were inadmissible for both phases of the trial was neither contrary to nor an unreasonable application of Supreme Court case law.

### 3. *Unconstitutional Aggravating Circumstance*

Petitioner contends in Claim III that the Tennessee death penalty statute at the time of his trial permitted imposition of the death penalty on the basis of an unconstitutionally vague aggravating circumstance: that the murder is "heinous, atrocious, or cruel in that it involved torture or depravity of mind." Claim III (Petition, ¶ 29). He contends that the statute is facially vague and that the judge instructed the jury in unconstitutionally vague defining terms.

The Tennessee death penalty statute in effect in July of 1985 stated as follows, in pertinent part:

> (i) No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or

more of the statutory aggravating circumstances, which shall be limited to the following: ... (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind

....

Tenn.Code Ann. § 39–2–203(i)(5)(1982). The trial court instructed the jury as follows regarding this aggravating circumstance:

> Tennessee Code Annotated § 39–2–203(i) provides that no death penalty shall be imposed by a Jury but upon a unanimous finding of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

> 1) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

> "Heinous" means extremely wicked or shockingly evil.

> "Atrocious" means outrageously wicked and vile.

> "Cruel" means designed to inflict a high degree of pain, utter indifference

to, or enjoyment of, the suffering of others, pitiless.

Addendum 13 at 1887.

Petitioner argues that this circumstance created no restraint on the arbitrary and capricious infliction of the death sentence. Relying on *Richmond v. Lewis,* 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992); *Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); and *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980),[39] petitioner contends that the terms " 'heinous,' 'atrocious,' and 'cruel' are themselves unconstitutional." This contention mischaracterizes this jurisprudence.[40] *See Cartwright v. Maynard,* 822 F.2d 1477, 1485 (10th Cir.1987) (recognizing that "the Supreme Court has not held such language [(the terms 'outrageously or wantonly vile,' 'heinous,' 'horrible,' "brutal," 'depraved,' 'cruel,' 'inhuman,' or 'atrocious')] to be facially unconstitutional" but has examined how the statute is applied to the particular death sentence), *aff'd,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

In *Godfrey,* the Court held that "the circumstances of this case [ ] do not satisfy

---

**39.** Petitioner also cites to *Houston v. Dutton,* 50 F.3d 381 (6th Cir.1995), *Rickman v. Dutton,* 854 F.Supp. 1305 (M.D.Tenn.1994), and various other circuit court opinions. As already noted, however, under amended § 2254, the "cynosure of federal review" is whether the state court's decision is contrary to or an unreasonable application of clearly established federal law as determined by the *Supreme Court,* not as determined by the lower federal courts. *Rickman,* of course, is only a district court opinion, is entitled to no particular weight at all, and in this Court's view relies on seriously flawed reasoning that is wholly unpersuasive. While *Houston* provides guidance in understanding Supreme Court jurisprudence, it is not itself determinative. Furthermore, *Houston* is distinguishable because the pre–1980 state court trial at issue there antedated most of the state and federal Supreme Court jurisprudence in this area. *See infra* at 641–645. More particularly, the trial was conducted before the Tennessee Supreme Court decision in *State v. Williams,* 690 S.W.2d 517, 526–27 (1985),

which narrowed the construction of the statute. Furthermore, the state trial court in *Houston* provided no definition at all for the statutory terms.

**40.** Petitioner also, yet again, misrepresents case law in regards to this issue. Petitioner represents that in *Shell,* which reversed a Mississippi conviction on the basis of *Maynard,* the jury was "provided identical definitions of 'heinous,' 'atrocious,' and 'cruel' provided here." Reply Brief at 75. The instructions in *Shell* actually read:

> The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious, or cruel, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

*Shell v. State,* 554 So.2d 887, 903 (Miss.1989). While similar, these definitions are *NOT* completely "identical."

the criteria laid out by the Georgia Supreme Court itself in the [prior case law adopting a narrowing construction of the statute]." 446 U.S. at 432, 100 S.Ct. 1759. Accordingly, the Court examined whether the state court had "applied a constitutional construction" of the facially vague aggravating circumstance, and answered no. *Id.* Thus, *Godfrey* does not stand for the proposition that these terms are "unconstitutional." Rather, it stands for the propositions that 1) the state court must construe the statutory terms by adopting criteria that comply with the constitutional requirement that murders warranting the death penalty be distinguishable from all other murders so that the jury's decision is not arbitrary, and 2) the facts of the murder must satisfy the criteria so enunciated. Notably, *Godfrey* observed that the murder there *did not* involve torture. *Id.*

Furthermore, Georgia procedure in *Godfrey* required the jury to articulate the aggravating circumstance relied on, but the jury only articulated part of the statutory factor—that the murder was "outrageously or wantonly vile, horrible and inhuman." The Court found that "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Id.* at 428, 100 S.Ct. 1759.

*Maynard* applied *Godfrey* to an Oklahoma death sentence. The Oklahoma appellate court had affirmed a sentence of death based on an aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." 486 U.S. at 359, 108 S.Ct. 1853. *Maynard* explained

that *Godfrey* had held the Georgia instruction "insufficient to cure the jury's unchanneled discretion because [the Georgia] court failed to apply its previously recognized limiting construction of the aggravating circumstance." *Id.* at 363, 108 S.Ct. 1853. The Court also noted that *Godfrey* "plainly rejected the submission that a particular set of facts surrounding a murder, however shocking they might be, were enough in themselves, *and without some narrowing principle to apply to those facts*, to warrant the imposition of the death penalty." 486 U.S. at 363, 108 S.Ct. 1853 (emphasis added). The Court then applied those principles to the Oklahoma sentence, holding that the mere use of the terms "heinous, atrocious, or cruel" without further definition, and in the absence of any meaningful narrowing review by the appellate court, violated the Eighth Amendment. The Court specifically relied on the Tenth Circuit's interpretation of Oklahoma case law as failing to provide an adequately narrowing construction of this aggravating circumstance.[41] In so doing, however, the Court specifically noted that it was not imposing a requirement that "torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable." *Id.* at 365, 108 S.Ct. 1853.

*Shell v. Mississippi* is a per curiam application of *Maynard* to a Mississippi aggravating circumstance different from the Tennessee factor. The state court's jury instruction did not, contrary to petitioner's characterization, define these terms in the same identical language as were used in

---

41. The Oklahoma court had instructed the jury that:

The term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

*Cartwright*, 822 F.2d at 1488. The appellate court clarified, however, that the Oklahoma courts had not consistently interpreted or applied the various narrowing constructions of

this statute, but had conflated the construction of the circumstance with a generalized consideration of the crime's surrounding circumstances, thus demonstrating that the "construction" had not "channel[ed]" the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Id.* at 1489 (quoting *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759).

petitioner's case. *Shell,* accordingly, is distinguishable.

In *Richmond v. Lewis* the Court found that Arizona, which employs judge-sentencing, improperly applied the aggravating circumstance "especially heinous and cruel manner" because the factor itself is vague, *had not previously been narrowed* by an appellate court construction, the sentencing judge did not find the facts necessary to support application of the circumstance under a properly narrowing construction later adopted by the Arizona courts, and the appellate courts did not reweigh application of the aggravating circumstance so as to cure the original error.

■ Tennessee did not apply an unconstitutionally vague and arbitrary aggravating circumstance to this petitioner because Tennessee adopted a narrowing construction and the trial court appropriately instructed the jury under the facts of the case so as to prevent any risk that the jury imposed the death penalty arbitrarily or capriciously. Prior to petitioner's trial, Tennessee adopted a narrowing construction of the above statute in *Williams,* 690 S.W.2d at 529–30.[42] After reference to the dictionary definitions of the terms "heinous," "atrocious," "cruel," "torture," and "depravity," the Court held:

> Our statute provides that it is the murder which must be especially heinous, atrocious, or cruel. The second clause of this statutory provision, viz., ". . . in that it involved torture or depravity of mind," qualifies, limits and restricts the preceding words "especially heinous, atrocious or cruel." This second clause means that to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved the torture of the victim or depravity of the mind of the killer.

> Torture means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

The Court went on to set aside a death sentence based on this circumstance because of lack of evidence that any pain was inflicted on the victim before death and because the mutilation of the body was not sufficiently close in time to the actual murder to support an inference that the defendant's state of mind at the time of the acts of mutilation were those at the time of the murder. *Id.* at 530–31.

The State further explicated this construction in *State v. Hines,* 919 S.W.2d 573, 581 (Tenn.1995), a prosecution for the stabbing murder of a motel maid. The defendant "[a]bout the time of death, and shortly after the infliction of the lethal wounds to the chest . . . inserted a flat object through the victim's vaginal orifice into the vaginal pouch until the instrument penetrated the vaginal dome and passed into the abdominal cavity." Following the holding of *Williams* that the aggravating circumstance is satisfied by torture, the Court held that

> willful insertion of a sharp instrument into the vaginal cavity of a dying woman (or a woman who had just died) satisfies the requirements of *Williams* . . . . [T]he stab wound to the vagina was sufficient to support finding that the wounds were intentionally inflicted and that the murder involved torture under *Williams.*

919 S.W.2d at 581.

When petitioner attacked the use of this aggravating circumstance during the post-

---

**42.** The petitioner faults respondent for citing this case, but that is because petitioner persists in misinterpreting the controlling Supreme Court case law. If, as petitioner has represented to this court, that jurisprudence flatly prohibited the aggravating circumstance applied here, and if the instruction used to define that circumstance was vague, petitioner might have an argument that *Williams* is irrelevant to this analysis. As indicated, however, this jurisprudence requires an examination of both the narrowing constructions of aggravating circumstances and the subsequent appellate review.

conviction proceeding, the Court of Criminal Appeals rejected it in reliance on *Hines*.

■ What the Supreme Court has actually held in these cases is that a statute employing these terms as aggravators requires, first, a narrowing construction that permits courts and the sentencing body (in Tennessee a jury), to distinguish those murders that merit the death penalty from those that do not; and, second, appellate court review that confirms that the facts of the crime fall within the appropriately narrowed definition of those terms. *See Lambrix v. Singletary*, 520 U.S. 518, 537–38, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). This is precisely what happened in petitioner's case.

The conclusion from this analysis is that petitioner now seeks to sculpt a "rule" that the aggravating circumstance as defined by the Tennessee courts' narrowing definition and limited by the jury instruction, cannot be applied to any set of circumstances, even though the facts plainly fit within the narrowed definition. The requested result, however, would amount to a new rule barred from retroactive application on federal habeas review by the principles of *Teague*, 489 U.S. at 310, 109 S.Ct. 1060. *See Lambrix*, 520 U.S. at 538, 117 S.Ct. 1517: "Before *Espinosa[ v. Florida*, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992)], we had never invalidated a death sentence where a court found the challenged aggravator to be within the appellate court's definition of a facially vague aggravator." *Lambrix* held that *Teague* barred retroactive application of *Espinosa*, and it also bars retroactive application of the new rule proposed here.[43]

Even if petitioner's claim does not propose a new rule, however, this claim is substantively devoid of merit. The Court of Criminal Appeals' application of *Hines* to this aggravating circumstance and the accompanying jury instruction is neither

contrary to nor an unreasonable application of clearly established federal law. The instruction did enunciate a limiting principle that required the jury to distinguish this murder from others. The definition of cruel as "designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others, pitiless" when combined with the term "torture" specifically directed the jury to consider whether there were characteristics of this murder that were not invariably found in every murder. That is, the jury was not instructed in terms that " 'could fairly characterize almost every murder.' " *Maynard*, 486 U.S. at 363, 108 S.Ct. 1853 (quoting *Godfrey*, 446 U.S. at 428–29, 100 S.Ct. 1759). Under *Maynard*, torture is clearly one of the constitutional constructions that limit the "heinous, atrocious, or cruel" aggravating circumstance. Tennessee has clearly adopted such a construction. The above jury instructions limited the jury's discretion and the reviewing court plainly applied the correct standard. Accordingly, the Court of Criminal Appeals' decision is neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court. This claim is devoid of merit.

#### 4. *Unconstitutional Jury Instruction on Reasonable Doubt*

Petitioner contends that the trial court provided the jury with unconstitutional instructions defining reasonable doubt in both the guilt and sentencing phases of his trial. Claim IV (Petition, ¶¶ 30, 30(n)). Petitioner relies on *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); and *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).

---

**43.** Of course, the respondent's failure to raise *Teague* or rely on its retroactivity principles on this issue is no barrier to this Court's

ability to consider it *sua sponte*. *See Lyons v. Stovall*, 188 F.3d 327, 340, and text, *supra* at 621.

In petitioner's case, at the conclusion of the guilt phase and before deliberations, the Court instructed the jury as follows regarding reasonable doubt:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

Addendum 13 at 1862. At the conclusion of the sentencing hearing and before deliberations, the Court again instructed the jury regarding reasonable doubt:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict. *Reasonable* doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdict.

Addendum 13 at 1886.

■ Petitioner contends that these instructions unconstitutionally lowered the standard for reasonable doubt. The Court of Criminal Appeals rejected this claim on appeal from the post-conviction petition. This decision was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

The constitutionality of Tennessee's reasonable doubt instruction has been passed on by *Austin v. Bell,* 126 F.3d 843, 847 (6th Cir.1997), *cert. denied,* 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). Although *Austin* was applying the prior version of § 2254, rather than the "con-

trary to or unreasonable application" standards, its analysis is valid.

*Austin* reviewed a habeas petition filed by another defendant convicted in the Shelby County Criminal Court. In that case the trial court instructed the jury as follows:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

126 F.3d at 846. This instruction is identical to the instruction issued in petitioner's case. Relying on *Cage's* holding that a jury instruction using the phrase "moral certainty" lowered the prosecution's burden of proof, petitioner contends that this instruction also did so, in violation of the Fifth Amendment as interpreted by *In re Winship,* 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

*Austin,* however, upheld the instruction, citing *Victor:*

In *Victor v. Nebraska,* however, the Supreme Court held that use of the term "moral certainty" does not, of itself, render a "reasonable doubt" instruction unconstitutional. The phrase "moral certainty" is constitutionally permissible where the rest of the instruction "lends content to the phrase," and indicates the government's proper burden of proof.

126 F.3d at 847 (citations omitted). In particular, the Court held that:

The reasonable doubt instruction in this case is more like the acceptable language in *Victor* than the unacceptable language in *Cage.* The language of an "inability to let the mind rest easily" lends content to the phrase "moral certainty" similar to the "abiding convic-

tion" language in *Victor*, increasing, if anything, the prosecutor's burden of proof. It also does not create a reasonable likelihood that the jury applied the instruction in a way that would lower the state's burden of proof because it does not increase the measure of doubt beyond a "reasonable doubt."

*Id.* Since *Austin*, the Sixth Circuit has twice upheld virtually identical instructions for both the guilt and sentencing phases in other Tennessee death penalty cases. *See Workman v. Bell*, 178 F.3d 759, 776–77 (6th Cir.1998), *cert. denied*, —— U.S. ——, 120 S.Ct. 264, 145 L.Ed.2d 221, 1999 WL 624390 (Oct. 4, 1999); [44] *Coe*, 161 F.3d at 329, *cert. denied*, —— U.S. ——, 120 S.Ct. 110, 145 L.Ed.2d 93 (1999).

Petitioner attempts to avoid *Austin's* holding by relying on other language in the instructions.

> The jury was also instructed that to find Sedley Alley guilty, they merely needed to reach a "satisfactory conclusion" that he was guilty: "Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense."

Reply Brief at 86 (quoting Addendum 13 at 1865). Petitioner's contention is devoid of merit, however, because he has quoted this instruction completely out of context. The excerpted quote is taken from an instruction on how to evaluate circumstantial evidence, and has nothing to do with the definition of reasonable doubt. Accordingly, this claim is devoid of even arguable substantive merit. Moreover, petitioner never raised this aspect of his claim in state court, and based on the Court's previous analysis of procedural default juris-

prudence, this aspect is barred by this default.

The state court's decision approving this instruction is not contrary to *Cage* or *Victor*, is not an unreasonable application of clearly established Supreme Court jurisprudence derived from those case, and is without merit.

### 5. *Unconstitutional Jury Instruction on Malice*

Petitioner contends that the jury instructions required the jury to find the essential element of malice based merely on his conscious deliberate act, without requiring them to find that the prosecution had introduced proof from which this element could be determined beyond a reasonable doubt. Claim V (Petition, ¶ 31). Petitioner relies on *Yates v. Evatt*, 500 U.S. 391, 401–02, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991).

The jury instruction at issue read, in pertinent part:

> Any person who willfully, deliberately, maliciously, and with premeditation kills another is guilty of murder in the first degree.

> For you to find the defendant guilty of murder in the first degree, the state must have proven beyond a reasonable doubt;

> \*　　\*　　\*　　\*　　\*　　\*

> 2) that the killing was malicious; that is, the defendant had the state of mind to do the alleged wrongful act without legal justification or excuse . . . .

> Malice is an essential ingredient of this offense, and it may be either express or implied. A case of homicide cannot be murder unless at and before the killing the wicked intent, constituting malice aforethought, exists in the mind of the slayer. Malice is an intent to do an injury to another, a design

*See Workman v. Dutton*, No. 94–2577–G/A, slip op. at 61–62 (W.D.Tenn. Oct. 29, 1996).

---

**44.** The jury instructions in *Workman* are found in the district court's opinion denying the petition for the writ of habeas corpus.

formed in the mind of doing mischief to another.

Express malice is actual malice against the very party slain and exists where a person actually contemplates the injury or wrong he inflicts. Implied malice is malice not against the party slain, but malice in general, or that condition of mind which indicates a wicked, depraved and malignant spirit and heart regardless of social duty and fatally bent on mischief. Implied malice may be found to exist where the wrongdoer did not intend to slay the person killed but death resulted from a consciously unlawful act done intentionally and with knowledge on the wrongdoer's part that the act was directly perilous to human life. In this event, there is implied such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice.

Malice cannot be inferred from deadly intent only, because the deadly intent may be justifiable under the law, as where one willfully kills another to save his *own* life or to save himself from great bodily harm and the danger is imminent and immediate, or when the intent to kill is produced by anger, for if it were sudden and upon reasonable provocation the killing might or might not be manslaughter, but it would not be murder.

You are reminded that the state always has the burden of proving every element of the crime charged beyond a reasonable doubt. A permissible inference may or may not be drawn from an elemental fact from proof by the state of a basic fact. However, all inferences permitted to be drawn may be rebutted. An inference does not place any burden of proof of any kind upon the defendant.

Addendum 13 at 1849–50.

Petitioner's reliance on *Yates* is misplaced. *Yates* condemned a South Carolina jury instruction that commanded jurors to make two mandatory presumptions, both of which were thereafter held unconstitutional by the South Carolina Supreme Court. Following *Sandstrom v. Montana*, 442 U.S. 510, 513, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), *Yates* confirmed that instructing a jury that certain facts create a "presumption" of the proof of an element of an offense relieves the prosecution of its constitutional burden to prove every element of the crime beyond a reasonable doubt. The instruction in *Yates* stated that " 'malice is implied or presumed' from the 'willful, deliberate, and intentional doing of an unlawful act.' " Even though the Court instructed the jury that the "presumption is rebuttable," the Court held that "a reasonable juror would have understood the unlawful act presumption to mean that upon introduction of evidence tending to rebut malice, the jury should consider all evidence bearing on the issue of malice, together with the presumption, which would still retain some probative significance." 500 U.S. at 401–02, 111 S.Ct. 1884.

As is evident from the text of the above instruction, petitioner's jury was not instructed of the existence of *any* presumption. Indeed, the instruction studiously avoided the prohibited word.

■■■ Nor is the word "implied" the equivalent here to a presumption. Although petitioner attempts to transmogrify this instruction into an impermissible burden-shifting instruction, the phrase "malice *may be implied* " does not mandate any inference at all.

In reviewing an instruction containing the identical language faulted by petitioner here, the Sixth Circuit stated, albeit in *dicta:*

> The inference in this instruction ("may be found") appears to us to be a permissive one. The several cases cited by the district court in finding this instruction impermissible all involve clearly mandatory language, and none of them contain the "directly perilous to human life" language present here.

*Coe,* 161 F.3d at 332. This Court finds this reasoning persuasive. Additionally, although the Sixth Circuit did not mention this point, "[i]t is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole." *Estelle v. McGuire,* 502 U.S. 62, 72–73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The petitioner makes the representation that the instruction "never used the word inference," Reply Brief at 92 n.55, and asserts that this Court must construe the various sentences of the instruction independently of one another. To the contrary, the specific direction therein that "a permissible inference may or may not be drawn from an elemental fact from proof by the state of a basic fact," together with the explicit reminder of the prosecution's burden before and after the explanation of malice, operated to eliminate any possibility that a reasonable jury would have misunderstood these clear instructions as creating a mandatory and unconstitutional burden-shifting presumption. Unlike the instructions on circumstantial evidence and reasonable doubt, the instructions on malice and permissive inferences were obviously integrally related. Accordingly, the Tennessee Court of Criminal Appeal's conclusion that this instruction did not violate petitioner's constitutional rights is neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court.

### 6. *Unconstitutional Use of Victim–Impact Evidence*

Petitioner claims that the display of a graduation photograph of the victim and testimony by the victim's father about her character deprived him of a fair trial. Claims VI.1, 3 (Petition, ¶ 32(a)(1), (3)). The Tennessee Supreme Court denied both claims, finding that the record did not support a claim of error regarding the photograph, and that the admission of the father's testimony was harmless beyond a reasonable doubt.

■■■ The photograph was a sixteen-inch by twenty-inch high school graduation photograph. The prosecution set it on the counsel table during the first two days of trial. Thereafter it was replaced by a smaller photograph. The petitioner does not cite any controlling Supreme Court authority prohibiting evidence from being displayed before a jury. The photograph was plainly relevant to demonstrate that the victim was in fact a human being.[45] Petitioner cites no Supreme Court case law that was unreasonably applied by the Tennessee Supreme Court on this point.

Insofar as petitioner complains of the introduction during the guilt phase of the victim's father's testimony, the Tennessee Supreme Court held that this was harmless error, even when applying *Booth.* Given that *Payne v. Tennessee,* 501 U.S. 808, 824, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), overruled *Booth,* petitioner cannot rely on the earlier case as invalidating even the admission of this testimony.[46]

---

**45.** Indeed, in this case, a photograph of the victim while she was alive bore increased probative value. Petitioner attempts by this argument to reinstate the mistaken view of *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), that while the defendant must be viewed as a unique person, the victim can be virtually ignored. The prosecution, to meet its burden of proof on the elements of malice and deliberation, and the aggravating factor of torture, was virtually forced to introduce photographs of the murder scene that demonstrated the way in which the victim's clothes were strewn about the scene, the numerous wounds on the victim's body, all inflicted after the petitioner stripped

her (no blood having been found on any items of clothing), and the victim's brutalized body. These highly relevant photographs, which demonstrated the manner in which the petitioner dehumanized the victim, also carried the risk that the jurors would not be able to view her as a "unique human being" who is protected by the laws prohibiting murder. The prosecution's use of the photograph to remind the jury that the victim was a human being protected by the law, and not just a corpse, was entirely proper.

**46.** Petitioner argues that *Payne* left portions of *Booth* intact, but this Court does not read *Payne* as so limited, and petitioner cites the

Nevertheless, assuming the irrelevance of this testimony to the guilt phase, petitioner points to no United States Supreme Court case contrary to the Tennessee Supreme Court's conclusion that the testimony's admission constituted, at most, harmless error.

■ The victim's father's testimony occupies only ten pages of an 1800–page transcript. Addendum 12 at 537–550.[47] The testimony consists of a relatively innocuous account of his daughter's education, her desire to join the Marines, her general friendliness, the family's last contacts with her, and their decision not to have an open casket funeral. The father then identified the graduation photograph and a morgue photograph of the victim. *Id.* at 548, 550, 107 S.Ct. 2529.

In analyzing this claim, even if petitioner could demonstrate that the Tennessee Supreme Court erred in holding this testimony harmless, he would still then have to demonstrate that this Court should not find it harmless under *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which requires that the petitioner demonstrate that the "error 'had substantial and injurious effect or influence in determining the jury's verdict'" (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). This he cannot do. The short and innocuous testimony could not have caused the jury to ignore the overwhelming evidence of petitioner's guilt, particularly his own confession, the substantial physical evidence, and the medical testimony regarding his sanity, and decided that he was guilty simply because the victim

was a good person. These two claims are utterly devoid of merit.

Insofar as petitioner contends that the death sentence was tainted by either the photograph or this testimony, his contention is also devoid of merit. *Payne,* 501 U.S. at 824, 827, 111 S.Ct. 2597, overruled both *Booth,* and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and permitted the prosecution to show "each victim's 'uniqueness as an individual human being'" and to argue "the human cost of the crime." Petitioner's arguments to the contrary consist of nothing but empty rhetoric.[48]

### 7. Unconstitutional Exclusion of Jurors Jarred and Todd

Petitioner's claim VII (Petition, ¶ 34), contends that the trial court violated his right to an impartial jury by excluding jurors Leslie Jarred and Kenneth E. Todd for cause. Petitioner raised both of these claims on direct appeal, and the Tennessee Supreme Court expressly found that both exclusions for cause complied with *Wainwright v. Witt,* 469 U.S. 412, 424–26, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

Petitioner claims that Juror Todd's exclusion violated *Witherspoon v. Illinois,* 391 U.S. 510, 521, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). During a series of questions from the prosecution, Todd stated, "I don't believe that I could say that this guy should get the death penalty." Addendum 12 at 40. Judge Axley then indicated that

Court to no controlling Supreme Court precedent that agrees with his position. The Court has reviewed case law from other circuits that takes the same position, but finds them insufficiently persuasive to merit further discussion.

47. The remaining pages in this series were occupied by the objections and arguments of counsel, the Court's ruling and the handling of exhibits.

48. Additionally, most of petitioner's argument focuses on his procedurally barred claims regarding the prosecution's arguments. Of course, given that the initial premise for his syllogism (that *Payne* does not permit the introduction of the evidence for sentencing purposes), his attack on the prosecution's arguments reduces to the frivolous contention that a prosecutor may not argue the persuasiveness and weight of admissible evidence. This contention, like so many of petitioner's claims, is self-refuting.

he would interrogate the juror, and asked the following questions:

Court: Mr. Todd, can you think of any set of circumstances that you might hear in a case that would make you comfortable in—or comfortable, and I've said, that's not a good term, that you would invoke the death penalty?

Todd: I can't think of anything. I just don't feel that I could be fair just to give this guy the death penalty.

Court: All right. So you're saying there's no set of circumstances that you could hear that you would then invoke the death penalty, following the law?

Todd: No.

Court: Where do you go to church?

Todd: Saint Andrew A.M.E. Church.

Court: All right. Okay. Who's your pastor?

Todd: Reverend Martin.

Court: All right. Gentlemen, I'm going to excuse him for cause. Step down, please, sir.

Addendum 12 at 42–43.

■■■ Petitioner claims that the Court did not conduct a full and fair hearing. The controlling Supreme Court case is *Witt.*

> [T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in

the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror.

469 U.S. at 424–26, 105 S.Ct. 844 (footnotes omitted). *Witt* went on to hold that a trial court determination of juror opposition to the death penalty is a finding of fact governed by former 28 U.S.C. § 2254(d)'s presumption of correctness of state court findings of fact. "The trial judge['s] predominant function in determining juror bias involves credibility findings whose basis cannot be easily ascertained from an appellate record." *Id.* at 429, 105 S.Ct. 844. It is clear that Judge Axley made a factual finding, based on his observation of Juror Todd and his evaluation of his credibility, that the prospective juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

*Witt*'s analysis must be applied in light of amended § 2254. The amended provision governing review of state court factual findings states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebut-

ting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Ergo, Judge Axley's determination that Todd was biased is presumptively correct.

Petitioner attacks this determination by contending that Todd "in no uncertain terms said earlier that he *could* impose the death sentence under certain circumstances, but then gave a contradictory answer stating that he *could not* impose death under any circumstances." Reply Brief at 124. Petitioner also refers to Juror Todd as "[h]aving stated that he could follow the law ...." *Id.* These contentions misconstrue both the voir dire record and the applicable law. Juror Todd *never* stated he could impose the death penalty, and he *never* made any reference to an ability to follow the law. In remarks demonstrating some ambivalence regarding the source of his beliefs, he merely indicated that the seriousness of the crime was a factor that affected his beliefs: "Well, depending on the crime, depending on the crime, that would have something to do with it, too, but just all—like I said, all of my life I've never believed that—just to have someone killed, you know, that's just a crime to me." Addendum 12 at 38. He then stated that concern with the death penalty would interfere with his ability to be fair, and that he could not give the death penalty in this particular case, as quoted above. The ambivalence expressed by this juror was not an ambivalence regarding his views about the death penalty but ambivalence regarding the explanation for those views. It was this ambivalence that led Judge Axley to clarify by an additional voir dire that Juror Todd could not impose the death penalty. Apart from flagrant mischaracterization of the record, petitioner provides no factual basis for contending that the voir dire was inadequate.

Since the facts are against him on this issue, petitioner also attempts to argue the law, by pointing to *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), as requiring an adequate voir dire. Here, too, petitioner is wrong. *Morgan,* which created a right to inquire whether jurors would *impose* the death penalty without following the law, is inapposite. *Morgan* does follow *Witt* in requiring an adequate voir dire. However, the Supreme Court did not set any additional parameters for inquiring into the convictions or beliefs of a prospective juror opposed to the death penalty, but merely reiterated *Witt*'s teaching that the Constitutional requirement of an impartial jury composed of qualified jurors who can follow the law "does not dictate a catechism for voir dire," 504 U.S. at 729, 112 S.Ct. 2222.[49] The Court did not revisit *Witt*'s enunciation of the standard for reviewing a trial court's decision to exclude a juror. Accordingly, petitioner's contention that Judge Axley's voir dire was inadequate under *Morgan* is without foundation.

Furthermore, even if *Morgan* created either a new rule demanding that trial judges conduct voir dire in a particular way, or that federal courts review the conduct of voir dire by a different standard than set forth in *Witt,* this new rule would run afoul of *Teague*'s prohibition on retroactive application of new rules of criminal procedure on federal collateral review.

Given that Judge Axley conducted a plainly adequate voir dire, the decision of the Tennessee Supreme Court affirming the exclusion of Juror Todd was not contrary to *Witt.*

The Tennessee Supreme Court also found that the exclusion of Juror Leslie D.

---

**49.** Since the issue in *Morgan* was not the general parameters and requirements for a valid voir dire *per se,* but the use of "anti-Witherspoon" jurors—(those who will always vote for the death sentence)—the Court limited its holding to requiring that a court must permit inquiry during voir dire regarding whether a defendant would *always* impose the death penalty, a requirement clearly inapplicable to petitioner's claim regarding the exclusion of Juror Todd.

Jarred for cause complied with *Witt.* Juror Jarred's voir dire proceeded as follows:

Williams (prosecutor): Mr. Jarred, what is your attitude toward the death penalty?

Jarred: Well, like these people here, I don't really—I haven't made an opinion. It's going to be hard for me to say. At this point I'm not sure whether I am for it or against it.

Williams: Whether you can follow the law?

Jarred: It's going to be hard for me to say I cannot follow the law. I think I could follow the law. If someone comes up to me and asked me if I'm for or against capital punishment, I would—I think I would have to say no. I mean, I'm trying to be honest.

Williams: Well, no, I definitely want you to be honest. That's the whole purpose in this. You've heard the explanation of what the stages in the trial are and what you'll be called upon to do. If we prove our case to your satisfaction and prove aggravation, can you consider then giving the death penalty?

Jarred: I think I would spend a lot of sleepless nights over it if I did, but I think I could.

Williams: Is this the type of thing that if the verdict was—if you find aggravating circumstances, and the mitigating circumstances don't outweigh it, that you feel like your mind could not rest easy on a verdict like that?

Jarred: I'd have to be honest and say that it would.

Williams: That it would. You understand that's one of the qualifications on the jury, that the verdict must be such that your mind can rest easily on

the—on the certainty of guilt, on your verdict.

Jarred: I don't think my mind could be easy.

Williams: Okay. I submit that to his Honor. Challenge for cause.

Court: All right. Mr. Jarred, I think you understand what—what the law says is that when you reach that point, if we reach that point—you may hear the proof and say he's not guilty, you know, and it's all over.

Should we reach that point, the law is going to say you shall. It's directory in nature. And the court must hear from you that you can follow the law. It doesn't mean—you must be able to consider the death penalty, as well as consider the alternative punishment, which is life. Can you consider that in arriving at your verdict?

Jarred: I'm not sure.

Court: Sir?

Jarred: I'm not sure that I could.

Court: Well, okay.

Jarred: I have to be honest. I don't know.

Court: You-all approach the bench.

Addendum 12 at 52–54. The Court then conducted a bench conference and excused Jarred for cause without permitting further interrogation by the defense.

 Like Juror Todd, Juror Jarred *never* stated he could impose the death penalty, and he *never* confirmed that he could in fact follow the law requiring consideration of the death penalty. Petitioner characterizes Juror Jarred's response as having "made eminently clear that he could follow the law." Reply Brief at 122. This is precisely the question that Jarred was not able to answer affirmatively. The statements, "I don't think my mind could be easy" and "I'm not sure that I could" in

response to not merely the discrete inquiries directly to him in particular but in the context of the entire voir dire and the instructions concerning following the law make it clear that this juror was not able to confirm his ability to follow the law. As with the previous juror-exclusion claim, petitioner has simply mischaracterized the facts.

As petitioner has misconstrued the facts, it follows *a fortiori* that his arguments regarding the application of the controlling Supreme Court case law are without merit. Contrary to petitioner's contention, Jarred's responses are not similar to those examined in *Adams v. Texas*, and, therefore, that case does not dictate that his exclusion violated the Constitution. Rather, as with Juror Todd, the actual issue is whether the state appellate court acted contrary to clearly established Supreme Court case law in finding that the trial judge properly excluded the juror. As with Juror Todd, the controlling case is not *Adams* but *Wainwright v. Witt*, and Judge Axley's determination that Juror Jarred could not faithfully and impartially apply the law is entitled to the same deference. The Tennessee Supreme Court's determination that Judge Axley properly excluded Jarred is not contrary to *Witt*.

### 8. *Prosecutorial Misconduct During Cross–Examination*

Petitioner's claim X.1 (Petition, ¶¶ 37, 38), contends that the prosecution violated his right to a fair trial by inquiring about non-existent prior criminal charges against petitioner during the penalty-stage cross-examination of petitioner's brother. During cross-examination of petitioner's brother, who was attempting to establish the petitioner's generally good character, the prosecution inquired whether petitioner "didn't have an assault charge up in Ypsilanti, Michigan?" and whether the brother could remember petitioner's involvement in fights.

The Tennessee Supreme Court concluded that this conduct was erroneous but harmless, relying on Tennessee case law rooted in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (requiring that constitutional error be harmless beyond a reasonable doubt).

Federal courts analyzing a habeas petition to determine whether trial error was harmless face a dilemma. Should the federal habeas court apply the standards set out in *Brecht*, 507 U.S. at 631, 113 S.Ct. 1710 (adopting harmless error standard of *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239), to make an independent determination of whether the error "had substantial and injurious effect or influence in determining the jury's verdict" or should the Court review whether the state court decision is "contrary to or an unreasonable application" of *Chapman*, and perforce review whether the error is "harmless beyond a reasonable doubt"? According to the Sixth Circuit:

> Under the highly deferential standard of AEDPA we may not find the state court's application of federal law unreasonable unless reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to be outside the realm of plausible credible outcomes. We think that when the issue before the federal habeas court is the state court's finding of harmless error, the test set out by the Supreme Court in *Kotteakos* and explicitly reiterated in *Brecht* quite precisely captures Congress's intent as expressed in AEDPA and, therefore, continues to be applicable. That test is whether the error "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710, 123 L.Ed.2d 353; it is the habeas petitioner's burden to demonstrate that the trial error resulted in "actual prejudice." *Id.* If the petitioner is able to make that showing, he will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt—the *Chapman* standard—was outside the realm of plausible

credible outcomes, and therefore resulted from an unreasonable application of *Chapman*.

*Nevers*, 169 F.3d at 371–72. Even if the federal court determines that the state court misapplied *Chapman*, however, that error would still be subject to harmless error analysis under *Brecht*. *See Nevers*, 169 F.3d at 374 n. 25.

 Here, the Tennessee Supreme Court decision was not an unreasonable application of *Chapman*. *Chapman* required that the reviewing court "must be able to declare a belief that it was harmless beyond a reasonable doubt", i.e., declare a belief that there is no "reasonable possibility that the error complained of might have contributed to the jury's verdict." 386 U.S. at 24, 87 S.Ct. 824. The questions at issue were isolated and drew a negative response. In short, they did not result in the introduction of any *evidence* against petitioner. Nor did the prosecution attempt to make any argument based on the negative responses. Given the overwhelming evidence of the existence of aggravating circumstances, particularly the petitioner's torture of the murder victim, the Tennessee Supreme Court's decision is clearly not "outside the realm of plausible credible outcomes" and is thus not an unreasonable application of *Chapman*.

Furthermore, the petitioner has made virtually no attempt to demonstrate that these two isolated questions had a substantial and injurious effect on the jury's decision to sentence petitioner to death. Petitioner argues that the jury might have used the questions to reject the statutory mitigating circumstance that petitioner had no significant history of prior criminal activity. Petitioner's counsel, however, have consistently demonstrated selective myopia regarding this circumstance. It is undisputed that petitioner had a significant history of illegal substance abuse, which clearly invalidated this circumstance as a mitigating factor. Given that the trial court instructed the jury that "remarks of

counsel ... are not evidence" Addendum 13 at 1848, petitioner cannot demonstrate that these questions had any effect on the jury's consideration of this circumstance. Accordingly, this error had no substantial and injurious effect on the jury's sentence, and petitioner is not entitled to relief.

9. *Prosecutor's Improper Use of Victim–Impact Evidence*

Petitioner's claim X.3 (Petition, ¶ 38), contends that the prosecution violated his right to a fair trial by displaying the victim's high school photograph and inviting the jury to decide the case based on sympathy for the victim rather than the evidence adduced against petitioner. As discussed already, *supra* at 648–649, it was not error to admit this photograph. It follows *a fortiori* that the prosecution did not commit any "misconduct" by their use of the photograph. Petitioner's recharacterization of the constitutional basis for this claim does not make it more meritorious. As previously explained, the Tennessee Supreme Court's decision on this issue was neither contrary to nor an unreasonable application of clearly established federal law as decided by the United States Supreme Court. This claim is without merit.

10. *Insufficient Evidence of Deliberation*

Petitioner's claim XI (Petition, ¶ 39) is that the prosecution failed to introduce sufficient proof of petitioner's deliberation—an essential element of first degree murder in Tennessee. Petitioner raised this claim on direct appeal and the Tennessee Supreme Court rejected this claim, determining that petitioner's "guilt in this case was established at the level of absolute certainty." *Alley*, 776 S.W.2d at 513.

 The United States Supreme Court case governing a sufficiency of the evidence claim is *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court views the

evidence at trial in the light most favorable to the prosecution and inquires "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* In Tennessee at the time of this murder, one of the elements of first degree murder was that the killing was "deliberate."[50] Construing this statute, the Tennessee Supreme Court concluded some years after petitioner's conviction, in *State v. Brown,* 836 S.W.2d 530, 543 (1992), that the element of a deliberate act (or "deliberation") requires that "the homicide was committed with a cool purpose and without passion or provocation," and that the murderer had time for "a careful weighing of the proposed decision" to kill. *Id.* at 540–41. The Tennessee Court of Criminal Appeals has explained, with regards to the successor statute that also required this element, that deliberation may be proved circumstantially:

> This Court has previously recognized the nature of proof which must be presented before a jury may properly infer either deliberation or premeditation:
> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity;
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
> (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*State v. Gentry,* 881 S.W.2d 1, 4–5 (Tenn. Crim.App.1993). As explained by the Supreme Court in subsequently applying *Brown,* the circumstances supporting the existence of deliberation include:

> The use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing.

*State v. Bland,* 958 S.W.2d 651, 660 (Tenn. 1997).

In this case, the proof at trial included just these types of facts. Petitioner points to his confession as not including proof of such facts, but he conveniently omits from his discussion the voluminous physical record and testimony of other witnesses that conclusively demonstrated how he murdered Corporal Collins, and how he himself acted shortly after having tortured her to death.

The independent evidence included, *inter alia,* testimony that the petitioner abducted Corporal Collins from the naval base and drove to the local park, stopping on the way to clear the military checkpoint at the gate to the naval base. Addendum 12 at 499–500. The evidence included a photograph of the tree branch that petitioner broke from a tree, visible in the photograph close to the victim's body, from which he in turn obtained the stick with which he repeatedly impaled the victim, along with the branch and the stick itself. Addendum 13 (Exhibit 31)(photograph of victim and tree branch); Addendum 12 at 463 (identifying photograph and branch); Addendum 12 at 925 (identifying stick, exhibit 68). Petitioner had prepared the thirty-one inch stick by removing the smaller branches and leaves from it. Ad-

50. At the time of the murder, Tennessee defined first degree murder in Tenn.Code Ann. § 39-2-202(a)(1982):
> Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree.

dendum 13, Exh. 68 (description of stick, which is in custody of State); Addendum 12 at 916 (testimony of medical examiner Dr. James Spencer Bell describing stick found in the victim). Petitioner stripped the victim, preventing any blood from the numerous wounds from which she bled from getting on any item of her clothing, even though blood was found on the ground immediately around the body and near some of the items of clothing. Addendum 12 at 471. Petitioner also removed his own clothing, which did not contain any blood, except for a small spot on the inside of his shorts. Petitioner was observed with wet hair, face, and neck shortly after the murder, tending to show that he cleaned blood off of himself after killing Corporal Collins. *Id.* at 515. When he was stopped shortly after the murder and briefly detained at the naval base, he "sat calmly," appeared to understand the purpose of the detention, apparently told his wife to "shut up," and thanked the military police for their time. *Id.* at 511.

The evidence regarding the manner in which the petitioner inflicted the injuries on Corporal Collins also provided proof of deliberation. The victim's injuries were extensive, according to the undisputed testimony of the medical examiner, Dr. Bell, *id.* at 913–20, including bruising over virtually her entire body, but were inconsistent with her either having been struck by an automobile or stabbed with a screwdriver—the two injuries petitioner related in his confession. The internal injuries from being impaled demonstrated that petitioner stuck the stick into Corporal Collins' vagina the first time, pulled it out at least four inches, and rammed it in again, inflicting other internal injuries. *Id.* at 916–18. Dr. Bell testified that the petitioner impaled Corporal Collins at least twice and possibly three or more times, *Id.* at 917, that she was alive when he did it, *Id.* at 928, and that the impalement alone would

have been enough to kill the victim. *Id.* at 921.

Furthermore, contrary to petitioner's characterization of the confession, his own expert witness testified that specific aspects of the confession could support an inference that he was aware of his conduct at the time of the murder, and could appreciate the difference between right and wrong. *See* Addendum 12 at 1140–48 (Testimony of Dr. Marshall).

This evidence alone, apart from the rest of the evidence at trial, clearly provides more than ample support for the element of deliberation. Despite petitioner's counsel's agnosticism on the meaning of cruelty, the murder was particularly cruel, it required petitioner to obtain and prepare a weapon, and petitioner first cleaned himself up and then calmly misled the authorities within a short time of the crime. Apart from an eyewitness account of the crime, more evidence of "cool purpose" would be difficult to develop. The Tennessee Supreme Court's rejection of this claim was not an unreasonable application of *Jackson v. Virginia,* and petitioner's claim of insufficiency of the evidence of deliberation is simply frivolous.

11. *Insufficient Evidence of Premeditation*

Petitioner's claim XII (Petition, ¶ 39) is that the prosecution failed to introduce sufficient proof of petitioner's premeditation, also an essential element of first degree murder in Tennessee. Petitioner also raised this claim on direct appeal. The analysis of this claim parallels that for his claim that the evidence of deliberation was insufficient. Petitioner, despite his reliance on *State v. Brown,*[51] conflates his attacks on the sufficiency of evidence of premeditation and deliberation. This is understandable, however, since much of the above evidence of deliberation also provides support for premeditation. In particular, the previously cited evidence

---

**51.** The Tennessee Supreme Court in *Brown* sought to clarify the analysis of these two

elements in the Tennessee courts. *See* 836 S.W.2d at 538–41.

that petitioner repeatedly abused the victim, stripped her, and then prepared the weapon to impale her, supports a jury finding of premeditation. As *Brown* explains, "premeditation is the process simply of thinking about a proposed killing before engaging in the homicidal conduct." 836 S.W.2d at 540–41. The Tennessee Supreme Court's rejection of this claim was also not an unreasonable application of *Jackson v. Virginia.* Petitioner's claim of insufficiency of the evidence of premeditation is also frivolous.

12. *Improper Instructions on Deliberation and Premeditation*

Petitioner's claims XIII and XIV (both at Petition, ¶ 39) are that the jury instructions on the elements of deliberation and premeditation misstated the prosecution's burden of proof on these elements. This attempt to create a constitutional claim, however, is based on a misrepresentation of the text of the instruction. The Court instructed the jury as follows:

> Premeditation means that the intent to kill must have been formed prior to the act itself. Such intent or design to kill may be conceived and deliberately formed in an instant. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval. The mental state of the accused at the time he allegedly instigated the act which resulted in the alleged death of the deceased must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Addendum 13 at 1850. As can be seen, this instruction did not specifically state that "deliberation can be formed in an instant." Accordingly, petitioner makes a fallacious straw-man argument by attacking an instruction that was not given.

 Furthermore, even if the Court construes the claim as a coherent attack on the constitutionality of this instruction, the claim suffers from at least four defects. Although during the post-conviction proceeding petitioner referred generally to federal constitutional rights when raising this claim, he relied purely on *Brown*, which did not address the constitutionality of instructions regarding a murderer's instantaneous deliberation or premeditation. This is not surprising, since *Brown* reaffirms that "no specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan." The Court merely disapproved specific instructions that "premeditation may be formed in an instant" as part of its requiring Tennessee courts to observe the distinction between the elements of premeditation and deliberation. *Id.* at 543. By citing to this state law analysis, however, petitioner did not raise a federal claim of a due process violation. Any attempt to raise one now is barred by this procedural default. Petitioner does not dispute the respondent's invocation of the procedural bar. Moreover, reliance on *Brown* simply does not raise a cognizable federal claim, but merely a claim under state substantive law.

Furthermore, as the Court of Criminal Appeals held in denying post-conviction relief to petitioner, *Brown* is non-retroactive as a matter of state law. Accordingly, petitioner's attempt to craft a federal procedural right out of this state court decision also runs afoul of *Teague*'s prohibition on non-retroactive application of new constitutional rules of criminal procedure.

Finally, any error is obviously harmless under *Brecht.* The evidence at trial clearly demonstrated, as explained above, that petitioner took far longer than "an instant" to prepare for and carry out the murder. The preparation here distinguishes this case from *Brown*, in which the only evidence of these elements, repeated blows, was offset by evidence of the defendant's anger and passion directed at the child victim—evidence that in the opinion of the Tennessee Supreme Court conclusively

showed that the defendant lacked the mens rea for first degree murder. *Brown* reversed the conviction, accordingly, on the basis of the lack of evidence of these necessary elements, *not* because of a faulty jury instruction. The discussion of jury instructions was simply administrative guidance for future trials in the Tennessee courts. Accordingly, *Brown* does not support a constitutional attack on this instruction. Petitioner has no argument that this portion of the instruction was anything other than irrelevant, much less that it had a "substantial and injurious effect" on the jury's decision. More importantly, the evidence here is exactly of the type identified in *Brown* as necessary to support a finding of both the elements of premeditation and deliberation essential to a conviction for first degree murder under Tenn.Code Ann. § 39–2–202. For all of these reasons, this claim is devoid of even arguable merit.

### 13. *Burden–Shifting Instructions on Mitigation*

Petitioner's claim XV.3 (Petition, ¶ 40) contends that the jury instructions during the penalty phase of the trial shifted the burden of proof to the defendant to demonstrate the existence of mitigating circumstances. The Court of Criminal Appeals rejected this claim on the merits during the post-conviction appeal. 958 S.W.2d at 155.

This claim suffers from two equally fatal defects. First, petitioner cites to no Supreme Court case law supporting the existence of a constitutional right prohibiting a state from requiring a petitioner to bear the burden of demonstrating mitigating circumstances during a capital sentencing proceeding. Supreme Court jurisprudence permits states to require a petitioner to prove mitigating circumstances that are in the nature of affirmative defenses even when those defenses are necessary to negate an element of a crime. It would be inconsistent to require the State to prove a negative by *disproving* the existence of mitigating circum-

stances. *See Patterson v. New York,* 432 U.S. 197, 206–07, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Martin v. Ohio,* 480 U.S. 228, 234, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987); *Rhodes v. Brigano,* 91 F.3d 803, 808 (6th Cir.1996). It follows logically that the Constitution also does not prohibit placing the burden on a defendant to prove mitigating factors at sentencing, so long as the ultimate burden of persuasion regarding the appropriateness of the death penalty remains with the prosecution. Petitioner, of course, makes no sensible argument that the jury instructions here shifted *that* burden.

Furthermore, petitioner's entire attack on these instructions (including the claims that are procedurally defaulted), rests on the speculative assumption that the jurors were certain to have disregarded the instructions and act on the basis of some imperceptible compulsion to impose the death penalty. The Supreme Court has rejected claims that every possible ambiguity in an instruction mandates an inference of juror misinterpretation.

> The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate

sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California,* 494 U.S. 370, 376, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Petitioner's claim is technical hairsplitting, and does not carry his burden to demonstrate that the Court of Criminal Appeals decision is an unreasonable application of clearly established Supreme Court preceden. This claim is devoid of merit.

### 14. *Prosecutor's Misconduct During Voir Dire*

 Petitioner's claim XVII.3 (Second Amended Petition, ¶ 44) contends that the prosecution committed misconduct during voir dire by asking juror Janie Hearn if she could give the victim's parents a fair trial. The Tennessee Supreme Court rejected this claim on direct appeal, holding that while the remark was irrelevant, the "single reference in this case falls far short of prejudicial error." 776 S.W.2d at 513. Hearn did not serve on the jury. Petitioner has completely failed to demonstrate that this decision was contrary to or an unreasonable application of clearly established federal law. Even if the Tennessee Supreme Court's resolution of this issue was error, it was clearly harmless under *Brecht.*

### 15. *Ineffective Assistance of Counsel*

Petitioner's claim XX (Petition, ¶ 3) consists of twenty-eight claims of ineffective assistance of counsel. Claims XX.15 (Petition, ¶ 33(m) at 41), XX.19 (Petition, ¶ 33(q)

at 41), XX.23 (Petition, ¶ 33(u) at 42), and XX.27 (Petition, ¶ 33(x) at 42), have previously been rejected as barred by petitioner's procedural default. The Court of Criminal Appeals rejected the remaining claims on the merits during the post-conviction appeal. 958 S.W.2d at 149–52.

### C. *Legal Standard for Sixth Amendment Claims*

A claim that ineffective of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards enunciated in *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. A petitioner claiming his conviction and sentence were entered in violation of this Sixth Amendment right must show:

1. deficient performance by counsel; and

2. prejudice to the defendant from the deficient performance.

*See id.* at 687, 104 S.Ct. 2052. In evaluating the quality of counsel's performance, the Court should not second guess counsel's tactical decisions. *Adams v. Jago,* 703 F.2d 978, 981 (6th Cir.1983).

 A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. *Lewis v. Alexander,* 11 F.3d 1349, 1352 (6th Cir.1993); *Isabel v. United States,* 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.* at 697, 104 S.Ct. 2052.

To demonstrate prejudice, a movant under § 2255 must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.* Additionally, however, in analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

*Lockhart v. Fretwell,* 506 U.S. 364, 368, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (citing *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). "Thus an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Fretwell,* 506 U.S. at 369, 113 S.Ct. 838.[52]

#### D. *Analysis of Specific Claims*

##### 1. *Inadequate Preparation*

Most of petitioner's ineffective assistance claims relate to his attorneys' pretrial preparation. Variations on this claim are presented in claims XX.1 (Petition, ¶ 33(a)), XX.2 (¶ 33(b)), XX.7 (¶ 33(f)), XX.8 (¶ 33(g)), XX.9 (¶ 33(h)), XX.10 (¶ 33(i)), XX.11 (¶ 33(j)), XX.12 (¶ 33(k)), and XX.24 (¶ 33(u)). Most of these claims, in turn, relate to the attorneys' investigation and preparation of medical evidence and testimony.

 It is clear that " 'counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary.' " *Workman,* 957 F.2d at 1345 (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052); *Lewis,* 11 F.3d at 1352 (same). "[C]ounsel's failure to investigate key evidence or to make a reasonable decision that a particular investigation is not necessary constitutes ineffective assistance." *Lewis,* 11 F.3d at 1353. However,

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

Petitioner first claims, claim XX.1 (¶ 33(a)), that his counsel's inadequate preparation for trial was partly caused by Judge Axley's failure to grant a continuance. This contention is frivolous. As the Court's detailed recitation of the state court procedural history shows, *supra* at 606, Judge Axley *did* grant a continuance. Furthermore, petitioner's attorneys testified at the state post-conviction hearing that he was prepared to proceed because he had worked on the case for over a year.

---

**52.** Petitioner argues that the *Strickland* analysis does not require him to demonstrate that he could not have been convicted or that his counsel's conduct more likely than not altered the outcome of the case, relying on *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir.1992), and *Glenn v. Tate,* 71 F.3d 1204, 1210 (6th Cir.1995). Petitioner then concludes that the possibility that even only one juror would not have convicted petitioner satisfies the prejudice component of *Strickland.* This ingenious attempt to resuscitate petitioner's meritless Sixth Amendment claims completely misconstrues *Strickland,* its lower court progeny, *Fretwell,* and the analytical methodology they require. In particular, petitioner's citation to *Workman* conveniently omits the immediately following critical phrase: "[a habeas petition-

er] must demonstrate that there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." 957 F.2d at 1345. Taking the petitioner's citations *in context,* it is clear that this is yet another example of petitioner shooting at the wrong target. No one is arguing that the petitioner ought to have to demonstrate that his conviction was impossible. Rather, he bears the burden of demonstrating a reasonable probability that but for counsel's errors, reasonable doubt could have been found to exist. Furthermore, petitioner's analysis reduces *Fretwell* 's insistence on constitutional reliability to the merely speculative possibility of generalized and vague unfairness.

*See* 958 S.W.2d at 145. Accordingly, this aspect of petitioner's claim folds into the remainder of his inadequate preparation claims.

From the binding factual findings of the state appellate court, it is clear that counsel did conduct an extremely thorough investigation. As demonstrated by the procedural history, petitioner's trial counsel participated in three competency hearings, during which petitioner's mental state at both the time of trial and the crime were extensively explored, along with the opinions of the numerous mental health professionals on both issues. Petitioner's counsel were in continual contact with the doctors and psychiatrists who were examining and treating petitioner. Petitioner's counsel even observed some of the hypnosis and sodium amytal interviews. 958 S.W.2d at 145.

■ The Court of Criminal Appeal made the following specific factual findings regarding trial counsel's investigation and use of medical experts:

The petitioner also claims his defense attorneys did not properly investigate his medical history, prepare their experts' testimony, or present the insanity defense. The petitioner complains that certain of his medical reports, including the birth records pertaining to his urinary tract dysfunctions, were not obtained or shown to the experts before trial; he argues that these records were essential to the presentation of his defense.

The petitioner also contends that his counsel was ineffective by failing to introduce any significant mitigating evidence during the sentencing phase of the trial. He insists that a miscommunication between Dr. Battle and trial counsel resulted in an inadequate psychological evaluation and undermined his insanity defense.... Every expert who had evaluated the petitioner before the trial and who testified later at the evidentiary hearing, examined the medical records and the previously unknown

neurosis diagnosis and maintained that their opinions on the petitioner's condition had not changed.... The record demonstrates that defense counsel spent a great deal of time in the selection and preparation of trial. The petitioner was examined by several in the medical profession. Once it was decided to pursue the insanity defense under the multiple personality theory, the attorneys called experts throughout the country before determining that Dr. Battle was one of the leading persons in the field. They also relied upon the evaluation and opinion of Dr. Marshall. Both concluded therefrom that the petitioner suffered from multiple personalities. As the record indicates, Dr. Battle did not definitively testify during trial that an alter personality was in control at the time of the offense. Mr. Jones testified he was aware Dr. Battle was wavering just before trial. It was not until Dr. Battle was on the stand that Mr. Jones realized Dr. Battle was not testifying as to what he had indicated. Nonetheless, both attorneys indicated that Dr. Battle still provided the defense with valuable mitigation evidence. His trial testimony did not discount the defense theory that an alter personality was in control at the time of the offense. The testimony of Dr. Marshall fully supported the defense.... Defense counsel had to rely upon the opinions of their experts. The physicians testifying for the defense were well respected in this field for their expertise. That one of the experts changed his opinion does not mean that counsel was ineffective.

958 S.W.2d at 150–51. These factual findings and legal conclusions resulted from an exhaustive evidentiary hearing and review of the record. Petitioner has not presented any evidence, much less clear and convincing evidence, that the state court's determination of these factual issues is incorrect. Nor has he presented any credible argument that the state court's factual determinations are unrea-

sonable in light of the evidence presented at the state court hearing. Accordingly, he cannot demonstrate that the legal conclusions are based on unreasonable factual determinations. Furthermore, the state court's analysis of the inadequate investigation claims are clearly a reasonable application of *Strickland, Fretwell,* and their progeny.

Furthermore, much of petitioner's argument in support of his inadequate investigation claim is premised on the alleged need for yet further hearings on these same issues. He has completely failed, however, to cross the threshold established by § 2254(e)(2) to obtain a new evidentiary hearing to develop the facts further.

The issue of the petitioner's sanity was thoroughly explored at trial. Petitioner's assertions to the contrary are based on an exaggerated and slanted view of the evidence and do not carry his burden under § 2254. Despite petitioner's counsels' efforts in the ensuing years to reopen this issue, he has totally failed to generate any reasonable basis for disagreeing with the original determination of the jury—that he was sane at the time he kidnapped, raped, and murdered Corporal Collins. Petitioner seeks to have the Court engage in precisely the type of tactical second-guessing *Strickland* prohibits. Like the attorney in *Lewis,* this case "does not involve a failure to investigate, but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation." *Id.*

The state court's resolutions of claims XX.1 (Petition, ¶ 33(a)), XX.2 (Petition, ¶ 33(b)), XX.7 (Petition, ¶ 33(f)), XX.8 (Petition, ¶ 33(g)), XX.9 (Petition, ¶ 33(h)), XX.10 (Petition, ¶ 33(i)), XX.11 (Petition, ¶ 33(j)), XX.12 (Petition, ¶ 33(k)), and XX.24 (Petition, ¶ 33(u)), are neither contrary to nor an unreasonable application of clearly established federal law. These claims are without merit.

### 2. *Failures to Make Objections to Victim–Impact Evidence*

Petitioner claims, claim XX.3 (Petition, ¶ 33(c)), that counsel failed to object to the presentation of victim-impact evidence during the guilt phase, including the use of the victim's graduation photograph. The Court of Criminal Appeals rejected these claims on appeal of the post-conviction petition, finding that the petitioner failed to demonstrate any prejudice. As this Court has already rejected petitioner's substantive claim that the admission of this evidence denied him a fair trial, it follows *a fortiori* that counsel's failure to object could not have constituted deficient performance. Furthermore, he cannot demonstrate that his trial was fundamentally unfair or unreliable. Accordingly, he has no Sixth Amendment claim. The Court of Criminal Appeals' resolution of these claims is neither contrary to nor an unreasonable application of *Payne v. Tennessee, Strickland,* or *Fretwell.* This claim is without merit.

### 3. *Failure to Object to Prosecution Arguments and Jury Instructions*

Petitioner raises five ineffective assistance claims related to his attorneys' failure to object to prosecution arguments or jury instructions. Claims XX.4 (Petition, ¶ 33(c)), XX.16 (Petition, ¶ 33(n)), XX.17 (Petition, ¶ 33(o)), XX.21 (Petition, ¶ 33(s)), XX.22, (Petition, ¶ 33(t)). The Court of Criminal Appeals rejected each of these Sixth Amendment claims. This Court has already rejected each of the underlying constitutional claims. Accordingly, counsel's failure to object could not have constituted deficient performance. Furthermore, he cannot demonstrate that his trial was fundamentally unfair or unreliable. Accordingly, he has no Sixth Amendment claim. The Court of Criminal Appeals' resolution of these claims is neither contrary to nor an unreasonable application of *Strickland* or *Fretwell.* This claim is without merit.

### 4. *Failure to Seek Trial Judge's Recusal for Bias*

Petitioner claims that his counsel failed to seek the trial judge's recusal despite

evidence of bias. Claim XX.5 (Petition, ¶ 33(d)). The Court of Criminal Appeals rejected this claim. This Court has already exhaustively considered the claim of bias and found it to be completely frivolous. It is equally clear that defense counsel could not have been·deficient for failing to seek recusal. Furthermore, given the frivolity of the underlying claim, petitioner cannot demonstrate that his attorney's inaction caused his trial to be fundamentally unfair or unreliable. Accordingly, he has no Sixth Amendment claim. The Court of Criminal Appeals' resolution of this claim is neither contrary to nor an unreasonable application of *Strickland* or *Fretwell.* This claim is without merit.

### 5. *Inadequate Cross–Examination of Expert Witnesses*

Petitioner claims that his counsel conducted an inadequate cross-examination of the expert medical witnesses so as to demonstrate that: he was insane, that mitigating evidence existed; and that each expert's opinion failed to consider relevant medical evidence, including the records of petitioner's medical history. Claim XX.6 (Petition, ¶ 33(e)). The Court of Criminal Appeals rejected this claim.

 The facts in this case provide no support for petitioner's claim of insanity and the petitioner's argument regarding mitigation is based on his mischaracterization of his medical history. Far from providing proof of mitigation, petitioner has simply presented a laundry list of medical conditions and labeled them as reasons for not imposing the death sentence. Unlike other cases involving actual mitigation, however, such as the *Glenn* case cited in petitioner's Reply Brief, counsel here did conduct a thorough investigation and weighed what evidence would be useful or not useful in demonstrating mitigation. Furthermore, counsel specifically articulated this reasoning at the post-conviction hearing. Most importantly, the medical evidence petitioner now claims should have been used to cross-examine the medical experts was determined to be only generally relevant to an understanding of petitioner's overall mental abilities. In *Glenn,* by contrast, medical evidence left undeveloped in a capital case charging the defendant with murdering a deputy while breaking his older brother out of the county jail included: extensive testimony concerning Glenn's "global" brain damage, expert testimony that Glenn could not have invented the fatal escape scheme and was completely under the influence of his older brother, and, most notably, counsel's complete failure to pursue appointment of defense medical experts until nine days before the *sentencing hearing.* As discussed fully already, petitioner was the beneficiary of over one year of psychiatric examination, evaluation, and treatment.· His attorneys clearly made conscientious strategic and tactical decisions regarding what evidence was useful and helpful to petitioner, and what areas should be left alone or explored a little less thoroughly to avoid the risk of further damaging testimony. *Glenn* is simply not comparable. The facts do not support petitioner's arguments that consideration of the additional medical history would have had any effect on the expert's testimony or the jury's ultimate decision. He has failed to demonstrate either that these decisions amounted to deficient performance or any reasonable probability that the result of the sentencing hearing would have been a life sentence, so as to undermine confidence in the reliability of the death sentence. The State Court's resolution of this claim is neither contrary to nor an unreasonable application of *Strickland* and *Fretwell.* This claim is without merit.

### 6. *Inadequate Presentation of Mitigating Evidence*

Petitioner claims that his counsel failed to present all available mitigating evidence during the penalty phase. Claim XX.13 (Petition, ¶ 33(1)). This claim is similar to the previous claim in that it rests primarily on petitioner's belief that further evidence

of his medical history would have turned the tide at the sentencing hearing. Counsel made strategic and tactical choices regarding the presentation of further medical evidence at the sentencing hearing, and the expert witnesses who testified at the post-conviction hearing indicated clearly that this evidence would not have caused them to change their conclusion regarding the petitioner. The State Court's resolution of this claim is neither contrary to nor an unreasonable application of *Strickland* and *Fretwell*. This claim is without merit.

### 7. *Inadequate Closing Argument*

Petitioner claims that his counsel failed to "make a forceful closing argument" during the penalty phase. Claim XX.14 (Petition, ¶ 33(1)). In actuality, this is simply a derivative argument of petitioner's arguments regarding presentation of the additional medical evidence, and it equally unpersuasive as a claim that the trial was fundamentally unfair and unreliable under the Sixth Amendment. In particular, petitioner simply presents no specific way in which counsel should have argued the case differently, much less any argument that would have created a reasonable probability that the jury would not have sentenced him to death. Petitioner simply cannot demonstrate any prejudice and has no claim under *Strickland* or *Fretwell*. Consequently, the Court of Criminal Appeals' rejection of this claim (embedded within the rest of its Sixth Amendment analysis), is neither contrary to nor an unreasonable application of either case. This claim is without merit.

### 8. *Failure to Raise Insufficient Evidence*

Petitioner claims that his counsel failed to raise a defense that the evidence of premeditation and deliberation was insufficient. Claim XX.18 (Petition, ¶ 33(p)). Petitioner made a perfunctory and conclusory presentation of these claims in his brief on appeal from the denial of his post-conviction petition. Addendum 30 at 39.

The Court of Criminal Appeals' rejection of his Sixth Amendment ineffective assistance of counsel claims encompasses this claim. This Court has already conducted an exhaustive analysis of the underlying constitutional claims and found them to be utterly without foundation. Petitioner cannot demonstrate that his attorney's inaction either constituted deficient performance or caused his trial to be fundamentally unfair or unreliable so as to amount to prejudice under *Strickland* or *Fretwell*. Accordingly, he has no Sixth Amendment claim. The Court of Criminal Appeals' resolution of these claims is neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court. This claim is without merit.

### 9. *Failure to Challenge Constitutionality of Tennessee Death Penalty Statute*

Petitioner claims that his counsel failed to challenge the constitutionality of the Tennessee Death Penalty as applied to him. Claim XX.25 (Petition, ¶ 33(v)). Petitioner made a perfunctory and conclusory presentation of this claim in his brief on appeal from the denial of his post-conviction petition. Addendum 30 at 39. The Court of Criminal Appeals' rejection of his Sixth Amendment ineffective assistance of counsel claims encompasses this claim. Again, as with other claims, this Court has already rejected the underlying constitutional claim as utterly without foundation. Petitioner cannot demonstrate that his attorney's inaction either constituted deficient performance or caused his trial to be fundamentally unfair or unreliable so as to amount to prejudice under *Strickland* or *Fretwell*. Accordingly, he has no Sixth Amendment claim. The Court of Criminal Appeals' resolution of these claims is neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court. This claim is without merit.

10. *Failure to File a Petition for Rehearing on Direct Appeal*

Petitioner claims that his counsel failed to file a petition for rehearing on direct appeal, based on the Tennessee Supreme Court's improper characterization of Dr. Marshall's testimony. Claim XX.26 (Petition, ¶ 33(w)). The Court of Criminal Appeals concluded that petitioner failed to demonstrate any prejudice from counsel's inaction. *Alley*, 958 S.W.2d at 151.

Rule 39 of the Tennessee Rules of Appellate Procedure provided the remedy petitioner claims his counsel should have invoked. Rule 39(a) states, in pertinent part, "[r]ehearing may be granted by the Supreme Court ... on petition of a party. In determining whether to grant a rehearing, the following, while neither controlling nor fully measuring the Court's discretion, indicate the character of reasons that will be considered ...." From this plain language it is clear that there is no right to seek rehearing, but that the grant of rehearing lies completely within the appellate court's discretion.

 Accordingly, this claim is not cognizable as a Sixth Amendment claim. The Sixth Amendment does not guarantee effective assistance in pursuing motions for rehearing after denial of a direct appeal. "[T]he right to appointed counsel extends to the first appeal of right, and no further." *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). Thus, the failure of petitioner's counsel to seek rehearing before the Tennessee Supreme Court cannot constitute ineffective assistance of counsel in violation of the Sixth Amendment. *Cf. Coleman*, 501 U.S. at 752, 111 S.Ct. 2546; *Kinsey v. State*, 545 So.2d 200, 203 (1989)(citing *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)), which held that the Equal Protection Clause does not require states to provide indigent defendants with state-compensated counsel to pursue discretionary appeals beyond the first appeal as of right, and *Coleman*, and holding that Sixth Amendment does not guarantee right to effective assistance of counsel during motion for rehearing under Ala. Rules of App. Proc. 39.

Even if this claim is a cognizable Sixth Amendment claim, however, it is devoid of merit. As with so much of this petition, the claim rests on a misinterpretation of the facts. This claim originated during the first post-conviction hearing, Addendum 22 at 58, when Mr. Jones expressed his belief, without citation to the trial record, that the testimony of Dr. Marshall differed from the description by the Tennessee Supreme Court, in that Jones remembered Dr. Marshall testifying that one of petitioner's alternate personalities was in control at the time of the offense, supporting a defense of insanity. The Supreme Court stated that Dr. Marshall "was unable to say that a personality other than 'Sedley' was in control at the time of the offense." *Alley*, 776 S.W.2d at 510. A review of Dr. Marshall's trial testimony, which petitioner fails to cite, confirms that Mr. Jones' memory was in error. *See* Addendum 12 at 1001–02, 1084, 1088, 1108–10.

Dr. Marshall testified that there was some evidence that another personality was in control, *Id.* at 1108, and that "if" another personality was in control, it was "doubtful" that Sedley was in control. *Id.* at 1109. He then made the statement, "[a]pparently, the other personality, whichever one it was, whether it was Billie or Power, was in full control, and Sedley didn't have anything to say about it." *Id.* This qualified statement is not the equivalent of a clearly expressed expert opinion that a specific other personality controlled petitioner's actions, and the Tennessee Supreme Court's characterization of the evidence, while less than perfectly precise, is not improper.

This level of imprecision demonstrates that the error, if any, was not of constitutional dimension. The critical issue here is not the accuracy *vel non* of the reviewing court's evidentiary description, but whether the accuracy of the description

materially altered the Court's resolution of a factual issue so as to cause the Court's resolution of any of petitioner's appellate claims to be "contrary to or an unreasonable application of clearly established federal law". Examined in this light, this claim is devoid of merit. The Supreme Court described Dr. Marshall's testimony as part of its detailed summary of the trial testimony relevant to its determination that the prosecution carried its burden to prove beyond a reasonable doubt that the petitioner was sane. For purposes of federal habeas relief, it is clear that the jury discounted this testimony, however the Tennessee Supreme Court described it, and rejected his insanity defense. The jury's decision was supported by overwhelming evidence, and the petitioner has completely failed to demonstrate that the decision resulted from error of constitutional dimension.

Finally, as to this issue, even if the description amounted to an error it was clearly harmless under the previously enunciated *Brecht* standard. Accordingly, the Tennessee Court of Criminal Appeal's decision that counsel was not ineffective for failing to file a petition for rehearing based on this evidentiary dispute is neither contrary to nor an unreasonable application of *Strickland* or *Fretwell*. This claim is devoid of merit.

Accordingly, as all of the petitioner's claims are plainly devoid of substantive merit, disposition of this petition without an evidentiary hearing is proper. Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts. This petition is therefore DISMISSED. Petitioner's motion for oral argument is denied.

## E. *APPEAL ISSUES*

### I. *Certificate of Appealability*

The Court must also determine whether to issue a certificate of appealability. Twenty-eight 28 U.S.C. § 2253(c) provides:

(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

■ *Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063, 1073 (6th Cir.1997), held that district judges may issue certificates of appealability under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, Title I, § 102, 110 Stat. 1220 (Apr. 24, 1996). The Court also held that the AEDPA codifies in amended § 2253 the standard for issuing a certificate of probable cause found in prior § 2253, which was essentially a codification of *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). *See Lyons*, 105 F.3d at 1073.

[P]robable cause requires something more than the absence of frivolity ... and the standard for issuance of a certificate of probable cause is a higher one than the 'good faith' requirement of § 1915.... [A] certificate of probable cause requires petitioner to make a substantial showing of the denial of [a] federal right. [A] question of some substance, or a substantial showing of the denial of [a] federal right, obviously [does not require] the petitioner [to] show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner;

or that the questions are adequate to deserve encouragement to proceed further.

*Barefoot*, 463 U.S. at 893, 103 S.Ct. 3383 (internal quotations and citations omitted). In this case, for the reasons discussed above, the petitioner's claims are clearly devoid of substantive merit, and he cannot present a question of some substance about which reasonable jurists could differ. The Court therefore denies a certificate of appealability.

## II. *In Forma Pauperis Appeal*

Also regarding any appeal, the United States Court of Appeals for the Sixth Circuit has held that the Prison Litigation Reform Act of 1995 (PLRA), 28 U.S.C. § 1915(b), does not apply to appeals of orders denying § 2254 petitions. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997). *Cf. McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir.1997) (instructing courts regarding proper PLRA procedures in prisoner civil-rights cases). Rather, to seek leave to appeal *in forma pauperis* in a § 2254 case, and thereby avoid the $105 filing fee required by 28 U.S.C. §§ 1913 and 1917,[53] the petitioner must seek permission from the district court under Rule 24(a) of the Federal Rules of Appellate Procedure (F.R.A.P.). *Kincade*, 117 F.3d at 952. If the motion is denied, the petitioner may renew the motion in the appellate court.

■ F.R.A.P. 24(a) states, in pertinent part that:

A party to an action in a district court who desires to proceed on appeal *in forma pauperis* shall file in the district court a motion for leave to so proceed, together with an affidavit, showing, in the detail prescribed by Form 4 of the Appendix of Forms, the party's inability

to pay fees and costs or to give security therefor, the party's belief that that party is entitled to redress, and a statement of the issues which that party intends to present on appeal.

The Rule further requires the district court to certify in writing whether the appeal is taken in good faith, and to deny the certificate if the appeal would be frivolous. In this case, for the same reasons that the Court denied a certificate of appealability the Court determines that any arguments he might present on appeal to the contrary would lack even arguable merit. The Court thus determines that any appeal in this case would not be taken in good faith. It is therefore certified, pursuant to F.R.A.P. 24(a), that any appeal in this matter by this petitioner is not taken in good faith and he may not proceed on appeal *in forma pauperis*.

## III. *Vacation of Stay of Execution*

The petitioner's execution was previously stayed pursuant to 28 U.S.C. § 2251. As the petition is devoid of merit and as petitioner is not entitled to a certificate of appealability, there is no longer a habeas petition pending within the meaning of that section. Accordingly, petitioner can no longer demonstrate entitlement to a stay of execution, and the stay is vacated.

## ORDER DENYING MOTION TO ALTER OR AMEND ORDER DENYING CERTIFICATE OF APPEALABILITY AND ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

Petitioner, Sedley Alley, is confined as an inmate on death row at the Riverbend Maximum Security Facility in Nashville, Tennessee. Alley filed a series of motions

---

**53.** The fee for docketing an appeal is $100. *See* Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

Upon the filing of any separate or joint notice of appeal or application for appeal or

upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant or petitioner.

related to his capital murder conviction and death sentence in the United States District Court for the Middle District of Tennessee. In preparation for filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254, Alley filed a motion for stay of execution under 28 U.S.C. § 2251, a motion under 28 U.S.C. § 1915 to proceed *in forma pauperis* in filing the habeas petition, and affidavit in support of the § 1915 motion, and an application under 21 U.S.C. § 848(q) for appointment of counsel to prepare and file a § 2254 habeas petition.

The Middle District Court granted a stay of execution, granted leave to proceed *in forma pauperis*, and transferred the petition to this District. This Court appointed counsel for Alley, and counsel filed a habeas petition and two subsequent amendments. The state filed answers to the petition and both amendments and filed the complete state court record with the Court. The Court previously entered a number of orders, including one holding inapplicable Chapter 154 of Title 28 of the United States Code, enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, Title I, § 102, 110 Stat. 1220 (Apr. 24, 1996), and one holding Chapter 153 of Title 28, as amended by the AEDPA, applicable to this petition. On November 4, 1999, the Court entered a detailed order denying all of petitioner's claims, dismissing the petition, denying a certificate of appealability, certifying that any appeal would not be taken in good faith, and vacating the stay of execution.[1] On November 15, 1999, the Court entered judgment on the order of dismissal. On November 29, 1999, the petitioner filed a motion to alter or amend the judgment under Rule 59(e), a motion for leave to proceed *in forma pauperis* on appeal under F.R.A.P. 24(a), and a motion for a certificate of appealability under 28 U.S.C. § 2253.

The Court's first concern is the successive petition limits of 28 U.S.C. § 2244(b). The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, Title I, § 102, 110 Stat. 1220 (Apr. 24, 1996), amended 28 U.S.C. § 2244(b) to preclude the filing of any subsequent habeas petition absent permission from the Court of Appeals for the Circuit in which the district court is located. Under *In re Sims*, 111 F.3d 45, 47 (6th Cir.1997), "when a second or successive ... § 2255 motion is filed in the district court without § 2244(b)(3) authorization from [the Sixth Circuit], the district court shall transfer the document to this court pursuant to 28 U.S.C. § 1631."

Under § 2244(b)(3), if Alley's motion to alter or amend is the functional equivalent of a successive petition it cannot be brought under Rules 59(e) or 60 of the Federal Rules of Civil Procedure without permission from the Court of Appeals.

> [A] post-judgment motion under Fed. R.Civ.P. 60(b) in the district court ... is a "second or successive" application for purposes of 2244(b) .... Otherwise the statute would be ineffectual. Instead of meeting the requirements of § 2244(b), the petitioner would restyle his request as a motion for reconsideration in the initial collateral attack and proceed as if the AEDPA did not exist.

*Burris v. Parke*, 130 F.3d 782, 783 (7th Cir.1997)(holding that a motion to recall a mandate denying a habeas petition is the "functional equivalent of a second or successive petition for habeas corpus" and must be evaluated under § 2244(b)). *See also Ruiz v. Norris*, 104 F.3d 163, 164 (8th Cir.1997)(same); *Mathenia v. Delo*, 99 F.3d 1476, 1480 (8th Cir.1996)(in pre-AEDPA case, a Rule 60 motion was properly construed as a second petition for habeas relief only reviewable under successive petition standards); *United States v. Stanley Anderson*, Misc. No. 97–26–G (W.D.Tenn.

---

1. The Court notes, however, that the Tennessee Supreme Court has not set an execution date for the petitioner.

July 29, 1997)(transferring motion to set aside dismissal of § 2255 motion to appellate court under *Sims* ), *on review under § 2244(b)*, *In re Anderson*, No. 97–0585 (6th Cir. Feb. 6, 1998)(denying motion for permission to file successive motion). *Cf. Alexander v. United States*, 121 F.3d 312, 313–14 (7th Cir.1997)(denying leave to mount fourth collateral challenge to federal criminal conviction and holding that "[r]ejected justifications may not be reiterated in a successive motion for leave to file.").

As explained *infra*, petitioner's Rule 59(e) motion does reiterate some claims rejected in the Court's order of dismissal. This character places it within the category of cases formerly proscribed by the "successive petition" doctrine. *See generally Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Lonberger v. Marshall*, 808 F.2d 1169, 1173–74 (6th Cir.1987). The Courts should not ignore Congress' clear expression in § 2244(b) of its intent to prevent duplicative litigation of habeas claims, weighing in favor of simply transferring this motion to the Sixth Circuit under *Sims*.

■■■ There is another side to the argument, however. As explained in *Van Skiver v. United States*, 952 F.2d 1241, 1244 (10th Cir.1991), arguments that challenge the legal correctness of a district court's order of dismissal, are properly cognizable under Rule 59(e). *See Smith v. Evans*, 853 F.2d 155, 159 (3d Cir.1988) (motion that "alleges no more than legal error and merely reiterates the arguments contained in the complaint" is a Rule 59(e) motion). The plain text of Rule 59(e) appears to support use of the motion, if in fact the Court should apply this one of the Rules of Civil Procedure to habeas petitions.[2]

■■■ There are instances—(the Court could cite any of the plethora of frivolous *pro se* habeas petitions that have proliferated in this district since passage of the AEDPA, a dramatic demonstration of the law of unintended legislative consequences, but further evidence would gild the lily)— in which the filing of a Rule 59(e) motion causes a waste of scarce judicial resources by the senseless rehashing of frivolous arguments. This is particularly so when a petitioner with no knowledge or grasp of habeas jurisprudence or procedure seeks to utilize a Rule 59(e) motion as a substitute for an appeal, since no filing fee attaches to the motion. Petitioner, as explained below, does tread perilously close to this edge in his motion. In this case, and very likely in virtually all death penalty cases, however, petitioner is not only represented by competent counsel, but is obviously going to seek appellate review. Transferring a true Rule 59(e) motion, (one that raises no new claims but merely questions the merits of the initial order of dismissal), would merely result in duplicative appeals, a result that is contrary to the very interests that § 2244(b) serves to protect. Accordingly, a practical approach to application of the Rule should prevail over a merely technical analysis of the Rule's relationship to the statute. Furthermore, in this case, in which the Court's order of dismissal contains an error of fact, (though not one that changes in any way the ultimate outcome), the Court should have the authority to correct the error.[3] The Court will therefore consider the merits of the Rule 59(e) motion.

Rule 59(e), Federal Rules of Civil Procedure, states: "A motion to alter or amend the judgment shall be served not later

**2.** Fed.R.Civ.P. 81(a)(2) states: "These rules are applicable to proceedings for … habeas corpus … to the extent that the practice in such proceedings is not set forth in statutes of the United States …." Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts states: "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules,

may be applied, when appropriate, to petitions filed under these rules."

**3.** The Court pretermits as unnecessary any analysis of the relationship between Rule 60 and § 2244(b), which was the focus of the cited caselaw, *supra*.

than 10 days after entry of the judgment." Under Rule 6(a), periods of time less than eleven days are counted by excluding weekends and holidays, and under Rule 6(e), when a party receives a paper through the mail, the period of time for acting is extended by three days. Therefore the last day for filing a Rule 59(e) motion to alter or amend the court's November 15 judgment was Friday, December 3, 1999. Petitioner's motion is, therefore, timely.

Consideration of the motion to alter or amend does not require detailed recitation of either the procedural history or the petitioner's numerous claims, all of which have already been exhaustively discussed in the order of dismissal, familiarity with which is presumed. It suffices to note very briefly that in March of 1987, a Shelby County, Tennessee, Criminal Court jury convicted petitioner of kidnapping, raping, and murdering United States Marine Corps Lance Corporal Suzanne Marie Collins, and sentenced him to death by electrocution. The Tennessee Supreme Court affirmed the conviction and sentence. *State v. Alley*, 776 S.W.2d 506 (Tenn.1989), and a long series of collateral attacks on the conviction and death sentence ensued, culminating in the Court's November 4 order.

■ The motion to alter or amend argues that the court erroneously rejected

his claim of judicial bias based on a mistaken view of the facts. Petitioner points out, correctly, that the order stated that the petitioner presented no evidence that Judge Axley gave private instructions to the jury. Order at 617–618. Petitioner points out that although his petition did not mention this evidence, that his motion for an evidentiary hearing was supported by an affidavit from one juror alleging that Judge Axley several times entered the room in response to the jury's signal, and "answered two or three questions," including one regarding the difference between lesser-included murder charges. The Court corrects itself: the petitioner did present juror Anne Marie Overstreet's affidavit stating that Judge Axley answered juror's questions in the jury room after the jury began deliberations. The difficulty with the claim as a basis for a Rule 59(e) motion, however, is that this is simply another instance of *judicial* conduct, not an act that supports a claim of bias.

■ As the Order of Dismissal explained at far more length than was probably necessary, Order at 614–619, 634–638, a claim of bias cannot be founded merely on erroneous trial court actions. The juror's affidavit is, accordingly, irrelevant. Adding it to the body of irrelevant evidence discussed in the Order gets petitioner no closer to the top of this mountain.[4]

4. The Court also notes, with regret, that petitioner chose to include in his motion yet another reference to Judge Axley's conversation with two law school students, the assertion that one of them was working for the prosecutor's office, and a repetition of a minor vulgarity by which Judge Axley referred to the petitioner following his conviction. Those conversations had nothing to do with the jury contact claim. Indeed, as the Court explained, Order at 617, the conversation took place *after* the jury returned its verdict. Furthermore, the Court already admonished counsel that the attempt to demonize Judge Axley by alleging that this conversation constituted evidence of a conspiracy with the prosecutor was reprehensible. As the Court has already explained in detail in analyzing these claims, this incident is not a factual

basis for the existence of such a conspiracy, and does not support petitioner's claim of judicial bias. Pointing out that the Court overlooked an item of evidence, even an irrelevant item, is permissible. Continuing to highlight an item of irrelevant evidence after an admonition that the inference sought to be drawn is improper leaves the Court with the unfortunate impression that counsel is making an unethical attempt to vilify the state court judge, and to highlight this particular allegation on appeal. Counsel may consider the state court judge's comment derogatory, but it has never been an example of extrajudicial or personal bias, and has never supported petitioner's claim that he was thereby deprived of due process. Counsel is simply not aiding petitioner's cause by his Sisyphean repetition of this claim.

Furthermore, petitioner does not contend that this item of evidence supports an independent claim of a Sixth Amendment violation or that it in any way affected the outcome of his trial and deprived him of due process. Given the overall vagueness of the affidavit, and the innocuous nature of the question,[5] such a claim would be patently frivolous.

More significantly for purposes of Rule 59(e) review, no claim based on this item of evidence was ever presented to the state courts. Accordingly, all claims derived from it, regardless of the constitutional basis asserted, are procedurally defaulted. The November 4 order of dismissal was based on that default, not on the merits of the claim. Accordingly, the Court's factual mistake provides no basis for Rule 59(e) relief.

Petitioner's attempt to avoid his procedural default by the assertion that state post-conviction counsel could not have been expected to discover this evidence is utterly devoid of merit, for the same reasons as discussed in the Order of Dismissal itself.

■ Moreover, petitioner's contention that this evidence makes the bias claim sufficiently similar to *Porter v. Singletary* to justify an evidentiary hearing is devoid of merit. As fully explained in the Order of Dismissal, at 614, 617, *Porter* involved late-discovered evidence of an act of clearly extra-judicial and personal bias. Overstreet's affidavit does not contain *any* evidence of bias, merely of a deviation from the requirements for instructing jurors during deliberations, and it describes that deviation so vaguely that the deviation cannot be identified as even remotely affecting the outcome of the trial. A petitioner is not entitled to an evidentiary hearing to fish for evidence of cause and prejudice to justify a procedural default. He must first demonstrate the cause and prejudice to obtain an evidentiary hearing to develop the procedurally defaulted claim. There is no point in conducting an evidentiary hearing here, because petitioner admits that it was his post-conviction counsel's failure to develop this evidence that caused the procedural default. The Order of Dismissal fully explained that *Coleman v. Thompson* bars this type of argument. Further discussion here is superfluous.

Petitioner argues that the court erroneously rejected his claim that the state trial court's sentencing-phase exclusion of the sodium-amytal and hypnosis videotapes from evidence deprived him of the right to present mitigating evidence. As explained in the Order of Dismissal, at 640, petitioner's trial counsel originally developed a trial strategy whose linchpin was an item of inadmissible evidence. Left with little alternative, petitioner continues to insist that the nature of this evidence is critical, relevant, and admissible evidence of the petitioner's state of mind. The problem petitioner has faced ever since the original state court trial, however, is that this view of the evidence is not founded in fact. As the Court explained in the Order of Dismissal at 639–640, the videotapes did not relate to petitioner's emotional or mental state at the time of the murder—they merely related to his mental and emotional state at the time of the videotaped sessions. Accordingly, petitioner's laundry list of the types of mitigating evidence admitted under Tennessee law is just that—an abstract list that is inapplicable to this case.

Petitioner is, again, also wrong as to the law. Petitioner chides the Court for ignoring his citations, particularly to *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57

---

**5.** What "lesser included" charges petitioner thinks were considered is not clear. In any event, given the overwhelming evidence of first degree murder to the exclusion of any other form of homicide, petitioner's focus on differences between, for instance, second-degree murder and manslaughter seems incongruous. This is not to approve of a judge giving ex parte instructions to a jury, but merely to point out that here, as with the rest of petitioner's case, evidence of a *constitutional* violation is simply not forthcoming.

L.Ed.2d 973 (1978). The Court did not discuss *Lockett*, however, because it is irrelevant. The issue is not whether there is a right to present mitigating evidence, or whether the state trial court infringed on petitioner's right—the issue is whether a defendant facing the death penalty may introduce mitigating evidence at the sentencing phase without regard to the evidence's admissibility under state law. That is the proposition for which there is no authority, and petitioner's motion merely confirms this by, again, not citing any authority that he had the right to introduce evidence despite its inadmissibility under state law. Petitioner's motion merely rehashes his prior arguments, which the Order of Dismissal fully considered and found to be devoid of even arguable merit.

■ The motion for a certificate of appealability under 28 U.S.C. § 2253(c) attempts to obtain a certificate as to a number of claims. Although not listed first in his motion, the Court notes that petitioner seeks a certificate of appealability on the issue of applicability of Chapter 153 of the AEDPA. This request misapprehends the nature of the inquiry under § 2253(c). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2). Application of Chapter 153, however, cannot deny petitioner a constitutional right because a ruling on what law governs federal habeas review is not itself a resolution of a claim that his conviction is infected by constitutional error. The Court, therefore, can neither issue nor deny a certificate of appealability as to the applicability of Chapter 153.

Insofar as petitioner's motion should be construed as an argument that he should be permitted to proceed *in forma pauperis* in seeking review of this Court's decision that Chapter 153 applies to his petition, his motion is devoid of even arguable merit. *See Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

As explained in this Court's Order finding Chapter 153 applicable:

> In habeas jurisprudence, the event or conduct that is affected by retroactive legislation is not the pursuit of collateral post-conviction remedies in any court, but the original criminal conduct that triggered prosecution and sentence. *See Lindh,* 117 S.Ct. at 2059–60 (Rehnquist, J. dissenting)("the primary conduct occurred when Lindh murdered two people"). As Justice Rehnquist explains, the state proceedings were secondary conduct. *Id. Landgraf* retroactivity analysis is simply inapplicable.

A review of the cases petitioner cites reveals neither any reasoning contradicting the Court's original analysis in any way nor the slightest support for petitioner's contention that the AEDPA cannot constitutionally be applied to his habeas claims. Accordingly, this motion is DENIED.

Turning to petitioner's request for a certificate of appealability as to specific constitutional claims that his conviction and sentence should be set aside, he first seeks a certificate as to the same claims on which he sought reconsideration of the Court's order of dismissal. For the reasons discussed previously in the order of dismissal and now in this order, those claims are not only devoid of merit, but are so devoid of merit that reasonable jurists could not differ as to their lack of merit. They do not deserve encouragement to proceed further.

Petitioner also attempts to rehash the Court's denial of a certificate as to specific claims relating to various jury instructions, and generally to all of his claims. The arguments in the motion require no further refutation than citation to the Order of Dismissal. As to all of those claims, the Court declines to reconsider its order denying a certificate of appealability.

■ One claim requires very brief mention. Petitioner contends that his claim that electrocution is cruel and unusual punishment deserves encouragement to

proceed further because the Supreme Court has granted certiorari on this question in *Bryan v. Moore*, —— U.S. ——, 120 S.Ct. 394, 145 L.Ed.2d 306 (1999). Petitioner misapprehends the relative role of a District Court as opposed to the United States Supreme Court. As explained in the Order of Dismissal, arguments that electrocution is cruel and unusual are foreclosed by precedent binding on this Court. The Supreme Court may have the authority to reconsider its precedents, this Court does not. The motion requires no further discussion or analysis.

Accordingly, for the reasons discussed in the Order of Dismissal and in this Order, the motion for a certificate of appealability is **DENIED**. For the same reasons, the Court reiterates its previous decision that leave to proceed *in forma pauperis* is also **DENIED**.